Nader Mobargha
Michael P. Beys
BEYS LISTON & MOBARGHA LLP
641 Lexington Avenue, 14th Floor
New York, New York 10022
(646) 755-3603
nmobargha@blmllp.com
mbeys@blmllp.com
*Attorneys for Defendant Azadeh Nasser Azari*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>WANSDOWN PROPERTIES<br>CORPORATION, N.V.,<br>　　　　　　　　　Debtor. | Chapter 11<br><br>Case No. 19-13223-smb |
| WANSDOWN PROPERTIES<br>CORPORATION, N.V.,<br>　　　　　　　　Plaintiff,<br>　　- against -<br>AZADEH NASSER AZARI,<br>　　　　　　　　Defendant. | Adv. Pro. No. 19-1450-smb<br><br>**NOTICE OF MOTION TO**<br>**DISMISS AMENDED COMPLAINT** |

PLEASE TAKE NOTICE that upon the Memorandum of Law in Support of Azadeh Nasser Azari's Motion To Dismiss The Debtor's Amended Complaint Under Federal Rule of Bankruptcy Procedure 7012 and Federal Rule of Civil Procedure 12(b)(6), and its attached exhibits, Defendant Azadeh Nasser Azari will move, before the Honorable Stuart M. Bernstein, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, Courtroom 723, on April 14, 2020 at 10:00 a.m., to dismiss the Amended Complaint, dated January 6, 2020, with prejudice, under Federal Bankruptcy Civil Procedure 7012 and Federal Rule of Civil Procedure Rule 12(b)(6), and for such other and further relief as the Court deems just and proper.

PLEASE TAKE FURTHER NOTICE that, according to a schedule approved by the Court at the January 23, 2020 hearing, the Debtor's opposition must be served by March 11, 2020, and Defendant's reply by March 25, 2020.

Dated: February 11, 2020

Respectfully submitted,

_____/s/_____
Nader Mobargha
Michael P. Beys
BEYS LISTON & MOBARGHA LLP
641 Lexington Avenue, 14th Floor
New York, New York 10022
(646) 755-3603
nmobargha@blmllp.com
mbeys@blmllp.com
*Attorneys for Defendant Azadeh Nasser Azari*

Nader Mobargha
Michael P. Beys
BEYS LISTON & MOBARGHA LLP
641 Lexington Avenue, 14th Floor
New York, New York 10022
(646) 755-3603
nmobargha@blmllp.com
mbeys@blmllp.com
*Attorneys for Defendant Azadeh Nasser Azari*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>WANSDOWN PROPERTIES<br>CORPORATION, N.V.,<br>               Debtor. | Chapter 11<br><br>Case No. 19-13223-smb |
| WANSDOWN PROPERTIES<br>CORPORATION, N.V.,<br>               Plaintiff,<br>    - against -<br>AZADEH NASSER AZARI,<br>               Defendant. | Adv. Pro. No. 19-1450-smb |

**DEFENDANT AZADEH NASSER AZARI'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS DEBTOR'S AMENDED COMPLAINT IN ITS ENTIRETY UNDER FEDERAL BANKRUPTCY RULE 7012 AND FEDERAL RULE OF <u>CIVIL PROCEDURE 12(B)(6)</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT…………………………………………...…………………1

STATEMENT OF FACTS……………………………………………………………….5

ARGUMENT…………………………………………………………………………15

I.      The Pleading Standards for a Motion to Dismiss a Claim Under
        544(b) of the Code ……………………………………………………..15

II.     The Debtor Fails to Allege a Single Fact to Support
        Its Claims Under Sections 274 and 275 of the New York
        Debtor and Creditor Law………………………………………………………16

III.    The Debtor Fails to State a Basis to Void the Judgment……………………………19

        A. Under Second Circuit Law, Bankruptcy Courts Must
           Respect Lawfully-Obtained Judgments And The
           Factual Findings Of State Courts ……………………………………………..19

        B. The Judgment Entry Was For Fair Consideration Since It Was To
           Repay An Antecedent Debt…………………………………………………...21

        C. The Debtor's Admissions And Public Records Show That It Was Solvent……..23

IV.     The Debtor Also Fails to State a Basis to Void the Pension Obligation ………..........25

        A. Debtor Admits Under Oath That There Was Consideration
           For The Pension Obligation………..........……….........………........……….......26

        B. The Debtor Does Not Even Allege – In A Conclusory Fashion – That It Was
           Insolvent When It Incurred The Pension Obligation………........………..........27

V.      Without a Viable Claim Under the DCL §§ 273, 274, and 275, Debtor's Claims
        Under §§ 278 and 279 Should Also Be Dismissed ………........………....................28

VI.     The Debtor's Claim Under Sections 502(b) and 502(d) Also Must Fail……………29

CONCLUSION……………………………………………………………………..29

**TABLE OF AUTHORITIES**

Page

**Cases**

*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937 (2009)..…………………………………….....16

*Atlanta Shipping Corp. Inc. v. Chemical Bank,* 818 F.2d 240 (2d Cir. 1987)…………………….21

*Azadeh N. Azari v. Wansdown*, Index No. 652137/2016…………………………………………….10

*In re Musicland*, 424 B.R. 95 (Bankr. S.D.N.Y. 2010) …………………………………………….15

*In re Bernard L. Madoff Securities*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016)…………………...15, 16

*In re Cohen*, 92 B.R. 54 (Bankr. S.D.N.Y. 1988)…………………………………………………...20

*In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279 (Bankr. S.D.N.Y. 1990)………………….15

*In re Direct Access Ptrs LLC,* 602 B.R. 495 (Bankr. S.D.N.Y. 2019)………………………….19

*In re Dreier,* 462 B.R. 474 (Bankr. S.D.N.Y. 2011) …………………………………………….22

*In re Higgins,* 270 B.R. 147 (Bankr. S.D.N.Y. 2001) …………………………………………...20

*In re Hydrogen, L.L.C.*, 431 B.R. 337 (Bankr. S.D.N.Y. 2010)………………………………….29

*In re Musicland*, 424 B.R. 95 (Bankr. S.D.N.Y. 2010)………………………………………….15

*In re Operations NY LLC*, 490 B.R. 84 (S.D.N.Y. 2013)……………………………...17, 23, 25

*In re Trace Int'l Holdings, Inc.,* 301 B.R. 801 (Bankr. S.D.N.Y. 2003)………………………….22

*In re Wonderwork, Inc.,* No. 16-13607 (SMB), 2020 WL 261801
   (Bankr. S.D.N.Y. Jan. 20, 2020)…………………………………………………….17-18

*The Liquidation Trust v. Daimler AG,* 435 B.R. 169 (Bankr. S.D.N.Y. 2010)…………………….22

*Kelleran v. Andreijevic,* 825 F.2d 692 (2d. Cir. 1987)……………………………………………….20

*Kurana v. Wahed Invest, LLC,* No. 18-CV-233 (LAK) , 2020 WL 364794
   (S.D.N.Y. Jan. 8, 2020) …………………………………………………………………….21

*Kreuter v. Tsucalas*, 734 N.Y.S.2d 185 (2d Dep't. 2001)……………………………………….27

iii

*Movado Group, Inc. v. Presburg,* 687 N.Y.S.2d 116 (1st Dep't 1999)............................20

*N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513 (1984)..................................................20

*Official Comm. Of Asbestos Claimants of G-I Holding, Inc. v. Heyman,*
    277 B.R. 20 (Bankr. S.D.N.Y. 2002) ....................................................18-19

*Pashaian v. Eccelston Properties, Ltd.,* 88 F.3d 77 (2d. Cir. 1996) ............................21-22

*Sarama v. John Mee, Inc.,* 422 N.Y.S.582 (Civ. Ct. N.Y. Cty. 1979).............................27

*Secured Capital Ptrs, LLC v. Wansdown,* Index No. 150780/2018.....................................14

*The Liquidation Trust v. Daimler AG,* 435 B.R. 169 (Bankr. S.D.N.Y. 2010) .....................22

*Unscheid v. Sinnacher,* 106 A.D.2d 380 (2d Dep't 1984) ...........................................27

*Weiner v. McGraw-Hill, Inc.,* 457 N.Y.S.2d 193 (N.Y. 1982) ....................................20-21

*Whiteford Plastics v. Chase Nat'l Bank of N.Y.C.,* 179 F.2d 582 (2d Cir. 1950)....................15

## **Statutes/Rules**

11 U.S.C. § 544...............................................................................*passim*

11 U.S.C. § 502.........................................................................7, 15, 29

CPLR 3218 .............................................................................10, 11, 19

CPLR 5015...............................................................................10, 11, 19

N.Y. Gen. Oblig. Law § 5-1105 (McKinney 1989).......................................27

New York Debtor and Creditor Law § 273 ........................................2, 15, 19, 29

New York Debtor and Creditor Law § 274.............................................*passim*

New York Debtor and Creditor Law § 275.............................................*passim*

Defendant Azadeh Nasser Azari ("Ms. Azari") submits this memorandum of law in support of her motion to dismiss Plaintiff Wansdown Properties Corporation, N.V.'s (the "Debtor") Amended Complaint, filed January 6, 2020 ("Amended Complaint" or "Am. Compl."), under Federal Rule of Bankruptcy Procedure 7012 and Federal Rule of Civil Procedure 12(b)(6), with prejudice. Ms. Azari consents to entry of final orders or judgment by the bankruptcy court under Federal Rule of Bankruptcy Procedure 7012(b).

## PRELIMINARY STATEMENT

1. Four years ago, Gholam Reza Golsorkhi ("Golsorkhi"), the President and Managing Director of the Debtor for the past 40 years, executed a confession of judgment, dated February 10, 2016 ("Confession of Judgment" or "Judgment"), on behalf of the Debtor and Princess Achraf Pahlavi (the "Princess"), the twin sister of the late Shah of Iran who was deposed in the country's 1979 revolution, in Ms. Azari's favor. The Confession of Judgment memorializes years of promises that the Debtor and the Princess made to Ms. Azari about her pension after her employment with them ends ("the Pension Obligation"). The sworn Confession of Judgment does not just memorialize Ms. Azari's 49 years of service to the Princess since she was 19 years old, but also confirms the consideration for the pension – even using the term "consideration" – which was Ms. Azari's obligation to remain with, and continue working for, the Princess and the Debtor until her death. Ms. Azari complied with her obligations, and the Debtor returned the favor by waging a three-year litigation campaign after the Princess died to cheat Ms. Azari out of the promised Pension. The litigation included two attempts to vacate the Confession of Judgment, one by the Debtor and one by a beneficiary of its sole shareholder, Pelmadulla Stiftung ("Pellmadulla"). Both were unsuccessful, with the First Department and the Honorable Nancy M. Bannon of the Supreme Court of New York dismissing both actions at the pleading stage. The First Department held that Golsorkhi had the authority to

1

bind the Debtor when he made the promises to Ms. Azari and to confirm the debt in the Confession of Judgment, and that Ms. Azari did not engage in any misconduct in either the execution or the docketing of the Judgment. As such, the Debtor owes Ms. Azari her Pension, an obligation that the Debtor still has not accepted.

2.      Now, the Debtor has filed a third action to vacate the Judgment, this time claiming the action is on behalf of creditors under sections 273, 274, and 275 of New York Debtor and Creditor Law ("DCL"), made applicable through section 544(b) of the Bankruptcy Code (the "Code"). Specifically, the Debtor seeks to use these state statutes to vacate two different transfers, the docketing of the Confession of Judgment (the "Judgment Entry") and the Pension Obligation, which was the reason the Debtor signed the Confession of Judgment. The Debtor, however, fails to satisfy the basic pleading requirements to vacate the transfers under the DCL for the following reasons.

3.      First, the Debtor's claims under DCL §§ 274 or 275 fail because they violate the Supreme Court and this Court's pleading requirements by simply repeating the statutory language rather than alleging any facts. DCL § 274 claims require that the Debtor allege what "business or transaction it was about to engage in" when either transfer occurred, and which "creditors [became] creditors during the continuance of such business or transaction." Rather than allege facts to satisfy this statutory requirements, the Debtor simply recites the statute. Similarly, for its DCL § 275 claim, the Debtor fails to allege a single fact supporting its claim that, at the time of either the Pension Obligation or the Judgment, the Debtor "intend[ed] or believe[d] that [it] would incur debts beyond [its] ability to pay as they mature." If anything, public records show the opposite to be true. In 2016, when the Judgment was docketed, the Debtor listed its sole asset, a Townhouse located at 29 Beekman Place, New York, New York 10022 (the "Townhouse") for sale at $34 million. Even if the Debtor attempts to argue that in

hindsight this was not the true market value of the Townhouse, it shows that, at the time, the

Debtor believed that it had plenty of equity to pay its debts once the Townhouse was sold.

Regarding the Pension Obligation, the Debtor does not – and it cannot – allege that, when the

Debtor and Princess made the promises to Ms. Azari, years before the Confession of Judgment

when the Princess was alive and living in New York City, it intended to, or believed that it

would, incur debts beyond its ability to pay as they mature.   The Debtor cannot claim it must

wait for discovery to plead these basic facts since it is the Debtor – and nobody else – who

knows about its own business transactions and its intentions or beliefs about its debts.  In the

past, this Court has dismissed such DCL claims based on the same pleading deficiencies and

should do so now.

4.      <u>Second</u>, even if the Court were to look past the Debtor's failure to plead any facts

to supports its claim, the Debtor's DCL claims still fall short because it fails to satisfy the

elements of the statute, namely the Debtor's insolvency and a lack of consideration by Ms. Azari

for either the Pension Obligation or the Judgment Entry.

5.      The Second Circuit and this Court have held that it is well-settled law that the

payment of an antecedent debt satisfies the DCL's fair consideration requirement and precludes

an action under the DCL.  The Confession of Judgment simply memorializes the Pension

Obligation and its docketing only secured repayment of the Pension Obligation, an antecedent

debt.  Furthermore, in the Confession of Judgment, the Debtor admits – under oath – that Ms.

Azari gave consideration for her Pension:

> In consideration of her loyalty, competence, and diligence, and to keep Ms. Azari as the manager of Wansdown and a key employee of the Private Secretariat for years to come, on multiple occasions in [Golsorkhi's] presence, the Princess assured Ms. Azari that she would take care of Ms. Azari's future and that Ms. Azari's future would be set.

> Following the Princess' directive and wishes, [Golsorkhi], as the President and Managing Director of [the Debtor] and the Head of the Private Secretariat, assured Ms. Azari

several times that her future was set and that she should have no concerns about her financial security when she retires.   Specifically, [Golsorkhi] promised her that [the Debtor] and the Private Secretariat would pay her monthly salary for the remainder of her life.   The intention of this promise and pension was for Ms. Azari to maintain the same standard of living after her employment with [the Debtor] and the Private Secretariat ends.   Relying on these promises and assurances, Ms. Azari continued to work at [the Debtor] and continues so today.

[Golsorkhi] acknowledges and do[es] not dispute that [the Debtor] and the Private Secretariat owes Ms. Azari the Azari Pension…

6.     The Debtor even uses the talismanic word "consideration."   The Debtor's response to its own sworn statement is to contradict itself by arguing that the Pension Obligation was only for "prior loyalty", and therefore, there was no consideration.   This argument fails for two reasons.    First, the unambiguous terms of the sworn Confession of Judgment show that Ms. Azari did give "new" or "future" consideration when she relied on the promises of the Princess and the Debtor and remained at their service, and continued to work for them until the Princess's death.   Second, General Obligations Law § 5-1105 makes an exception to the rule that past consideration is no consideration when the past consideration is "expressed in writing and is proved or given or performed."   Here, the Debtor expresses the past consideration in writing, and also confirms, in writing, Ms. Azari's 49 years of unblemished service.  It is all there, in black and white, under oath.

7.     The Debtor also fails to adequately allege that it was insolvent either at the time of the Pension Obligation or the Judgment Entry.    It fails to allege the fair salable value of the Townhouse, or the amount of its liabilities, at the time of Judgment Entry.  It does not even provide estimates.   As such, the Debtor has no basis to claim it was insolvent.  In fact, Debtor's own admissions – specifically, its signature on a $17 million contract of sale in 2017– confirm that it was more than solvent.   Public records also confirm that, when the Debtor executed the Confession of Judgment in early 2016, it only had a $3 million mortgage and, when the

Judgment was docketed, its mortgage was raised to merely $5 million, leaving substantial equity. Even more significantly, the Debtor fails to allege a single statement, even a conclusory one, about *any* aspect of its financial condition when it incurred the Pension Obligation and promised Ms. Azari her pension.

8.      In short, Debtor's complaint fails on almost every level.   It fails to allege a single fact to support its DCL §§ 274 and 275 claims.  It fails to allege a lack of consideration for the Judgment Entry, since it was a payment of an antecedent debt.  It admits under oath that Ms. Azari gave consideration for her Pension Obligation.   It fails to allege any basis for its insolvency at the time of Judgment Entry, not even providing estimated values for its assets or liabilities.  If anything, its own admissions contradict its conclusory claim of insolvency. Finally, Debtor's Amended Complaint fails to allege – even in a conclusory way – that it was insolvent when it incurred the Pension Obligation.   Consequently, just like the state appellate and the trial court did, this Court should dismiss the Debtor's Amended Complaint in its entirety.

## STATEMENT OF FACTS

9.      The following facts are based on the Debtor's allegations, the Debtor's sworn admissions, and undisputed public records.

## I.      THE PARTIES

### a.  Plaintiff Debtor

10.      The Debtor is a Netherland Antilles corporation with its "principal place of business at [Townhouse]."  (*See* Ex. 1, Confession of Judgment, ¶ 2; *see also* Ex. 2, Am. Compl., ¶ 13).

11.      The Townhouse is also Debtor's "principal asset."  (Ex. 2, ¶ 13).

12.      Pelmadulla, a "trust…formed under the laws of the country of Lichtenstein and…domiciled in Vaduz, Lichtenstein", is the Debtor's sole shareholder.  (Ex. 2, ¶ 15).

13.     Both the Debtor and Pelmadulla were formed to serve the estate of the Princess.

**b.  Golsorkhi, the Debtor's President and Managing Director,**

14.     For the past 40 years, since the Debtor's formation in 1979, Golsorkhi has served as the Debtor's President and Managing Director.   As such, he has "responsibility over the compensation of all employees."   (Ex. 1, at ¶ 1).

15.     Golsorkhi was Defendant Ms. Azari's boss.   (*See id.*)

16.     Since 1970, Golsorkhi also has served as the Head of the Private Secretariat of the Princess.[1]   (*See* Ex. 2, ¶ 16*; see also* Dock. No. 15, ¶ 17)(citing Golsorkhi online profile).   From 1979 until her death in 2016, the Princess lived in exile in France and New York, spending much of her time in the Townhouse until her final years.   (*See* Ex. 2, ¶¶ 23-24).

**c.  Defendant Ms. Azari**

17.     Ms. Azari was the Princess' oldest employee and worked for her for 49 years. (*See* Ex. 1, ¶ 3).  During this period, Ms. Azari held two positions.  From 1967 until 1979, Ms. Azari worked for the Iranian royal family at the Consulate General of Iran.  In 1979, when a revolution occurred overthrowing the royal family, she refused to swear allegiance to the current theocratic regime in power, and as a result, her Iranian passport and diplomatic visa were revoked.   Ms. Azari has not visited Iran since then, and can never return to Iran again.  (*See id.*, ¶ 9).

18.     After the revolution, Ms. Azari continued to work for the Princess and started her position at the Debtor.   She worked for the Debtor and the Princess from 1979 until December 2016 when the Debtor ended her employment after the Princess' death.   (*See id.*, ¶ 10).

19.     Ms. Azari has not held any other position during her working life.  (*See id.*, ¶ 3).

---

[1] The Private Secretariat is the personal bureau of the Princess.

### d.  **The Creditors On Behalf of Whom The Debtor Filed This Action**

20.     The Debtor has filed this action to void Ms. Azari's Judgment.   The only two

named creditors in the Amended Complaint are National Investment Bank (N.A.), N.V. (the

"Bank"), the mortgagee on the Debtor's Townhouse, and the New York State Department of

Taxation ("New York State").   (*See* Ex. 2, ¶ 27).  Both are secured creditors who are guaranteed

payment of their claims in full, plus interest.  (*See* Dock. 13, Official Form 206D).

21.     The Debtor does generally allege that there is "at least one creditor who held and

holds matured or unmatured unsecured claims against Plaintiff that were allowable claims under

section 502 of the Bankruptcy Code."   (Ex. 2, ¶¶ 66, 71, 76, 81, and 86).

## II.     **MS. AZARI'S PENSION**

### a.  **The Princess And The Debtor Promise Ms. Azari A Pension If Ms. Azari Remains An Employee Of The Debtor And The Princess For Life**

22.     It is undisputed that the Pension Obligation arose as follows.

23.     "From October 1979 until [2016], Ms. Azari diligently and loyally worked for

[the Debtor] and the Private Secretariat.   She [showed] competence, diligence, and loyalty in her

duties.   She began her employment at [the Debtor] as an executive assistant, and ultimately

became [the Debtor's] office manager.   She [was] an integral part of [the Debtor].   Indeed, Ms.

Azari single-handedly operated and managed [the Debtor] and was often the only executive staff

member at [the Debtor's] New York office while [Golsorkhi] traveled frequently to handle

matters abroad."  (Ex. 1, ¶ 11).

24.     "In consideration for her loyalty, competence, diligence, and to keep Ms. Azari as

the manager of [the Debtor] and a key employee of the Private Secretariat for years to come, on

multiple occasions in [Golsorkhi's] presence, the Princess assured Ms. Azari that she would take

case of Ms. Azari's future and that Ms. Azari's future would be set."  (Ex. 1, ¶ 14) (emphasis

added).  This was significant for Ms. Azari given that the Debtor "did not provide any of its employees with ERISA, 401(k) or 403(b), or any other pension or profit-sharing plans."  (Dock. No. 13, pg. 20, Form 207, Part 9).

25.     "Following the Princess' directive and wishes, [Golsorkhi], as the President and Managing Director of [the Debtor], assured Ms. Azari that her future was set and that she should have no concerns about her financial security when she retires.   Specifically, [he] promised her that [the Debtor] and the Private Secretariat would pay her monthly salary for the remainder of her life.   The intention of this promise and pension was for Ms. Azari to maintain the same standard of living after her employment with [the Debtor] and the Private Secretariat ends."  (Ex. 1, ¶ 15).

26.     In exchange, Ms. Azari would continue working for the Princess and the Debtor until her death, displaying the trust, loyalty, and discretion that was integral to the job, and would not pursue any other job.  (Ex. 1, ¶¶ 14 & 15).

27.     Ms. Azari "[r]el[ied] on the [the Debtor and the Princess'] promises and assurances," when she "continued to work at [the Debtor]" until after the Princess' death.  (Ex. 1, ¶ 15).

28.     The reason why keeping Ms. Azari on staff was so important was because "[t]rust and loyalty were premium qualities to work for both [the Debtor] and the Private Secretariat," and Ms. Azari "possessed both."  (Ex. 1, ¶ 13).  Ms. Azari was also "protective" of the Princess. (Ex. 1, ¶ 12).   Throughout her life, the Princess encountered danger and betrayal.   "In 1977, two men with semiautomatic pistols opened fire on the Princess' Rolls-Royce when she was returning from a night at the casino in Cannes, killing her lady in waiting and wounding her driver."  (*See, e.g.,* NEW YORK TIMES, "Ashraf Pahlavi, Twin Sister of Iran's Last Shah, dies at 96", dated January 8, 2016).   It was an assassination attempt on the Princess' life.   After the

revolution, the danger only increased.  In December 1979, 10 months after the Iranian revolution, a lone gunman assassinated the Princess' son, Prince Shahriar Shafik, in Paris.  In Iran, the Ayatollah, the self-proclaimed head of Iran's revolutionary tribunal, claimed responsibility for the murder.  (*See, e.g.,* THE WASHINGTON POST, "Nephew of Deposed Shah Murdered in Paris Street", dated December 8, 1979).

29.     Golsorkhi admits that it was due to Ms. Azari's "twelve years of loyalty at the Consulate General" prior to the revolution and "her refusal to pledge allegiance" to the Ayatollah that caused the Princess and the Debtor in 1979 to "hire[] Ms. Azari to work for [the Debtor] and the Private Secretariat under [his] supervision."  (Ex. 1, ¶ 10).

30.     Ms. Azari's willingness to remain in her position until the Princess's death allowed the Princess and the Debtor to avoid the "difficult, if not impossible task", of "replac[ing Ms. Azari]" with a less trustworthy and loyal– and much less known – stranger.  (Ex. 1, ¶ 13).

31.     In 2012, the Princess permanently moved to Monaco.  Ms. Azari did not have any contact with the Princess again due to her failing mental health.

32.     On January 7, 2016, the Princess passed away.

33.     All of these facts are undisputed and based on public records or the Debtor's own sworn admissions.

   **b.  Golsorkhi, The President And Managing Director Of The Debtor, Memorializes The Princess And The Debtor's Promises In A Confession Of Judgment**

34.     On February 10, 2016, a few weeks after the Princess' death, Golsorkhi, as [the Debtor's] President and Managing Director, memorialized the years of past promises concerning Ms. Azari's pension and her spotless performance during her 49-year tenure in a Confession of Judgment, which he had notarized.  (Ex. 1, ¶¶ 3 & 5).  The $2.7 million pension amount in the

Confession of Judgment was based on Ms. Azari's estimated 25 years' life expectancy after her retirement. (Ex. 1, ¶ 5).

### c. The Debtor Does Not Dispute The Debt And Admits That It Owes It To Ms. Azari

35.     The Debtor "doe[s] not dispute that [it]…owes Ms. Azari" her "Pension." (Ex. 1, ¶ 16). Golsorkhi further admits that the "Confession of Judgment is based upon a debt justly due and owing by [the Debtor] and the Private Secretariat." (Ex. 1, ¶ 7).

36.     The Debtor also authorized Ms. Azari to file and enter the Confession of Judgment" in New York County, which she did on February 12, 2016. (Ex. 1, ¶¶ 17 & 18); *see also Azadeh N. Azari v. Wansdown*, Index No. 652137/2016 (Case docket reflecting entry of the Judgment).

37.     Ultimately, the clerk docketed the Judgment on April 21, 2016. (*See* Ex. 3, Docketed Judgment (i.e., the Judgment Entry).

## III-    THE DEBTOR BEGINS AN UNSUCCESSFUL LITIGATION CAMPAIGN TO RENEGE ON ITS OWN AFFIDAVIT GRANTING MS. AZARI HER PENSION

38.     Despite the Debtor's unequivocal admission that it owed the Pension Obligation to Ms. Azari and its authorization for her to enter the Judgment, three years ago, on February 13, 2017 – without giving Ms. Azari any notice – the Debtor filed an action in New York Supreme Court under CPLR 3218 and CPLR 5015 to renege on its own affidavit memorializing the pension it promised Ms. Azari. (*See Wansdown v. Azari*, Index No. 151406/2017) (the "First Action"). CPLR 3218 requires affidavits of confession of judgment to comply with certain statutory requirements, including "stating concisely the facts out of which the debt arose and showing that the sum confessed is justly due or become due." CPLR 5015 allows a court to

vacate a judgment on the grounds of "fraud, misrepresentation, or other misconduct by the adverse party."

39.     On October 23, 2018, after one and a half years of litigation, the First Department unanimously held that the Judgment was valid, and dismissed the entire complaint under CPLR 3211(a)(1) and (7).  (*See* Dock. No. 15, ¶ 18).   Specifically, the First Department held that Golsorkhi had the authority under the Debtor's Articles of Incorporation to bind the Debtor and execute the Judgment in Ms. Azari's favor.  The First Department also found no "misconduct" by Ms. Azari in the execution or entry of the Judgment.   (*Id.*) (holding "[t]he misconduct alleged in the complaint is not the sort of misconduct that would warrant vacating the judgment (*See Giryluk*, 30 AD2d at 23 [a judgment by confession has "all the qualities, incidents and attributes of a judgment on verdict, including a presumption of validity."])."

40.     In its decision, the First Department considered and disregarded all of the Debtor's allegations and arguments, including that (i) "[i]n late 2012, the Pelmadulla took over the management and control of" the Debtor; (ii) Ms. Azari's son, who is a lawyer, drafted the Confession of Judgment; (iii) the Confession of Judgment "did not create a contractual obligation on [the Debtor];" and (iv) the Confession of Judgment "did not modify Azari's employment status from that of an at-will employee."   (*See* First Action, Dock. No. 1, ¶¶ 17, 25, 28).   In the face of the First Department's findings, the Debtor recycles these allegations in its Amended Complaint in this bankruptcy.   (*See* Ex. 2, ¶¶ 22, 32, 33).

41.     Almost a year later, on October 1, 2019 – a week before a duly-noticed sheriff's sale of the Town House – Kamran Abbas-Vahid, a beneficiary of Pelmadulla, the Debtor's shareholder, filed a second action in New York Supreme Court to vacate the Judgment again under CPLR 3218 and CPLR 5015, and alleged "fraud and collusion" against Ms. Azari (the

"Second Action").  Abbas-Vahid also sought a temporary restraining order ("TRO") to enjoin the Sheriff's Sale.  (*See* Dock. No. 15, at ¶¶ 19-20).

42.    Judge Bannon denied the TRO and dismissed the entire Second Action.  (*See id.* at ¶ 21).

## IV-    THE DEBTOR FILES THIS BANKRUPTCY PETITION TO AVOID MS. AZARI'S JUDGMENT

43.    On October 8, 2019, the Debtor filed this bankruptcy petition to (i) seek a third attempt to void Ms. Azari's pension, this time in an adversary proceeding, and (ii) sell the Townhouse under a bankruptcy plan to 29 Beekman Corp., a buyer, to save taxes.  This time, the Debtor claimed it was not seeking to void the Judgment Entry and Pension Obligation on its own behalf, but rather on behalf of creditors under section 544(b) of the Code.

44.    On December 18, 2019, the Debtor filed its adversary proceeding to void Ms. Azari's pension, and on January 6, 2020, it amended its complaint.

45.    In the Amended Complaint, the Debtor represented that it is seeking to void two transfers: the Pension Obligation and the Judgment Entry.  (*See* Ex. 2, ¶ 2)(the two transfers are the "transfers effected by the Confession of Judgment" and the "docketing of the judgment"); *see also* Ex. 4, Excerpt from Transcript of January 16, 2020 Hearing re: Adversary Proceeding, 53:17-19 (counsel for Debtor indicates that the "two transfers" are "the creation of the obligation" and "recording the lien and the judgment")).

46.    During the Debtor's three-year litigation campaign against Ms. Azari, which continues today, Ms. Azari has not had a job or any income, and has not received any of her promised Pension.

## V-    DEBTOR DOES NOT ALLEGE ANY FACTS SHOWING THAT IT WAS INSOLVENT WHEN EITHER TRANSFER OCCURRED

**A.  The Debtor Fails To Allege That It Was Insolvent When It Incurred The Pension Obligation**

47.     In its Amended Complaint, the Debtor fails to allege that it was insolvent – even in a conclusory fashion – when it incurred the Pension Obligation.   The Debtor incurred the Pension Obligation years before it memorialized it by executing the Confession of Judgment.

**B.  The Debtor's Conclusory Allegation Of Insolvency At The Time Of Judgment Entry Is Unsupported By Any Facts And Is Contradicted By Its Own Public Admissions And Records**

48.     The Debtor alleges that it was balance sheet insolvent when the Judgment was entered, because "[t]he sum of its debts exceeded that of its assets in that the Townhouse was mortgaged, it had continuing payroll obligations and obligations to other creditors, and liens and warrants issued and recorded against its property by the Commissioner of Labor, State of New York resulting from its inability and failure to pay the amounts owed to the State."  (Ex. 2, ¶ 27).

49.     The Debtor, further alleges that, when the Judgment was entered, it did "not have sufficient funds to pay its debts such as real estate taxes or mortgage payments", and that "non-consensual liens and warrants had been filed and recorded encumbering [the Debtor's] property." (Ex. 2, ¶¶ 37 & 46).

50.     The Debtor, however, does not provide any estimates for its liabilities or even a fair market value estimate for its sole asset, the Townhouse.  If anything, the Debtor's allegations of insolvency at the time of Judgment Entry are contradicted by undisputed public records and Debtor's admissions.

51.     First, the Debtor's Title Report show that those "non-consensual liens and warrants" – which only totaled $36,573.57 – were docketed on October 12, 2016, almost six months after the Judgment Entry on April 21, 2016.  (Ex. 5, Judgment Docket and Lien Information from Title Report).

52.     Second, according to its own public records and a signed contract, the Debtor was balance sheet solvent.  In February 2016, when the Second Transfer occurred, it consented to have its property listed on the market at $34 million.   (Ex. 6, Streeteasy Town House Sale Prices) (listing Town House for $34 million).  Even a year and a half later, in late 2017, the Debtor admitted that the Townhouse was worth at least $17 million by signing a Contract For Sale for $17 million.  (See Ex. 7, Contract of Sale, dated December 18, 2017).  The buyer also thought it was a great price and filed an action against the Debtor for specific performance of the contract.  (See Secured Capital Ptrs, LLC v. Wansdown, Index No. 150780/2018 Dock. No. 1) (the "Real Estate Action").  The Court ultimately dismissed the buyer's case for failing to timely pay the contract deposit, even though the Debtor did attempt belatedly to wire the contract deposit to the Debtor.   (The Real Estate Action, Dock No. 82, Notice of Entry of Court's Decision, at 7) (buyer's attorney "advised [seller's attorney]…that the Down Payment had been transferred 'for the purpose of completing the sale of 29 Beekman per the December 2017 contract'").  The Debtor does not allege any facts about its debt-to-equity ratio to contradict these public records or admissions.

53.     Third, even with the mortgage that the Debtor alleges, the undisputed record confirms that the Debtor was balance sheet insolvent.  When the Debtor executed the Confession of Judgment, the Debtor only had a $3 million mortgage.  (See Bank. Proc., Dock No. 44, ¶ 1). When the Judgment was docketed, the Debtor's mortgage had increased to $5 million.  (Id.)  As such, the Debtor had plenty of equity under either a $34 million or $17 million, or even a $10.3 million valuation.

54.     Since the Debtor has never paid Ms. Azari any cash to satisfy her Pension Obligation – not when it incurred the obligation or when it signed the Judgment – neither the Pension Obligation nor the Judgment Entry affected the Debtor's ability to pay its bills.

<u>**ARGUMENT**</u>

**I.     THE PLEADING STANDARDS FOR A MOTION TO DISMISS A CLAIM**
**       UNDER 544(B) OF THE CODE**

55.     The Debtor alleges state claims under sections 273, 274, 275, 278 and 279 of the

New York Debtor and Creditor Law ("<u>DCL</u>"), on behalf of its creditors, based on its avoidance

power under section 544(b) of the Code.

56.     To assert a claim under section 544(b), the Debtor must allege as follows:

Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the
debtor in property or any obligation incurred by the debtor that is voidable under applicable law
by a creditor holding an <u>unsecured</u> claim that is allowable under section 502 of this title or that is
not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b) (emphasis added).

57.     Following the plain language of the statute, this Court has held that a debtor may

only assert a claim under section 544(b) on behalf of a "triggering creditor…holding an

allowable unsecured claim who could have avoided the transfer under non-bankruptcy law." *In*

*re Musicland*, 424 B.R. 95, 102 (Bankr. S.D.N.Y. 2010); *see also In re Bernard L. Madoff*

*Securities*, 557 B.R. 89, 119 (Bankr. S.D.N.Y. 2016) ("Thus, the Trustee's state law fraudulent

conveyance claims depend on the existence of a creditor holding an allowed unsecured claim

against BLMIS"); *In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279, 288 (Bankr. S.D.N.Y.

1990) ("[A] transaction can be avoided under section 544(b) only to the extent the avoidance

benefits unsecured creditors") (citing *Collier on Bankruptcy* ¶ 544.03 (15th ed. 1989); *Whiteford*

*Plastics v. Chase Nat'l Bank of N.Y.C.,* 179 F.2d 582, 584) (2d Cir. 1950).

58.     This Court has also discussed the pleading standard on a motion to dismiss an

avoidance claim.   "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its fact.  A claim has facial

plausibility when the plaintiff alleges factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged. Courts do not decide plausibility in a vacuum. Determining whether a claim is plausible is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant acted unlawfully." *In re Madoff,* 557 B.R. at 111 (citations omitted).

59. Following the Supreme Court decision in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937 (2009), this Court outlined "a two-step approach in deciding a motion to dismiss." *Id.* at 111. "First, the court should begin by identifying pleadings that, because they are not more than legal conclusions, are not entitled to the assumption of the truth. Threadbare recitals of the elements of a cause of action supported by conclusory statements are not factual. Second, the court should assume the veracity of well-pleaded factual allegations, [and] determine whether, together, they plausibly give rise to an entitled of relief." *Id.* (citing *Iqbal,* 556 U.S. 678-79).

## II- THE DEBTOR FAILS TO ALLEGE A SINGLE FACT TO SUPPORT ITS CLAIMS UNDER SECTIONS 274 AND 275 OF THE NEW YORK DEBTOR AND CREDITOR LAW

60. In its Amended Complaint, the Debtor does precisely the opposite, failing to allege basic facts that are key to pleading a claim under DCL §§ 274 and 275.

61. Sections 274 and 275, respectively, read as follows:

> **Conveyances by persons in business**: Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

> **Conveyances by a person about to incur debts**: Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

16

(emphasis added).

62.     In its Amended Complaint, all the Debtor does is repeat the statutory language of DCL §§ 274 and 275.   (*See* Ex. 2, at ¶¶ 49-50) (simply quoting the statutory language).   This Court has held that simply repeating legal conclusions in a statute does "not entitle [the Debtor] to the assumption of the truth" of those claims, even on a motion to dismiss.   *In re Madoff Securities,* 557 B.R. 89 at 111 ("[T]hreadbare recitals of the elements of a cause of action supported by conclusory statements are not factual") (citing the Supreme Court decision in *Iqbal,* 556 U.S. 678-79); *see also In re Operations NY LLC*, 490 B.R. 84, 99 (S.D.N.Y. 2013)(This Court dismisses DCL § 275 claim where complaint "does not allege any facts relating to the Debtor's intent to incur debt that it believed it would be unable to pay"); *supra* § I.

63.     To satisfy is pleading requirements for DCL section 274 claim, the Debtor alleges that it "was engaged in business or a transaction, or was about to engage in business or transaction, for which any property remaining with the Debtor after the conveyance constituted unreasonably small capital."  (Ex. 2, ¶ 49).  Aside from quoting the statutory language word-for-word again, the Debtor fails to even hint at what that "business" or "transaction" it was engaged in, or was about to engage in, such that the Confession of Judgment would have shrunk its capital to an unreasonably small amount.   The Debtor also fails to allege, even generally, who "bec[a]me [a] creditor during the continuance of such business or transaction" or whether the Debtor ultimately paid the creditor's obligation.

64.     Similarly, for its DCL § 275 claim, the Debtor fails to allege a single fact to support its claim that it "intend[ed] to incur, or believed [it] would incur, debts that would be beyond the Debtor's ability to pay as those debts matured" when it incurred the Pension Obligation or signed the Judgment.  (Ex. 2, ¶ 50).   This is fatal to the Debtor's claim, even on a motion to dismiss. *See, e.g., In re Wonderwork, Inc.,* No. 16-13607 (SMB), 2020 WL 261801, at

* 24 (Bankr. S.D.N.Y. Jan. 20, 2020) (This court dismissed the claim because it did "not plead the Debtor's subjective belief that it would be unable to repay the…loans" and a report showed that the opposite was true).  As a matter of law, Golsorkhi, the President and Managing Director of the Debtor, could not have believed that the Confession of Judgment would result in "debts that would be beyond the Debtor's ability to pay as those debts matured" when he consented to list the Townhouse for $34 million at the time of Judgment Entry.  (Ex. 2, ¶ 50).  Regardless of whether the $34 million sale price represented its true market value, at the time of Judgment Entry, when the Townhouse was listed at $34 million, the Debtor subjectively believed that the sale would result in substantial proceeds to cover all the debts.  The Debtor has not made a single factual allegation to even allow an inference to support its belief that it "would incur debts…beyond [its] ability pay."  (*Id.*).

65.      Furthermore, the Debtor cannot claim that it needs discovery from Ms. Azari to allege these key facts for its DCL §§ 274 and 275 claims since it is the Debtor itself – not Ms. Azari – who possesses knowledge concerning the "business transactions" it entered into and its "intent" or "belief" about its future debts.  Nobody else can testify or provide information about these issues.  Only the Debtor can.  And it failed to do so even after it amended its complaint.  After two attempts at drafting a complaint, the Debtor decided to just repeat the statutory language of DCL §§ 274 and 275.

66.      The Debtor's use of DCL §§ 274 and 275 is nothing but a transparent attempt to circumvent the requirement that, ultimately for its DCL § 273 claim, it must establish the existence of an unsecured creditor both at the time of the petition and at the time of the transfers it is seeking to void.  *See, e.g., Official Comm. Of Asbestos Claimants of G-I Holding, Inc. v. Heyman,* 277 B.R. 20, 35 (Bankr. S.D.N.Y. 2002) (contrasting section 273 on the one hand and sections 275 and 276 on the other and noting that the absence of the phrase "future creditors" in

section 273 means that there must be a "present creditor" at the time of the transfer); *In re Direct Access Ptrs LLC,* 602 B.R. 495, 513 (Bankr. S.D.N.Y. 2019) ("[C]laims under New York Debtor and Creditor Law section 273…..many only be by persons who were creditors at the time of the challenged transfers.").  Although the Debtor generally alleges that there were unsecured creditors with allowable claims "at all relevant times", the only two creditors that the Debtor has alleged by name that existed at the time of the transfers are the Bank and New York State – both of whom are secured.   (*See* Ex. 2, ¶ 27).  Since they are secured creditors, the Debtor does not have standing to allege a claim under section 544(b) of the Code or DCL § 273 on their behalf. *supra* § I (Debtor may only assert 544(b) claim on behalf of <u>unsecured</u> creditors).

67.     Regardless of the Debtor's motives, the Debtor has failed to allege a claim under DCL §§ 274 and 275, and consequently, the Court should dismiss the Debtor's Third, Fourth, Fifth, and Sixth causes of action.

### III-     <u>THE DEBTOR FAILS TO STATE A BASIS TO VOID THE JUDGMENT</u>

#### A.     **Under Second Circuit Law, Bankruptcy Courts Must Respect Lawfully-Obtained Judgments And The Factual Findings Of State Courts**

68.     Even if the Debtor may still challenge the transfers it made to Ms. Azari under its new DCL theory, it cannot challenge its contractual obligation to pay Ms. Azari her pension. The Judgment and the Debtor's contractual obligation to Ms. Azari have been challenged twice – each time under both CPLR 3218 and CPLR 5015.  Both attempts were unsuccessful and dismissed at the pleading stage.  Significantly, the First Department held that (i) Golsorkhi, as the President and Managing Director of the Debtor for the past 40 years, had the authority under the plain terms of the Debtor's Articles to incur the Pension Obligation and sign the Judgment, and (ii) Ms. Azari did not engage in any misconduct in the execution of the Judgment.

69.     The First Department's finding is binding on the Debtor.   *Kelleran v. Andreijevic,*
825 F.2d 692 (2d. Cir. 1987) (Bankruptcy courts must respect lawfully-obtained state court
judgments, even if the underlying claims are meritless); *In re Cohen*, 92 B.R. 54, 59 (Bankr.
S.D.N.Y. 1988) ("In general, collateral estoppel precludes relitigation before a bankruptcy court
of factual issues that were previously determined by another court."); *In re Higgins,* 270 B.R.
147, 157 (Bankr. S.D.N.Y. 2001) ("A prior judgment will normally preclude further litigation of
those issues which were actually litigated and determined, as well as matters which although not
expressly determined, are comprehended and involved in the thing expressly stated and
decided…")  (citations omitted).  Furthermore, the simple act of declaring bankruptcy does not
grant Debtor the right to reject its prepetition agreements, such as the Pension Obligation.  *See
N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 528 (1984), which held that "[f]or [contract
rejection] purposes, it is sensible to view the debtor-in-possession as the same 'entity' which
existed before the bankruptcy petition.").  Consequently, even though the Debtor may be able to
assert a claim under section 544(b) of the Code, the Debtor cannot claim that it "was not
indebted to Ms. Azari in the amount set forth in the Affidavit" or that the Judgment was not "in
satisfaction of any debt owed to Ms. Azari."  (Amended Compl., at ¶¶ 1, 32).   This issue was
"actually litigated" and the First Department "determined" that the there was a debt owed to Ms.
Azari.  *In re Higgins,* 270 B.R. at 157.

70.     Furthermore, even under well-settled law, the Pension Obligation is valid.   The
First Department has held that even a "broad commitment…not limited to one opening
transaction" is enough for consideration in an agreement.  *Movado Group, Inc. v. Presburg,* 687
N.Y.S.2d 116, 117 (1st Dep't 1999); *see also Weiner v. McGraw-Hill, Inc.,* 457 N.Y.S.2d 193,
196-7 (N.Y. 1982) (Consideration to support an agreement exists where there is "either a benefit
to the promisor or a detriment to the promise" and does not need "to be coextensive or even

proportionate").  Just last month, a district court in the Southern District considered a fact pattern almost identical to this one and held that the employee properly pleaded adequate consideration under contract law.  *See Kurana v. Wahed Invest, LLC,* 18-CV-233 (LAK), 2020 WL 364794, at *8 (S.D.N.Y. Jan. 8, 2020) (employee gave consideration in exchange for employer's oral promise to pay him cash bonus and equity grants to "keep working for defendants" where "as an at will employee he was not obligated to do so").

71.     Finally, and most compelling, the Debtor itself has admitted, under oath, that the Pension Obligation is indisputably valid.  (Ex. 1, ¶¶ 7, 16) (The Debtor "doe[s] not dispute that [it]…owes Ms. Azari" her "Pension" and admits that the "Confession of Judgment is based upon a debt justly due and owing by [the Debtor] and the Private Secretariat.").

72.     Consequently, any analysis of the Debtor's claims under the New York DCL must presume that there was a valid agreement between Ms. Azari and the Debtor.   This fact, alone, dooms the Debtor's challenge to void the Judgment Entry.

**B.     The Judgment Entry Was For Fair Consideration Since It Was To Repay An Antecedent Debt**

73.     <u>First</u>, the Debtor's claim that the Judgment Entry lacked fair consideration fails because the docketing of the Judgment was simply a repayment of a debt owed to Ms. Azari, namely the Pension Obligation.

74.     It is a bedrock principle of Second Circuit law that the repayment of an antecedent debt – such as the valid Pension Obligation – is fair consideration unless the transferee is an officer, director, or major shareholder of the transferor.  *Atlanta Shipping Corp. Inc. v. Chemical Bank,* 818 F.2d 240, 249 (2d Cir. 1987)(affirming dismissal of constructive fraud provisions of the DCL and holding that "repayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director or major shareholder of the transferor"); *Pashaian v.*

*Eccelston Properties, Ltd.,* 88 F.3d 77, 85 (2d. Cir. 1996)("[T]he general rule is that the satisfaction of a preexisting debt qualifies as fair consideration for transfer of property…[E]ven the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance"); *The Liquidation Trust v. Daimler AG,* 435 B.R. 169, 190 (Bankr. S.D.N.Y. 2010) ("It is only when the transferee is an insider that New York courts recognize an exception to the rule the repayment of an antecedent debt constitutes fair consideration").   This Court itself has held that "[i]t is well-settled that the repayment of an antecedent debt constitutes fair consideration, satisfying both prongs of DCL 272…"  *In re Dreier,* 462 B.R. 474, 489 (Bankr. S.D.N.Y. 2011) (citing *Atlanta Shipping supra*); *see also In re White Metal Rolling,* 222 B.R. 417, 430 (Bankr. S.D.N.Y. 1998) (This Court holds that "[t]he payment of an antecedent debt satisfies the value component" of fair consideration); *In re Trace Int'l Holdings, Inc.,* 301 B.R. 801, 805 (Bankr. S.D.N.Y. 2003) ("'An antecedent debt' satisfies the requirement of fair consideration and reasonably equivalent value, and….the payment of an existing liability is not fraudulent.").   "The rationale for this rule is based on the objective that the Uniform Fraudulent Conveyance Act, which '[u]nlike the Bankruptcy Code…is a set of legal rather than equitable doctrines, whose purpose is not to provide equal distribution of a debtor's estate among creditors, but to aid specific creditors who have been defrauded by the transfer of debtor's property."  *In re Dreier LLP,* 452 B.R. at 443.

75.     Here, the First Department and Judge Bannon of the New York Supreme Court have held that the antecedent debt – namely the Pension Obligation – is valid.  The Judgment

Entry was simply a repayment of the Pension Obligation, or an assurance of repayment, that the Debtor incurred years ago.[2]

76.     Furthermore, Ms. Azari – who was the transferee here – is neither an officer, director, or shareholder of the Debtor, and the Debtor does not allege that she is.

77.     Finally, the Debtor does not allege that Ms. Azari acted in bad faith when the clerk entered the judgment.   Nor can it.  The First Department already held that there was no misconduct by Ms. Azari in the execution or entry of the Judgment.

78.     Based on these reasons, and the Court should dismiss the Debtor's Second, Fourth, and Sixth Causes of Action.

### C.     The Debtor's Admissions And Public Records Show That It Was Solvent

79.     Second, the Debtor fails to properly allege that it was insolvent at the time of the Judgment Entry.   Under DCL § 271(1), "a person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."  "This is a 'balance sheet test.'" *In re Operations NY LLC*, 490 B.R. at 97.   The Debtor fails to allege the "present salable fair value" of the Townhouse, or the amount of its "liabilities" or "probable liabilities," or how those amounts exceed the value of the Townhouse, the Debtor's sole asset.  In fact, Debtor's own admissions – which it fails to controvert – show that it is solvent.

80.     At the time of the Judgment Entry, the Debtor identifies three liabilities:   (i) a mortgage; (ii) "liens and warrants issued and recorded against its property by the Commissioner of Labor, State of New York"; and (iii) "payroll obligations and obligations to other creditors."

---

[2] In fact, repayment would have been much better than a docketed judgment since Ms. Azari would have received her pension right away rather than living without it for the past three years with simply a docketed judgment in hand.

(Ex. 2, ¶ 27).    However, it omits dollars amounts, or even estimates, for these liabilities.  Public records show that, at the time of Judgment Entry, the Debtor had a mortgage for $5 million. Two months earlier, when the Debtor signed the Confession of Judgment, its mortgage was $3 million only.  Furthermore, the Debtor's own Title Report indicates that the tax lien was not docketed until October 12, 2016, almost six months after the Judgment Entry, and the amount was only for $36,573.57.  (*See* Ex. 5).  Finally, the Debtor fails to indicate the amount of its payroll obligations.  Simply having bills to pay does not make a company balance sheet insolvent, especially if the Debtor eventually paid those bills.  The liabilities alleged at the time of Judgment Entry were at most $5,036,573.57 according to public records and Debtor's allegations.

81.    Regarding its sole asset, the Townhouse, at the time of Judgment Entry, the Debtor had the Townhouse on the market for $34 million.  Even if that was not the true value of the Townhouse, one and a half years after the Judgment was docketed, the Debtor admitted that the market value of the Townhouse was at least $17 million by signing a contract for that amount.   The buyer, Secured Capital, also believed it was worth $17 million, and even sued for specific performance for the right to buy the Townhouse at that price.

82.    Under a $34 million, $17 million – or even the depressed $10.3 million valuation, the price of the current residential sales agreement between the Debtor and 29 Beekman Corp – the Debtor had plenty of equity at the time the Judgment was docketed, and was not rendered balance sheet insolvent by the $2.7 million Judgment.  The Debtor has not alleged ***any*** value for the Townhouse that contradicts these figures.[3]

---

[3] At the January 23, 2019 hearing, the Court raised Pelmadulla's alleged loans as possibly rendering the Debtor insolvent.  First, the Debtor intentionally omitted to allege these loans as part of its section 544(b) claim, and therefore, they cannot be part of the Debtor's section 544(b) claim.  Second, the reason that the Debtor did not do so is that the Debtor itself disputes Pelmadulla's claims.   (*See* Bankr. Proc. Dock. No. 38, ¶ 24)(The Debtor represents that it "does not believe the Pelmadulla claim is a valid claim against the

83.     Rather than allege any value for its Townhouse that contradicts these figures, the Debtor argues that the Townhouse "produced no income." (Ex. 2, ¶ 28). However, rental income is not relevant to an insolvent inquiry. Asset value is what matters. As such, Debtor has failed to allege how it was balance sheet insolvent.

84.     Although there are two other tests that courts sometimes employ to determine insolvency – namely the "unreasonably small capital" and the "ability to pay debts" tests – they do not apply since the Debtor failed to satisfy the pleading requirements for its DCL §§ 274 and 275 claims. *See supra*, § II; *In re Operations*, 490 B.R. at 98-99 (those insolvency tests are under DCL §§ 274 and 275).

## IV- THE DEBTOR ALSO FAILS TO STATE A BASIS TO VOID THE PENSION OBLIGATION

85.     Without any basis to void the Judgment, the Debtor also seeks to void the underlying Pension Obligation.

### A.     Debtor Admits Under Oath That There Was Consideration For The Pension Obligation

86.     In its Confession of Judgment, the Debtor not only admits under oath that it owed the Pension Obligation it owed Ms. Azari, and the circumstances giving rise to the obligation, it

---

Debtor and the Debtor intends to object to the claim."). Third, even if the Court were to ignore the Debtor's intentional omission of these loans as part of its 544(b) claim, and consider Pelmadulla's alleged loans in the calculation of the Debtor's equity – the Debtor would still be solvent when it incurred the Pension Obligation and the Judgment was docketed. There is *no* allegation that the Debtor was insolvent when it incurred the Pension Obligation. Regarding the Judgment Entry, according to Pelmadulla's own Proof of Claim (*See* Claim No. 9), on April 21, 2016, at the time of Judgment Entry, Pelmadulla's alleged loans totaled $1,488,549.58. Under either a $17 million, $34 million, or $10.3 million valuation of the Townhouse, the Debtor would still be balance sheet solvent, under its own allegations, since it would only have $6,488,549.58 million in outstanding debt (the $5 million mortgage + $1,488,549.58 in alleged shareholder loans) when the Judgment was entered. Regarding when the Debtor incurred the Pension Obligation, there is no allegation that any of Pelmadulla's loans existed at that time.

also admits under oath that Ms. Azari gave "consideration" for the Pension Obligation.

Specifically, the Debtor states the following:

> In consideration of her loyalty, competence, and diligence, and to keep Ms. Azari as the manager of Wansdown and a key employee of the Private Secretariat for years to come, on multiple occasions in [Golsorkhi's] presence, the Princess assured Ms. Azari that she would take care of Ms. Azari's future and that Ms. Azari's future would be set.
>
> Following the Princess' directive and wishes, [Golsorkhi], as the President and Managing Director of [the Debtor] and the Head of the Private Secretariat, assured Ms. Azari several times that her future was set and that she should have no concerns about her financial security when she retires.   Specifically, [Golsorkhi] promised her that [the Debtor] and the Private Secretariat would pay her monthly salary for the remainder of her life.   The intention of this promise and pension was for Ms. Azari to maintain the same standard of living after her employment with [the Debtor] and the Private Secretariat ends.   Relying on these promises and assurances, Ms. Azari continued to work at [the Debtor] and continues so today.
>
> [Golsorkhi] acknowledges and do[es] not dispute that [the Debtor] and the Private Secretariat owes Ms. Azari the Azari Pension…

(Ex. 2, ¶¶ 14-16).  The affidavit also details Ms. Azari's flawless performance throughout her 49-year tenure with the Princess, working at both the Consulate, the Debtor, and the Private Secretariat, and how Ms. Azari's trust, loyalty, and willingness to remain with the Princess until the end of her life were of paramount importance to the Princess.  (Ex. 2, ¶¶ 8-13).

87.     The Debtor attempts to downplay its own Confession of Judgment by arguing that the consideration that the Debtor itself swore Ms. Azari gave was only for "prior loyalty" – implying inadequate consideration – and that its affidavit "recites no other consideration."   (Ex. 2, at ¶ 31).  In making this argument, the Debtor brazenly ignores the future actions it required from Ms. Azari and that the promise of the Pension was "to keep Ms. Azari as the manager of Wansdown and a key employee of the Private Secretariat for years to come."   (Ex. 1, ¶ 14). The Debtor further ignores Ms. Azari's "reliance on [the Debtor and the Princess'] promises and assurances" and that Ms. Azari "continue[ed]" to work for the Debtor and the Princess, showing that the consideration that Ms. Azari gave was not in the past.  (*Id.* at ¶ 15).

88.     Even if this Court were to consider it as past consideration, it should still find it adequate as a matter of law.   "A promise in writing and signed by the promisor or by his agent shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is expressed in writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed."  N.Y. Gen. Oblig. Law § 5-1105 (McKinney 1989).   "To be enforceable [under] § 5-1105 of the General Obligations Law, the writing must contain an unequivocal promise to pay a certain sum, at a date certain, and must express consideration for the promise."  *Unscheid v. Sinnacher,* 106 A.D.2d 380, 381 (2d Dep't 1984); *see also Sarama v. John Mee, Inc.,* 422 N.Y.S.582 (Civ. Ct. N.Y. Cty. 1979) (consideration for Christmas bonus was adequate where employer memorialized in writing employee's past consideration of "all of [employee's] efforts on behalf of the company" over the previous year).   Consequently, the Debtor cannot challenge the consideration that Ms. Azari gave for her Pension Obligation based on it being in the past since the Debtor memorialized that consideration in a signed writing.   Here, the Debtor's promise in its Confession of Judgment was "unequivocal."  It was for a "certain sum" of $2,700,000.  It was for a "date certain", which was Ms. Azari's retirement from the Debtor and the Private Secretariat and after the Princess' death.  Finally, the "consideration" was "express", with the Debtor even using the and talismanic word, "consideration."  *Unscheid*, 106 A.D.2d at 381; *see also Kreuter v. Tsucalas*, 734 N.Y.S.2d 185, 188 (2d Dep't. 2001)(citing General Obligations Law § 5-1105 in rejecting lower court's conclusion that contract was unenforceable because it was based on past consideration where writing expressed the past consideration that party provided).   Consequently, the Debtor's argument concerning past consideration fails as a matter of law.

**B.     The Debtor Does Not Even Allege – In A Conclusory Fashion – That It Was Insolvent When It Incurred The Pension Obligation**

89.     Even if this Court still considers the fairness of Ms. Azari's consideration – 49 years of spotless service and a willingness to remain with the Debtor and the Princess until her death – a factual issue, the Court should still dismiss the Debtor's challenge to the underlying Pension Obligation.   That is because the Debtor does not even attempt to allege – even in its customary conclusory fashion – that it was insolvent when it incurred the Pension Obligation. The Debtor confuses the time when the Debtor created the obligation and Ms. Azari gave consideration for the obligation, with the time when the Debtor memorialized the Pension Obligation and signed the Confession of Judgment.     However, the Confession of Judgment is not a contract in which the parties create their obligations by signature.   Rather, as the sworn statements in the Confession of Judgment confirm, the Debtor and the Princess made the oral promises to Ms. Azari years before the execution of the Judgment.   And as the First Department confirmed, Golsorkhi, on behalf of the Debtor, had the authority to make these promises and bind the Debtor.  The Confession of Judgment merely admitted that the promises took place and memorialized them.   As such, to avoid the Pension Obligation, the Debtor had to allege that it was insolvent at the time of the *promises*, not the execution of the Confession of Judgment.  It failed to do so.   Based on this failure, the Court should dismiss the Debtor's Third and Fifth Causes of Action challenging the Pension Obligation.

**V-     WITHOUT A VIABLE CLAIM UNDER THE DCL §§ 273, 274, and 275, DEBTOR'S CLAIMS UNDER §§ 278 AND 279 SHOULD ALSO BE DISMISSED**

90.     Since the Debtor has failed to state a claim under DCL §§ 273, 274 and 275, the Court should also dismiss the Debtor's claims under DCL §§ 278 and 279.   For the Debtor to benefit from DCL §§ 278 and 279, it first must successfully establish that "a conveyance or

obligation is fraudulent as to a creditor." Without a viable fraudulent conveyance claim, the remedies under these DCL sections are not available to the Debtor.

## VI- THE DEBTOR'S CLAIM UNDER SECTIONS 502(B) AND 502(D) ALSO MUST FAIL

91.     The Debtor seeks disallowance of Azari's proof of claim, under sections 502(b) and (d) of the Code, on the ground that it "is only supported by the Affidavit and Judgment" and states "[t]o the extent he Affidavit and Judgment are avoided, the Claim must be disallowed." (Compl. ¶ 95.) Because the avoidance claims must be dismissed for reasons discussed above, this claim should be dismissed because it cannot stand alone. *In re Hydrogen, L.L.C.*, 431 B.R. 337 (Bankr. S.D.N.Y. 2010).

## CONCLUSION

92.     The Court should dismiss the Debtor's <u>Third</u>, <u>Fourth</u>, <u>Fifth</u>, and <u>Sixth</u> Causes of Actions because the Debtor intentionally fails to allege any facts to meet the key pleading requirements of its claims under DCL §§ 274 and 275.

93.     The Court should dismiss the Debtor's <u>Second</u>, <u>Fourth</u>, and <u>Sixth</u> Causes of Action, which seek to void the <u>Judgment</u> <u>Entry</u>, because there was fair consideration since the Judgment Entry was to repay an antecedent debt and since the Debtor has not alleged any specific facts concerning the value of its sole asset, the Townhouse, or the amount of its liabilities. Furthermore, the Debtor's allegation of insolvency is contradicted by public records and the Debtor's own admissions.

94.     The Court should dismiss the Debtor's <u>First</u>, <u>Third</u>, and <u>Fifth</u> Causes of Action, which seek to void the <u>Pension</u> <u>Obligation</u>, since the Debtor admits that it gave Ms. Azari consideration in a sworn statement, and the Debtor fails to allege, even in a conclusory way, that it was insolvent when the Princess and Debtor made the promises to Ms. Azari.

Dated:   February 11, 2020
         New York, New York

                               **BEYS LISTON & MOBARGHA LLP**

                               By:   _____/s/_____
                                     Nader Mobargha, Esq.

                                   641 Lexington Avenue, 14th Floor
                                 New York, New York 10022
                                 Telephone: (646) 755-3603
                                 Facsimile: (646) 755-5229
                                 Email: nmobargha@blmllp.com
                                 *Attorneys for Defendant and Secured*
                                 *Creditor Azadeh Azari*

# EXHIBIT 1

## Affidavit of Confession of Judgment by the Debtor

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------- x
AZADEH NASSER AZARI,                               :
                                                   :          Index No.
                    *Plaintiff,*                   :
                                                   :
        -against-                                  :
                                                   :
                                                   :
WANSDOWN PROPERTIES CORPORATION N.V.               :
                                                   :
                    *Defendant.*                   :
                                                   :
                                                   :
                                                   :
---------------------------------------------------------------- x

## AFFIDAVIT OF CONFESSION OF JUDGMENT BY WANSDOWN PROPERTIES CORPORATION N.V.

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

        **GHOLAM REZA GOLSORKHI**, being duly sworn, deposes and says:

        1.      I, Gholam Reza Golsorkhi, am the President and Managing Director of

Wansdown Properties Corporation N.V. ("Wansdown") and the Head of the Private Secretariat

of Her Imperial Highness ("HIH") Princess Achraf Pahlavi (collectively, "Wansdown and the

Private Secretariat"). As President and Managing Director of Wansdown and the Head of the

Private Secretariat, I have responsibility over the compensation of all employees.

        2.      Wansdown is a limited liability company formed on December 11, 1979, with its

statutory seat in the Country of Curacao. Wansdown maintains its principal place of business at

29 Beekman Place, New York, New York 10022.

1

3.    Azadeh N. Azari ("Ms. Azari") is both an employee and office manager for Wansdown and the Private Secretariat. She is currently 68 years old and has been working for either the Iranian government or Wansdown and the Private Secretariat for (49) forty-nine years.

4.    I hereby confess judgment, on behalf of Wansdown and the Private Secretariat of HIH Princess Achraf, and authorize its entry in favor of Ms. Azari, and against Wansdown and the Private Secretariat, in the sum of $9,000 per month for the rest of Ms. Azari's natural life, under Rule 3218 Rule of the Civil Practice Law and Rules ("CPLR") (the "Azari Monthly Pension").

5.    Alternatively, I hereby confess judgment on behalf of Wansdown and the Private Secretariat of HIH Princess Achraf and authorize its entry in favor of Ms. Azari, and against Wansdown, in the sum of $ 2,700,000 under CPLR 3218 (the "Azari Lump Sum Pension"). The Azari Lump Sum assumes that Ms. Azari will live for another twenty-five years, and consequently, represents twenty-five years of Ms. Azari's monthly salary.

6.    Ms. Azari is entitled to either the Azari Monthly Pension or the Azari Lump Sum Pension, at her election.

7.    This Confession of Judgment is based upon a debt justly due and owing by Wansdown and the Private Secretariat, and arises from the following facts:

8.    Ms. Azari has been working for Wansdown and the Private Secretariat for almost thirty-seven years, beginning in October 1979.

9.    Prior to this, Ms. Azari worked at the Consulate General of Iran in New York (the "Consulate General") for thirteen years, from 1967 until the Iranian revolution in 1979. When the Iranian revolution occurred, Ms. Azari refused to pledge her allegiance to the Ayatollah Khomeini. As a result, her passport and diplomatic visa were revoked.

2

10.     Due to her twelve years of loyalty at the Consulate General and her refusal to pledge allegiance to the Ayatollah, in October 1979, six months after the Iranian revolution, HIH Princess Achraf and I hired Ms. Azari to work for Wansdown and the Private Secretariat under my supervision.

11.     From October 1979 until the present, Ms. Azari diligently and loyally worked for Wansdown and the Private Secretariat. She has shown competence, diligence, and loyalty in her duties. She began her employment at Wansdown as an executive assistant, and ultimately became Wansdown's office manager. She has been an integral part of Wansdown. Indeed, Ms. Azari single-handedly operated and managed Wansdown and was often the only executive staff member at Wansdown in its New York office while I traveled frequently to handle matters abroad.

12.     In addition, Ms. Azari has been protective and loyal to HIH Princess Achraf.

13.     Trust and loyalty were premium qualities required to work for both Wansdown and the Private Secretariat. Since Ms. Azari possessed both, and demonstrated a high capacity for managing and operating the company, both HIH Princess Achraf Pahlavi and I knew that it was imperative to keep her as an employee of Wansdown and the Private Secretariat. It would be difficult, if not impossible, to replace her.

14.     In consideration for her loyalty, competence and diligence, and to keep Ms. Azari as the manager of Wansdown and a key employee of the Private Secretariat for years to come, on multiple occasions in my presence, HIH Princess Achraf assured Ms. Azari that she would take care of Ms. Azari's future and that Ms. Azari's future would be set.

15.     Following Princess HIH Princess Achraf Pahlavi's directive and wishes, I, as the President and Managing Director of Wansdown and the Head of Her Private Secretariat, assured

3

Ms. Azari several times that her future was set and that she should have no concerns about her financial security when she retires. Specifically, I promised her that Wansdown and the Private Secretariat would pay her monthly salary for the remainder of her life. The intention of this promise and pension was for Ms. Azari to maintain the same standard of living after her employment with Wansdown and the Private Secretariat ends. Relying on these promises and assurances, Ms. Azari continued to work at Wansdown and continues to do so today.

16.     I acknowledge and do not dispute that Wansdown and the Private Secretariat owes Ms. Azari the Azari Monthly Pension or the Azari Lump Sum Pension, at her election.

17.     I acknowledge that Ms. Azari's filing of this Affidavit of Confession of Judgment and entry of judgment against Wansdown and the Private Secretariat are without prejudice to all of Ms. Azari's rights and remedies and that, to the extent Wansdown or the Private Secretariat owes any monies to Ms. Azari not reflected in this Affidavit of Confession of Judgment, Ms. Azari may also collect those monies by any lawful means and to the fullest extent permitted under the law.

4

18.     Wansdown and the Private Secretariat hereby authorize Ms. Azari to finally and irrevocably fix, enter, and assess a judgment against them for the full amount of the Azari Monthly Pension or the Azari Lump Sum Pension, at her election, in any court in the United States – including, but not limited to, the Supreme Court of the State of New York, County of New York – as well as in any foreign jurisdiction where assets or property belonging to Wansdown, or those in which Wansdown has an interest, may be found.


**WANSDOWN PROPERTIES CORPORATION**

By:_____

**Gholam Reza Golsorkhi, President and
Managing Director**


STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF NEW YORK  )

On this 10ᵗʰ day of February 2016, before me personally came Gholam Reza Golsorkhi, to me known, who executed the foregoing instrument and duly acknowledge to me that he executed the same, and that he is authorized to do so on behalf of Wansdown Properties Corporation.

SARAH E JENKINS
Notary Public - State of New York
NO. 01JE6272342
Qualified in Queens County
My Commission Expires _11|13| 2016

_____
Notary Public

5

## EXHIBIT 2

## Amended Complaint, dated January 6, 2020

**BLANK ROME LLP**
1271 Avenue of the Americas
New York, NY 10020
Tel:   212-885-5000
Fax:   212-885-5001
Ira L. Herman
Evan J. Zucker

*Special Litigation Counsel for Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------- x

In re:                                                                                    Chapter 11

WANSDOWN PROPERTIES CORPORATION N.V.,                  Case No.:  19-13223 (SMB)

                            Debtor.

---------------------------------------------------------------- x

WANSDOWN PROPERTIES CORPORATION N.V.,

            Plaintiff
                                                                                       Adv. Pro. No. 19-1450
                    v.

AZADEH NASSER AZARI,

            Defendant.

---------------------------------------------------------------- x

<u>**AMENDED ADVERSARY COMPLAINT**</u>

        Wansdown Properties Corporation N.V. (the "**Debtor**" or "**Plaintiff**"), by and through its

undersigned counsel, as and for its complaint against defendant Azadeh Nasser Azari, alleges as

follows:

<u>**NATURE OF THE ACTION**</u>

        1.        This is an action to avoid a fraudulent conveyance:  the execution of an affidavit of

confession of judgment and the resulting judgment in favor of the defendant, Azadeh Nasser Azari,

in exchange for insufficient consideration.  Azari prevailed upon her long-time supervisor and friend, Gholam Reza Golsorkhi ("**Golsorkhi**"), to execute the affidavit of confession of judgment for $2.7 million in favor of Azari out of loyalty, friendship or to avoid a confrontation.  In any event, Azari did not give value to the Plaintiff in exchange for the debt obligation created by the affidavit of confession of judgment, nor was it given in satisfaction of any debt owed to Azari.

2.      Through this action, Plaintiff seeks to avoid the transfers effected by the affidavit of confession of judgment and docketing of the judgment as constructive fraudulent conveyances for the benefit of Plaintiff's estate and creditors.

## PARTIES

3.      Plaintiff Wansdown Properties Corporation N.V. is a limited liability company incorporated under the laws of Curacao, with its principal place of business at 29 Beekman Place, New York, NY 10022.

4.      Defendant Azadeh Nasser Azari ("**Azari**" or "**Defendant**"), upon information and belief, resides at 360 East 55th Street, Apartment 13H, New York, NY 10022.

5.      Azari is a former employee of Plaintiff.

## JURISDICTION AND VENUE

6.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334.

7.      This is a core proceeding under 28 U.S.C. § 157(b)(2).

8.      Plaintiff confirms its consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), to the entry of a final order by the Court in connection with this Complaint to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2

9.      Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

10.     The statutory predicates for the relief sought herein are 11 U.S.C. §§ 502(b), 502(d), and 544(b), and N.Y. Debt. & Cred. Law §§ 273, 275, 278 and 279.

11.     This adversary proceeding concerns the chapter 11 case *In re Wansdown Properties Corporation N.V.*, Case No. 19-13223 (SMB) currently pending before the Court.

FACTUAL BACKGROUND

## I.      Plaintiff's History and Operations

12.     Plaintiff was incorporated in 1979 to, among other things, invest and manage the assets of Princess Achraf Pahlavi.

13.     Plaintiff's principal asset and place of business is a residential townhouse located on Beekman Place in Manhattan (the "**Townhouse**").

14.     Plaintiff is incorporated in Curaçao under Article 38 of the Commercial Code of the Netherlands Antilles, and continues to exist under the laws of Curaçao.

15.     Plaintiff is, and has been since its inception, owned by a trust entitled Pelmadulla Stiftung (the "**Foundation**"), formed under the laws of the country of Lichtenstein and is domiciled in Vaduz, Lichtenstein.

16.     Golsorkhi was hired by the Princess, in or about 1970, in Iran to manage her personal affairs. When the Princess fled Iran during the Iranian revolution, Golsorkhi continued to work for her in Europe and the United States.

17.     Golsorkhi became a Managing Director of Plaintiff in 1979, together with Netherland Antilles Corporation Company, N.V.

18.     Golsorkhi is not, and has never been, a shareholder of Plaintiff.

19.     In 1979, Golsorkhi hired Azari to work for Plaintiff as a secretary and she later became the Plaintiff's office manager.

20.     At all times relevant Azari was an at-will employee of the Plaintiff.

21.     Prior to the signing of the Affidavit (as herein defined), Azari did not have any severance agreement with Plaintiff regarding her employment or her compensation.

22.     In late 2012, the Foundation took over the management and control of Plaintiff. The Foundation is the sole shareholder of Plaintiff.

23.     During the final years of her life, the Princess's advanced age and deteriorating health resulted in the Princess spending limited time in New York.  Accordingly, Plaintiff's need for staff at the Townhouse decreased significantly, and the Foundation sought to reduce Plaintiff's expenses, including by reducing and/or terminating the salaries of staff members like Azari.

24.     The Princess died in January 2016.  At the time of the Princess' death, Azari was earning $9,000 a month for her services to Plaintiff.  Notwithstanding the Princess' death and the decreased need for staff at the Townhome, Azari's employment was maintained with Plaintiff at the reduced salary of $6,000 per month in the summer of 2016.

25.     In the fall of 2016, the need for staff at the Townhome further decreased.  Nevertheless, Azari's employment continued with Plaintiff at the reduced salary of $2,000 per month starting in December 2016.

26.     In or around December 2016, Azari chose to terminate her employment with Plaintiff.

27.     In or around 2016, the Plaintiff was insolvent.  The sum of its debts exceeded that of its assets and income in that the Townhouse was mortgaged, it had continuing payroll

4

obligations and obligations to other creditors, and had liens and warrants issued and recorded against its property by the Commissioner of Labor, State of New York resulting from its inability and failure to timely pay the amounts owed to the State.

28.    In or around 2016, the Townhouse produced no income for the Plaintiff, and the Plaintiff did not therefore have adequate capital at the time the debts were incurred to satisfy such liabilities.

29.    In or around 2016, as a result of the Plaintiff's lack of cash income, Golsorkhi advanced funds to the Plaintiff to meet some of its debt obligations.

**II.    Azari Procures a Confession of Judgment for No Consideration**

30.    On February 10, 2016, Golsorkhi signed an Affidavit of Confession of Judgment on behalf of Plaintiff in favor of Azari (the "**Affidavit**").

31.    The Affidavit states that Plaintiff was confessing a judgment in favor of Azari in the amount of $9,000 per month for the remainder of Azari's life or a lump sum of $2.7 million, purportedly in exchange for Azari's prior loyalty to the Princess and the Plaintiff.  The Affidavit recites no other consideration.

32.    At the time Golsorkhi signed the Affidavit, Debtor was not indebted to Azar in the amount set forth in the Affidavit.

33.    Upon information and belief, the Affidavit was drafted by Azari's son and attorney, Nader Mobargha, Esq. ("**Mobargha**").

34.    At the time the Affidavit was signed, the Plaintiff was insolvent or rendered insolvent and had no cash income.

35.    At the time the Affidavit was signed, the Plaintiff was not paying its bills as they became due.

36.    At the time the Affidavit was signed, the Townhouse was the subject of a mortgage, the Plaintiff had ongoing payroll obligations and obligations to other creditors.

37.    At the time the Affidavit was signed, non-consensual liens and warrants had been filed and recorded encumbering the Plaintiff's property.

38.    On February 12, 2016, Mobargha filed the Affidavit in the Supreme Court of the State of New York on behalf of Plaintiff.

39.    Based on the Affidavit, on April 21, 2016, the Clerk of the Court entered a judgment in favor of Azari and against Wansdown Properties in the amount of $2.7 million, plus $225 for filing fees (the "**Judgment**").

40.    At the time the Judgment was entered, the Plaintiff was insolvent or rendered insolvent.

41.    At the time the Judgment was entered, the Plaintiff was not paying its bills as they became due.

42.    At the time the Judgement was entered, the Townhouse was the subject of a mortgage, the Plaintiff had ongoing payroll obligations and obligations to other creditors.

43.    At the time the Judgment was entered, non-consensual liens and warrants had been filed and recorded encumbering the Plaintiff's property.

44.    On November 3, 2016, Mobargha served notice of entry of the Judgment on Plaintiff.

45.    The Debtor had no legal obligation to provide the Affidavit or the Judgment to Defendant

46.     When the Affidavit was signed and when the Judgment was entered, and at all relevant times thereafter, the Townhouse did not generate income, and the Debtor lacked sufficient funds to pay its debts such as real estate taxes or mortgage payments as they matured.

47.     When the Affidavit was executed and when the Judgment was entered, and at all relevant times thereafter, given the Debtor's lack of adequate cash to pay its debts, Golsorkhi was advancing funds to Debtor to pay the carrying costs of the Townhouse and other obligations of the Debtor

48.     When the Affidavit was executed and when the Judgment was entered, and at all relevant times thereafter, the Debtor was failing to timely pay its obligations.

49.     When the Affidavit was signed and when the Judgment was entered, the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor after the conveyance constituted unreasonably small capital.

50.     When the Affidavit was signed and when the Judgment was entered, the Debtor had incurred, intended to incur, or believed the Debtor would incur, debts that would be beyond the Debtor's ability to pay as those debts matured.

51.     The Affidavit was not signed, and the Judgment was not entered, on account of an antecedent debt owed by Debtor to Defendant.

## III.    Plaintiff Seeks to Vacate the Judgment

52.     On February 13, 2017, Plaintiff filed a plenary action in the Supreme Court of the State of New York against Azari seeking to vacate the Judgment.

53.     In its complaint, Plaintiff asserted that Golsorkhi did not have the authority to bind Plaintiff by signing the Affidavit.

54. Azari moved to dismiss the complaint on the basis that Plaintiff's controlling corporate documents provided Golsorkhi, in his position as president and managing director, with the authority to bind Plaintiff.

55. On October 17, 2017, the Supreme Court denied Azari's motion to dismiss, holding that Azari had not conclusively established her position with documentary evidence, and that Wansdown had stated a cause of action. In particular, the Supreme Court recognized that the key factual issue in the case was whether Golsorkhi had the authority to sign the Affidavit was a factual issue which needed to be addressed at trial.

56. On November 10, 2017, Azari filed a Notice of Appeal of the Supreme Court's Order to the Appellate Division First Department.

57. On November 18, 2018, the First Department reversed and dismissed Plaintiff's complaint, holding that Plaintiff's corporate documents refuted Plaintiff's claim that Golsorkhi lacked authority.

## IV.  Plaintiff's Bankruptcy Filing

58. On October 8, 2019 (the "**Petition Date**"), Plaintiff filed a voluntary petition for relief under chapter 11 of the title 11 of the United States Code (the "**Bankruptcy Code**") in this Court. Plaintiff continues to operate its business as a debtor in possession. No trustee has been appointed in this case and no Official Committee of Unsecured Creditors has been formed.

59. On November 6, 2019, the Court entered an order [D.I. 18] setting December 31, 2019, as the last day to file a proof of claim against Plaintiff.

60. Plaintiff filed its schedules of assets and liabilities on October 21, 2019 [D.I. 13]. As reflected in those schedules, there were and are creditors holding unsecured claims against Plaintiff that have not been satisfied.

8

61.    On December 12, 2019, Azari filed a proof of claim alleging that she holds a secured claim in the amount of $3,605,152.23 based on the Judgment. *See* Claim No. 6.

62.    The Bankruptcy Court entered its Order in the Debtor's case setting December 31, 2019 as the last date to file claims against the Debtor.

### FIRST CAUSE OF ACTION
### (Avoidance of Fraudulent Conveyance Under 11 U.S.C. §§ 544(b) and 550 and N.Y. Debt. & Cred. Law § 273, 278 and/or 279)

63.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as though fully set forth herein.

64.    Plaintiff did not receive fair consideration for the obligation set forth in the Affidavit.

65.    Plaintiff was insolvent at the time the Affidavit was executed or, in the alternative, Plaintiff became insolvent as a result of the execution of the Affidavit.

66.    At all relevant times there was and is at least one creditor who held and holds matured or unmatured unsecured claims against Plaintiff that were and are allowable under section 502 of the Bankruptcy Code.

67.    As a result of the foregoing, Plaintiff is entitled to judgment under sections 273, 278, and 279 of the New York Debtor and Creditor Law and section 544(b) and 550 of the Bankruptcy Code avoiding the obligation set forth in the Affidavit and directing that it be set aside.

### SECOND CAUSE OF ACTION
### (Avoidance of Fraudulent Conveyance Under 11 U.S.C. §§ 544(b) and 550 and N.Y. Debt. & Cred. Law § 273, 278 and/or 279)

68.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as though fully set forth herein.

69.    Plaintiff did not receive fair consideration for entry of the Judgment.

9

70.     Plaintiff was insolvent at the time the Judgment was entered or, in the alternative, Plaintiff became insolvent as a result of the entry of the Judgment.

71.     At all relevant times there was and is at least one creditor who held and holds matured or unmatured unsecured claims against Plaintiff that were and are allowable under section 502 of the Bankruptcy Code.

72.     As a result of the foregoing, Plaintiff is entitled to judgment under sections 273, 278, and 279 of the New York Debtor and Creditor Law and section 544(b) and 550 of the Bankruptcy Code avoiding the entry of the Judgment and directing that it be set aside.

**THIRD CAUSE OF ACTION**
**(Avoidance of Fraudulent Conveyance Under 11 U.S.C. §§ 544(b) and 550 and N.Y. Debt. & Cred. Law § 275, 278 and/or 279)**

73.     Plaintiff repeats and realleges the allegations contained in all prior paragraphs as though fully set forth herein.

74.     Plaintiff did not receive fair consideration for the obligation set forth in the Affidavit.

75.     At the time the Affidavit was executed, Plaintiff had no income and no ability to pay its ordinary course obligations or the obligations in the Affidavit.

76.     At all relevant times there was and is at least one creditor who held and holds matured or unmatured unsecured claims against Plaintiff that were and are allowable under section 502 of the Bankruptcy Code.

77.     As a result of the foregoing, Plaintiff is entitled to judgment under sections 275, 278, and 279 of the New York Debtor and Creditor Law and sections 544(b) and 550 of the Bankruptcy Code annulling the obligation set forth in the Affidavit and directing that the Affidavit be set aside.

### FOURTH CAUSE OF ACTION
**(Avoidance of Fraudulent Conveyance Under 11 U.S.C. §§ 544(b) and 550 and
N.Y. Debt. & Cred. Law § 275, 278 and/or 279)**

78.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as though fully set forth herein.

79.    Plaintiff did not receive fair consideration for the entry of the Judgment.

80.    At the time the Judgment was entered, Plaintiff had no income and no ability to pay its ordinary course obligations or the Judgment.

81.    At all relevant times there was and is at least one creditor who held and holds matured or unmatured unsecured claims against Plaintiff that were and are allowable under section 502 of the Bankruptcy Code.

82.    As a result of the foregoing, Plaintiff is entitled to judgment under sections 275, 278, and 279 of the New York Debtor and Creditor Law and sections 544(b) and 550 of the Bankruptcy Code annulling the entry of the Judgment and directing that it be set aside.

### FIFTH CAUSE OF ACTION
**(Avoidance of Fraudulent Conveyance Under 11 U.S.C. §§ 544(b) and 550 and
N.Y. Debt. & Cred. Law § 274, 278 and/or 279)**

83.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as though fully set forth herein.

84.     Plaintiff did not receive fair consideration for the obligation set forth in the Affidavit.

85.    At the time the Affidavit was executed, Plaintiff was engaged in or was about to engage in a business or transaction for which the property remaining after the conveyance was an unreasonably small capital.

11

86.     At all relevant times there was and is at least one creditor who held and holds matured or unmatured unsecured claims against Plaintiff that were and are allowable under section 502 of the Bankruptcy Code.

87.     As a result of the foregoing, Plaintiff is entitled to judgment under sections 274, 278, and 279 of the New York Debtor and Creditor Law and sections 544(b) and 550 of the Bankruptcy Code annulling the obligation set forth in the Affidavit and directing that it be set aside.

**SIXTH CAUSE OF ACTION**
**(Avoidance of Fraudulent Conveyance Under 11 U.S.C. §§ 544(b) and 550 and**
**N.Y. Debt. & Cred. Law § 274, 278 and/or 279)**

88.     Plaintiff repeats and realleges the allegations contained in all prior paragraphs as though fully set forth herein.

89.     Plaintiff did not receive fair consideration for the entry of the Judgment.

90.     At the time the Judgment was entered, Plaintiff as engaged in or was about to engage in a business or transaction for which the property remaining after the conveyance was an unreasonably small capital.

91.     At all relevant times there was and is at least one creditor who held and holds matured or unmatured unsecured claims against Plaintiff that were and are allowable under section 502 of the Bankruptcy Code.

92.     As a result of the foregoing, Plaintiff is entitled to judgment under sections 274, 278, and 279 of the New York Debtor and Creditor Law and sections 544(b) and 550 of the Bankruptcy Code annulling the entry of the Judgment and directing that it be set aside.

## SEVENTH CAUSE OF ACTION
**(Disallowance of Claim under 11 U.S.C. § 502(b) and (d))**

93.     Plaintiff repeats and realleges the allegations contains in all prior paragraphs as though fully set forth herein.

94.     By proof of claim dated December 12, 2019 (the "**Claim**"), Azari has asserted a secured claim in the amount of $3,605,152.23 based on the Judgment.

95.     The Claim is not supported by the books and records of Plaintiff and is only supported by the Affidavit and Judgment.  To the extent the Affidavit and Judgment are avoided, the Claim must be disallowed.

96.     As a result of the foregoing, Plaintiff is entitled to an order disallowing the Claim.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court enter judgment in favor of Plaintiff and against Azari:

1.     avoiding the obligations created by the Affidavit as fraudulent conveyances under sections 273, 278, and 279 of the New York Debtor and Creditor Law and section 544(b) of the Bankruptcy Code;

2.     avoiding the transfers represented by entry of the Judgment as fraudulent conveyances under sections 273, 278, and 279 of the New York Debtor and Creditor Law and section 544(b) of the Bankruptcy Code;

3.     avoiding the obligations created by the Affidavit as fraudulent conveyances under sections 274, 278, and 279 of the New York Debtor and Creditor Law and section 544(b) of the Bankruptcy Code;

13

4.      avoiding the transfers represented by entry of the Judgment as fraudulent conveyances under sections 274, 278, and 279 of the New York Debtor and Creditor Law and section 544(b) of the Bankruptcy Code;

5.      avoiding the obligations created by the Affidavit as fraudulent conveyances under sections 275, 278, and 279 of the New York Debtor and Creditor Law and section 544(b) of the Bankruptcy Code;

6.      avoiding the transfers represented by entry of the Judgment as fraudulent conveyances under sections 275, 278, and 279 of the New York Debtor and Creditor Law and section 544(b) of the Bankruptcy Code;

7.      disallowing the Claims; and

8.      granting Plaintiff such other and further relief as may be just and proper.

Dated: New York, New York
       January 6, 2020

                                        BLANK ROME LLP

                                        By:     /s/ Ira L. Herman
                                                Ira L. Herman
                                                Evan J. Zucker
                                        1271 Avenue of the Americas
                                        New York, NY 10020
                                        Tel:  212-885-5000
                                        Fax:  212-885-5001

                                        *Special Litigation Counsel for Plaintiff*

## EXHIBIT 3

## Docketed Judgment in *Azadeh Nasser Azari v. Wansdown Properties Corporation, N.V.*, Index No. 652137/2016

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------x

AZADEH NASSER AZARI,

        *Plaintiff,*

        -against-

WANSDOWN PROPERTIES CORPORATION N.V.

        *Defendant.*

------------------------------------------------------------x

Index No. 652137 /16

**JUDGMENT**

Upon the Affidavit of Confession of Judgment by Wansdown Properties Corporation,

N.V. ("Wansdown"), dated and notarized on February 10, 2016, and signed by Gholam Reza

Golsorkhi, the President and Managing Director of Wansdown, and the Head of the Private

Secretariat of Her Imperial Highness Princess Achraf Pahlavi (the "Confession of Judgment");

And in accordance with the requirements of Civil Practice Law and Rules ("CPLR")

section 3218;

NOW, on application of BEYS LISTON MOBARGHA & BERLAND LLP, counsel for

Plaintiff Azadeh Nasser Azari, it is hereby

Adjudged that the plaintiff, Azadeh Nasser Azari, with an address of 360 East 55th Street,

apartment 13h, New York, New York, 10022, recover of the defendant, Wansdown Properties

Corporation N.V., with an address of 29 Beekman Place, New York, New York 10022,

the sum of $2,700,000.00, and costs and disbursements in the sum of $~~210.00~~ 225.00, and total sum of

$~~2,700,210.00~~ 2,700,225.00; and that the plaintiff shall have execution thereof.

**FILED**

APR 21 2016

COUNTY CLERK'S OFFICE
NEW YORK

Milton A. Tingling
Clerk

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------- x

AZADEH NASSER AZARI,

        *Plaintiff,*

    -against-

WANSDOWN PROPERTIES CORPORATION N.V.

        *Defendant.*

-------------------------------------------------------------- x

Index No. 652137/2016

**AFFIRMATION FOR BILL OF COSTS**

I HEREBY CERTIFY THAT I HAVE ADJUSTED THIS BILL OF COSTS AT $ 225

APR 2 1 2016

CLERK

STATE OF NEW YORK    )
                      ) ss.:
COUNTY OF NEW YORK  )

      I, **NADER MOBARGHA**, an attorney duly admitted to practice before all the Courts of

the State of New York, duly affirm that the following is the following Bill of Costs for the

Plaintiff in the above-captioned matter:

**Costs and Disbursements**

Index Number Fee...................................................................$210

Cost under CPLR § 3218.........................................................$15

                                                   **TOTAL:** $225

Dated:  April 21, 2016
        New York, New York

                         Nader Mobargha, Esq.

**FILED**

APR 2 1 2016

COUNTY CLERK'S OFFICE
NEW YORK

1

| | |
|---|---|
| Index No. 652137/16 | |

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

AZADEH NASSER AZARI,

Plaintiff,

-against-

WANSDOWN PROPERTIES CORPORATION N.V.,

Defendant.

---

**JUDGMENT** *and Bill of costs*

---

Beys Liston Mobargha & Berland, LLP
Attorneys for Plaintiff
825 Third Avenue, 2nd floor
New York, New York 10022
T: (646)- 755-3603
F: (646) 755-3599

nmobargha@blmblaw.com

**FILED AND
DOCKETED**

APR 2 1 2016

AT *12:50 p* M

N.Y., CO. CLK'S OFFICE

---

Service a copy within _____ is hereby admitted.

Dated,

_____
Attorney(s) for

## EXHIBIT 4

## Excerpt from January 16, 2020 Court Hearing

```
                    UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK
```

<table>
<tr><td>1</td><td></td></tr>
</table>

|  |  |  |
|---|---|---|
| 1 | *In re:* | Case No. 19-13223-smb |
| 2 | WANSDOWN PROPERTIES CORPORATION N.V., | New York, New York<br>January 16, 2020 |
| 3 | *Debtor.* | 10:43 a.m. - 12:07 p.m. |

4   19-13223-SMB, WANSDOWN PROPERTIES CORPORATION N.V., CHAPTER 11
    CASE CONFERENCE; MOTION PURSUANT TO 11 U.S.C. 363 AND 365 AND
5     FED. R. BANKR. P. 2002 AND 6004 FOR AN ORDER APPROVING THE
       SALE OF THE DEBTOR'S REAL PROPERTY; CONFIRMATION HEARING

6   A P P E A R A N C E S :

7   *For the Debtor:*              PAUL A. RUBIN, ESQ.
                                   HANH V. HUYNH, ESQ.
8                                  Rubin LLC
                                   345 Seventh Avenue, 21st Floor
9                                  New York, New York 10001
                                   (212) 390-8054; (212) 390-8064 fax
10

11  *For Secured Creditor,*        NADER MOBARGHA, ESQ.
    *Azadeh Nasser Azari:*         Beys Liston & Mobargha LLP
12                                 641 Lexington Avenue, 14th Floor
                                   New York, New York 10022
13                                 (646) 755-3603; (646) 755-3599 fax

14  *For National Investment*      DAWN KIRBY, ESQ.
      *Bank:*                      Kirby Aisner & Curley LLP
15                                 700 Post Road, Suite 237
                                   Scarsdale, New York 10583
16                                 (914) 401-9500

17  *Special Litigation and Tax*   IRA L. HERMAN, ESQ.
      *Counsel for Debtor:*        Blank Rome LLP
18                                 1271 Avenue of the Americas
                                   New York, New York 10020
19                                 (212) 885-5052; (914) 629-4221 fax

20
    *For 29 Beekman Corp:*         SETH ANDREW AKABAS, ESQ.
21                                 Akabas & Sproule
                                   488 Madison Avenue, 11th Floor
22                                 New York, New York 10022-5702
                                   (212) 308-8505; (212) 308-8582 fax
23
    *Transcriber:*                 AA EXPRESS TRANSCRIPTS
24                                 (888) 456-9716
                                   aaexpress@court-transcripts.net
25
          *(Proceedings recorded by electronic sound recording)*

1  file a plan.  You're going to have to file another disclosure

2  statement and re-solicit at least the unsecured class.  You

3  don't have to re-solicit the secured class, I wouldn't thing.

4  They're not affected.

5          MR. RUBIN:  We understand.

6          THE COURT:  All right.

7          ALL COUNSEL:  Thank you.

8          THE COURT:  Thank you.  (Pause.)  Let me move things

9  along.  You're going to file an adversary?  Have you filed your

10 adversary proceeding?

11         MR. HERMAN:  We filed.

12         THE COURT:  All right.  And your theory is what?

13         MR. HERMAN:  The theory is that at the time that the

14 Debtor granted confession of judgment to Ms. Azari, the Debtor

15 was not obligated to Ms. Azari for any amount.

16         THE COURT:  So, you're seeking to void the obligation.

17         MR. HERMAN:  To avoid the obligation and the judgment.

18 There are two transfers, arguably.  The creation of the

19 obligation and the recording the lien and the judgment.

20         THE COURT:  Isn't the argument foreclosed that there

21 was no obligation at the time?  Couldn't you have raised that in

22 state court as an --

23         MR. HERMAN:  But, Your Honor, the Debtor could not

24 have raised the fraudulent conveyance argument in state court.

25         THE COURT:  Putting aside the fraudulent conveyance,

1  there's a difference between saying something is not supported

2  by consideration for contract law, and saying that there's no

3  fair equivalent for the lien --

4          MR. HERMAN:  The latter is the theory --

5          THE COURT:  Well, I guess for the obligation.

6          MR. HERMAN:  Right.  The latter is the theory of the

7  case because that was a creditors' remedy pre-petition and the

8  Debtor's --

9          THE COURT:  No, I understand.

10          MR. HERMAN:  And, Your Honor, what I was going to get

11 up and say when you started ruling and you sat down, was Your

12 Honor, the Debtor's intention is to seek a scheduling order that

13 would allow this case to be resolved before Your Honor retires.

14          MR. HERMAN:  There's like a hard stop on that date,

15 Judge.

16          THE COURT:  That's a very compelling argument.

17          MR. RUBIN:  Your Honor, when we submit this more

18 vanilla sale order, would you like a blackline against the

19 blackline or against the original?

20          THE COURT:  A blackline against the original.  I

21 haven't looked at the other one.  And email it to my chambers.

22          MR. RUBIN:  Very good, Your Honor.

23          THE COURT:  In Word format and you can send the

24 blackline in PDF.  That's usually the way it works.  All right.

25 Thank you very much.

**EXHIBIT 5**

**Excerpt from Debtor's Title Report:   Judgment Docket and Lien Information**

# Judgment Docket & Lien Information:

### Judgment Docket - Control Number 003529868 - 01

### For WANSDOWN in NEW YORK COUNTY

| Docketing Data | | | | Source Document | | | |
|---|---|---|---|---|---|---|---|
| Docketing Date | 10/12/2016 | | | Type | CT - NY CITY TAX WARRANT | | |
| Docketing Time | 12:00 | | | County | 31 - NEW YORK | | |
| Effective Date | 9/27/2016 | | | Court | | | |
| Effective Time | 12:00 | | | Total Debtors | 01 | | |
| Clerk / Seq # | WRNTTAPE 494 | | | Index # | 0000000026 | | |

| Debtor / Corporation | | | | Creditor | | | |
|---|---|---|---|---|---|---|---|
| Name | WANSDOWN PROPERTIES CORP NV | Type | C | Name | NYC DEPARTMENT OF FINANCE | Type | C |
| Address | 29 BEEKMAN PL | | | Address | 59 MAIDEN LANE | | |
| City | NEW YORK NY | Zip Code | 10022 8004 | City | NEW YORK NY | Zip Code | 10038 |
| Occupation | | | | | | | |

| Creditor Attorney | | | | Satisfaction Data | | |
|---|---|---|---|---|---|---|
| Name | NYC, DIRECTOR OF | Type | I | Type | Sheriff's Execution | |
| Address | 59 MAIDEN LANE 28 FL. | | | Date | Operator ID | |
| City | NEW YORK NY | Zip Code | 10038 | | | |

Amount - $36,573.57

Download Date: 10/5/2016

## Remarks

| Date | Remarks |
|---|---|
| 10/12/2016 | WARRANT # 00000000268193 |

## For WANSDOWN in NEW YORK COUNTY

| Docketing Data | | | | Source Document | | | |
|---|---|---|---|---|---|---|---|
| Docketing Date | 1/18/2017 | | | Type | ST - NY STATE TAX WARRANT | | |
| Docketing Time | 10:00 | | | County | 31 - NEW YORK | | |
| Effective Date | 1/14/2017 | | | Court | | | |
| Effective Time | 10:00 | | | Total Debtors | 01 | | |
| Clerk / Seq # | NYSTAX 366 | | | Index # | E017607604 | | |

| Debtor / Corporation | | | | Creditor | | | |
|---|---|---|---|---|---|---|---|
| Name | WANSDOWN PROPERTIES CORPORATION N.V. | Type | C | Name | NY STATE DEPT OF TAXATION AND FINANCE | Type | C |
| Address | 29 BEEKMAN PL | | | Address | | | |
| City | NEW YORK NY | Zip Code | 10022 8004 | City | | Zip Code | |
| Occupation | | | | | | | |

| Creditor Attorney | | | | Satisfaction Data | | | |
|---|---|---|---|---|---|---|---|
| Name | | Type | | Type | | Sheriff's Execution | |
| Address | | | | Date | | Operator ID | |
| City | | Zip Code | | | | | |

Amount - $103.69                                                                                                    Download Date: 1/17/2017

# Remarks

No Remarks

## For WANSDOWN in NEW YORK COUNTY

| Docketing Data | | | | |
|---|---|---|---|---|
| Docketing Date | 1/18/2017 | | | |
| Docketing Time | 10:00 | | | |
| Effective Date | 1/14/2017 | | | |
| Effective Time | 10:00 | | | |
| Clerk / Seq # | NYSTAX 367 | | | |

| Source Document | |
|---|---|
| Type | 6T - NY STATE TAX WARRANT |
| County | 31 - NEW YORK |
| Court | |
| Total Debtors | 01 |
| Index # | E017607604 |

| Debtor / Corporation | | | | |
|---|---|---|---|---|
| Name | WANSDOWN PROPERTIES CORPORATION N.V. Type | | | C |
| Address | 29 BEEKMAN PL | | | |
| City | NEW YORK NY | | Zip Code | 10022 5004 |
| Occupation | | | | |

| Creditor | | | |
|---|---|---|---|
| Name | NY STATE DEPT OF TAXATION AND FINANCE Type | | C |
| Address | | | |
| City | | Zip Code | |

| Creditor Attorney | | | |
|---|---|---|---|
| Name | | Type | |
| Address | | | |
| City | | Zip Code | |

| Satisfaction Data | |
|---|---|
| Type | Sheriff's Execution |
| Date | Operator ID |

Amount - $9,623.53

## Remarks

No Remarks

# EXHIBIT 6

## Sale Prices From 2015 – 2019 For The Townhouse

**1 ACTIVE SALE IN THIS BUILDING**

SINGLE-FAMILY HOME IN B

29 Beekman Place

**$14,500,000**

10          9



## House: 29 Beekman Plac
29 Beekman Place, New York, NY, 10022

1 unit     6 stories     Built in 1910

Single-Family Home in Beekman

☆ SAVE          ✉ S



# Description

29 Beekman Place is a remarkable residence was built in 1934 by William S. Paley, head of CBS for his wife, Dorothy Paley and they lived there until 1940. The house was subsequently acquired by Albert and Mary Lasker, the noted philanthropists who lived there for 35 years. Since 1975, it has housed equally notable and accomplished

**READ MORE**

## Amenities

StreetEasy Verified

LOCATION

NYC Storm Zone 6

## Building Facts

| | |
|---|---|
| Facts | 1 unit    6 stories    Built in 1910 |
| Building Class | A4 |
| District | Community District 106    City Council District 4    Police Precinct 17 |
| Floorplans | 10 floorplans available |
| Documents and Permits | 3 documents and permits |
| Sales Listings | 1 active sale ($1,183 per ft² avg, $14,500,000 avg price)<br>5 previous sales ($2,747 per ft² avg, $32,560,000 avg price) |

## Units

Filter th

| Date ▼ | Unit | Price | Listing status | Beds | Baths | ft² | Fl |
|---|---|---|---|---|---|---|---|
| 09/18/2019 | Unknown | $16,900,000 | No Longer Available on StreetEasy | 10 beds | 9 baths | 12,260 ft² | |
| 10/24/2017 | Unknown | $28,000,000 | No Longer Available on StreetEasy | 8 beds | 7+ baths | 12,240 ft² | |
| 09/14/2016 | Unknown | $34,000,000 | No Longer Available on StreetEasy | 10 beds | 11 baths | 12,268 ft² | |
| 01/18/2016 | Unknown | $34,000,000 | No Longer Available on StreetEasy | 10 beds | 9 baths | 11,000 ft² | |
| 01/01/2015 | Unknown | $49,900,000 | No Longer Available on StreetEasy | 8 beds | 11 baths | 11,500 ft² | |

## Nearby

TRANSPORTATION



at Lexington Av-53 St **0.46 miles**

at 51st St **0.47 miles**

at 42 Street - Grand Central **0.59 miles**

 N R     W at Lexington Av-59 St **0.62 miles**

at Grand Central **0.62 miles**

© Mapbox | © OpenStreetMap

VIE

[View subway lines on Google Maps ▶](#)

SCHOOLS

**District 02** - Schools zoned for this address:

[P.S. 059 Beekman Hill International](#) (PK,0K,01,02,03,04,05,SE)

[J.H.S. 104 Simon Baruch](#) (06,07,08,SE)

Disclaimer: School attendance zone boundaries are not guaranteed to be accurate – they are provided by a third party and subject to change. Check with the applicable school district prior to making a decision based on these boundaries.

## Similar Buildings

### 414 East 50th Street

Single-Family Home in Beekman

### 411 East 50th Street

Single-Family Home in Beekman

### 21 Beekman Place

Single-Family Home in Beekman

**111 Murray Stree**

1- to 5-BRs from $2.
Immediate Occupar
Models Now Open

## Latest discussions

**BE THE FIRST TO CREATE A DISCUSSION ABOUT THIS LISTING**

## More Listings

**MORE SALES LISTINGS IN BEEKMAN**

**MORE RENTALS LISTINGS IN BEEKMAN**

**EXHIBIT 7**

**December 17, 2017 Contract of Sale between the Debtor and Secured Capital Ptrs. LLC**

KDW DRAFT 12/17/2017

### Contract of Sale

THIS CONTRACT OF SALE (this "***Contract***") is made and entered into as of the 18th day of December, 2017 by and between **WANSDOWN PROPERTIES CORPORATION N.V.**, a Netherlands Antilles limited liability company, having an address at Schottegatweg Oost 44, Curacao ("***Seller***") and **SECURED CAPITAL PARTNERS LLC**, having an address at 10727 Wilshire Blvd., Los Angeles, CA 90024 ("***Purchaser***"). The parties hereby agree as follows:

1. **Premises.**

(a) Seller shall sell and convey and Purchaser shall purchase the property, together with all buildings and improvements thereon (collectively the "***Premises***"), more particularly described hereinbelow and commonly known as 29 Beekman Place, New York, New York.

(b) Seller shall cause to be conveyed, and Purchaser shall accept, good, unencumbered and insurable fee simple title to the Premises in accordance with the terms of this Contract, together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

(c) Purchaser shall cooperate with Seller, at Seller's request, to alter and amend this Contract prior to Closing so as to qualify as a tax free exchange as defined in Section 1031 of the Internal Revenue Code of 1986 as amended.

(d) Purchaser shall have the right at any time prior to Closing (as herein defined) to assign, and transfer the benefits and burdens to, this Contract by notice in writing to Seller to any person with which Purchaser is directly or indirectly affiliated.

2. **Personal Property.** This sale also includes all fixtures now attached or appurtenant to the Premises, but excludes all personal property including chandeliers, furniture and household furnishings, artwork, sculptures, statuaries and items of personal property on the grounds of the Premises.

3. **Purchase Price.** The Purchase Price for the sale of the Premises is SEVENTEEN MILLION AND NO/100 DOLLARS

($17,000,000), payable as follows:

(a) on the signing of this Contract, by bank wire to the client trust account of Escrowee (as herein defined), to be confirmed in writing by Purchaser's bank within two business days after execution hereof and which will be held in escrow pursuant to Paragraph 4 hereof (the "*Down Payment*"): ONE MILLION SEVEN HUNDRED THOUSAND AND NO/100 DOLLARS ($1,700,000).

(b) on Closing (as herein defined), by bank wire to Escrowee's client trust account or Purchaser's good check payable to the Escrowee: FIFTEEN MILLION THREE HUNDRED THOUSAND AND NO/100 DOLLARS ($15,300,000).

4. **Down Payment in Escrow.**

(a) Seller's attorney identified on the signature page hereto ("*Escrowee*") shall hold the Down Payment in escrow in a segregated interest bearing bank account at Citibank, N.A., 153 East 53rd Street, New York, NY 10043 until the Release Date (as herein defined). All interest shall be for the account of Seller.

(b) From and after complete execution of this Contract, Purchaser shall commence due diligence regarding title and right of possession to the Premises and review of the physical condition of the Premises, including physical inspection of the Premises in its "as is" condition. Purchaser shall have the right, exercisable by notice in writing to Seller, to terminate this Contract on or before January 8, 2018 ("Release Date") based on the result of its diligence and inspection. Purchaser shall only exercise its right of termination based on its good faith judgment that there is a previously undisclosed material defect in Seller's title or right of possession and occupancy of the Premises or in its physical condition, such as for example if structural repairs to the Premises would require an investment substantially in excess of $100,000. Purchaser reaffirms its good faith intention to complete the purchase of the Premises on the terms set forth in this Contract absent a material undisclosed defect in Seller's title or right to possession of the Premises or in its physical structure. Should Purchaser exercise such right to termination, Escrowee shall return the Down Payment to Purchaser. If Purchaser does not give such notice in writing to the Escrowee on or before the Release Date, Escrowee shall pay the Down Payment plus interest thereon to the Seller.

(c) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in

willful disregard of this Contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this Contract or involving gross negligence on the part of Escrowee.

(d) Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

(e) Escrowee acknowledges receipt of the Down Payment by check subject to collection and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this Contract.

(f) Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Down Payment or any other dispute between the parties whether or not Escrowee is in possession of the Down Payment and continues to act as Escrowee.

(g) Seller shall be liable to Purchaser for any loss of the Down Payment.

5. **Covenants Prior To Closing.**

(a) Closing shall occur as herein provided on a date designated by Purchaser by notice in writing to Seller but no later than ninety (90) days after the date of this Contract ("Outside Date").

(b) Purchaser shall have the right and option, exercisable if at all prior to the expiration of such ninety (90) period, by notice in writing to Seller, to extend the date for Closing to a further date designated by Purchaser but no later than the date sixty (60) days after the Outside Date. If Purchaser so elects to extend the date of Closing, Purchaser shall pay to Escrowee the additional sum of ONE MILLION SEVEN HUNDRED THOUSAND AND NO/100 DOLLARS ($1,700,000) ("Extension Payment") which shall be credited against the balance of the Purchase Price then remaining due.

(c) From and after the Release Date until the date of Closing or the Outside Date as extended (which is later), Purchaser shall pay the following costs associated with the Premises whether or not Closing shall occur: (i) Seller's current monthly mortgage payments ($TBD), (ii) monthly utility

charges, (iii) any property taxes falling due in this period and (iv) existing structural damages to the Premises at a cost not to exceed ONE HUNDRED THOUSAND DOLLARS ($100,000) (collectively "Pre-Closing Costs").

(d) Should Closing not occur on or before the Outside Date as may be extended by the terms hereof for any reason other than Seller's refusal to perform or to deliver title to the Premises as herein agreed or Seller's other material breach of this Contract, Seller may retain the Down Payment and the Extension Payment for its own account as liquidated damages for Purchaser's failure to complete the purchase of the Premises as herein agreed. Otherwise Seller shall promptly return the Down Payment and Extension Payment (if any), and repay the Pre-Closing Costs, to Purchaser without interest.

6. **Acceptable Funds**. All money payable under this Contract, unless otherwise specified, shall be paid by:

(a) Cash but not more than $500.00;

(b) Wire transfer or official bank check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser; and

(c) As otherwise agreed to in writing by Seller or Seller's attorney.

7. **Permitted Exceptions**. The Premises are sold and shall be conveyed subject to:

(a) Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

(b) Consents for the erection of any structures on, under or above any streets on which the Premises abut;

(c) Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway; and

(d) Real estate taxes that are a lien, but are not yet due and payable.

8. **Seller's Representations and Covenants**.

(a) Seller represents and warrants to Purchaser that:

(i) The Premises abut or have a right of access to a public road; and

(ii) Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this Contract, free and clear of any and all encumbrances of any nature or kind whatsoever except as specifically permitted hereunder.



(b) Seller covenants and warrants that all of the representations and warranties set forth in this Paragraph shall be true and correct at Closing.

(c) Except as otherwise expressly set forth in this Contract, none of Seller's covenants, representations, warranties or other obligations contained in this Contract shall survive Closing.

9. **FinCen Form 8300**. Purchaser covenants that Purchaser shall cooperate with Escrowee in the preparation and delivery of the FinCen Form 8300 (Report of Cash Payment Over $10,000 Received in a Trade or Business) (*"FinCen Form 8300"*).

10. **Purchaser Representation.** Purchaser is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named on any sanction list of the European Union, the Principality of Liechtenstein or by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and Purchaser is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation. Any breach by Purchaser of the representations in this Paragraph 9, shall constitute a default hereunder and entitle Seller to immediately terminate this Contract of Sale and retain the Down Payment.

11. **Purchaser Disclosure.** Within one (1) business day of delivery by Seller of a fully executed Contract of Sale, Purchaser shall provide Seller a written disclosure of the identity of each and every individual who, directly or indirectly, owns any equity interest in Purchaser. Such disclosure shall include such individual's (s') driver's license, passport, or other similar identifying documentation. Purchaser's failure to comply with this Paragraph 10, shall constitute a default hereunder and entitle Seller to immediately terminate this Contract of Sale and retain the Down Payment.

12. **Condition of Property**. Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this Contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same **"AS IS/WHERE IS** in their present condition and state of repair. All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems (including elevators), equipment and machinery in the building(s) located on the property shall be delivered in their **"AS IS/WHERE IS"** condition at the time of Closing subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of Closing, without any reduction in the purchase price or claim of any kind for any change in such condition by reason thereof subsequent to the date of this Contract. Purchaser and its authorized



representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

13. **Governmental Violations.** Seller shall convey and Purchaser shall accept the Premises subject to any violations of law or municipal ordinances, orders or requirements, noted or issued as of the date of Contract through and including the date of Closing, by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises, including without limitation the violation for the cracked masonry wall. The Premises shall be conveyed subject to such violations, notes and orders at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters

14. **Insurable Title.** Seller shall give and Purchaser shall accept such title as a reputable title insurance company shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this Contract.

15. **Closing, Deed and Title.** *"Closing"* means the settlement of the obligations of Seller and Purchaser to each other under this Contract, including the payment of the Purchase Price to Seller, and the delivery to Purchaser of a bargain and sale fee title simple deed with covenant against grantor's acts in proper statutory short form for recording, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by Section 13(5) of the Lien Law.

16. **Closing Date and Place.** Closing shall take place at the office of Seller's attorney, Kelley Drye & Warren LLP, 101 Park Avenue, New York, New York, at the time and date designated by Purchaser by notice in writing to Seller but no later than the Outside Date as may be extended as provided herein.

17. **Conditions to Closing.** This Contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

(a) The accuracy, as of the date of Closing, of the representations and warranties of Seller and Purchaser made in this Contract of Sale.

(b) The delivery of the Premises and all building(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with



keys to the Premises.

(c) Delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting alarm device or devices.

(d) Delivery by the parties of any other affidavits customarily required as a condition of recording the deed.

18. **Deed Transfer and Recording Taxes**. At Closing, certified or official bank checks payable to the order of the appropriate State, City or County officer in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed shall be delivered by the party required by law or by this Contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

19. **Apportionments and Other Adjustments; Water Meter and Installment Assessments.**

(a) To the extent applicable, the following shall be apportioned as of midnight of the day before the day of execution of this Contract and shall be deemed Pre-Closing Costs hereunder payable by Purchaser but reimbursed by Seller if, as and when required by Paragraph 5 hereof: (i) taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; (iii) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (iv) vault charges; (v) rents as and when collected.

(b) If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

(c) If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than thirty (30) days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d) If at the date of Closing the Premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this Contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e) Any errors or omissions in computing apportionments or other adjustments at Closing shall be

corrected within a reasonable time following Closing. This subparagraph shall survive Closing for a period of 60 days following Closing.

20. **Allowance for Unpaid Taxes, etc.** Subject in all events to the terms of Paragraph 5 hereof, Seller has the option to credit Purchaser as an adjustment to the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less than five (5) business days after Closing, provided that official bills therefor computed to said date are produced at Closing.

21. **Title Examination; Seller's Inability to Convey; Limitations of Liability.**

(a) Purchaser shall order an examination of title in respect of the Premises from the Title Company or any agent for the Title Company promptly after the execution of this Contract. Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney for Seller promptly after receipt thereof.

(b) (i) If at the date of Closing Seller is unable to transfer title to Purchaser in accordance with this Contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "*Defects*"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this Contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding sixty (60) days in the aggregate, and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this Contract by Notice to the other given within ten (10) days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage and any

matter created by Seller after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c) If this Contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this Contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that Seller shall pay to Purchaser the sums provided in Paragraph 5 hereof.

22. **Defaults and Remedies**. If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the payments set forth in Paragraph 5 as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that such Purchaser payments constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty. If Seller defaults hereunder Purchaser may elect either to (i) terminate this Contract and recover all Purchaser payments as provided in Paragraph 5 hereof or (ii) specifically enforce Seller's obligations to convey the Premises in accordance with this Contract. Purchaser hereby expressly waives all other remedies available at law or at equity with regard to a Seller default.

23. **Notices**. Any notice or other communication ("*Notice*") shall be in writing and either:

(a) sent by either of the parties hereto or by their respective attorneys who are hereby authorized to do so on their behalf or by the Escrowee, by registered or certified mail, postage prepaid, or

(b) delivered in person or by overnight courier, with receipt acknowledged, to the respective addresses given in this Contract for the party and the Escrowee, to whom the Notice is to be given, or to such other address as such party or Escrowee shall hereafter designate by Notice given to the other party or parties and the Escrowee pursuant to this paragraph. Each Notice mailed shall be deemed given on the third business day following the date of mailing the same, except that any notice to Escrowee shall be deemed given only upon receipt by Escrowee and each Notice delivered in person or by overnight courier shall be deemed given when delivered, or



(c) sent by fax or electronic internet communication to the party's attorney. Each notice by fax or internet communication shall be deemed given when transmission is confirmed by the sender's fax machine computer.

A copy of each notice sent to a party shall also be sent to the party's attorney. The attorneys for the parties are hereby authorized to give and receive on behalf of their clients all Notices and deliveries.

24. **No Assignment.** This Contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

25. **Consultant.** Seller and Purchaser each represents and warrants to the other that it has not dealt with any Consultant/Broker in connection with this sale other than Core Capital Holdings, LLC ("Consultant") and Seller shall pay Consultant 3% of the Purchase Price. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this Contract.

26. **Miscellaneous.**

(a) All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this Contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this Contract.

(b) Neither this Contract nor any provision thereof may be waived, changed or cancelled except in writing. This Contract shall also apply to and bind the heirs, distributes, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this Contract.

(c) Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever this Contract may require it.

(d) The captions in this Contract are for convenience of reference only and in no way define, limit or describe the scope of this Contract and shall not be considered in the interpretation of this Contract or any provision hereof.

(e) This Contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

(f) Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(g) Each party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this Contract. This subparagraph shall



survive Closing.

(h) This Contract is intended for the exclusive benefit of the parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK SIGNATURES ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, this Contract has been duly executed by the parties hereto.

**SELLER:**
**WANSDOWN PROPERTIES CORPORATION**
N.V., a Netherlands Antilles limited liability Company

By: _____

~~Robert F. Armao~~  Gholam Reza Golsorkhi
~~Director~~
Attorney for Seller:
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
Attention: Robert D. Bickford, Jr., Esq.
Tel.: (212) 808-7638
Fax: (212) 808-7897

**PURCHASER:**

**SECURED CAPITAL PARTNERS LLC**

By: _____
Name: Victor Franco Noel
Title: President

Attorney for Purchaser:

Law Offices of Anthony A. Capetola

Two Hillside Avenue - Building C
Willston Park, New York 11596
Attention: Michael C. Barrows, Esq.
Tel: (516) 746-2300
Fax: (516) 746-2318

Receipt of the Down Payment is acknowledged and the undersigned agrees to act in accordance with the provisions of Paragraph 4 hereof.

ESCROWEE:

**KELLEY, DRYE & WARREN** LLP

By: _Robert J. Birch_

Name: ROBERT J. BIRCELL, JR.
Title: PARTNER

**PREMISES**:

Block: 1361
Lot: 121
County or Town: New York County
Street No. Address: 29 Beekman Place

4825-0687-0869v.4