Nader Mobargha
Alison Moss
BEYS LISTON & MOBARGHA LLP
641 Lexington Avenue, 14th Floor
New York, New York 10022
(646) 755-3603
nmobargha@blmllp.com
amoss@blmllp.com
*Attorneys for Defendant Azadeh Nasser Azari*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: <br> WANSDOWN PROPERTIES <br> CORPORATION, N.V., <br>          Debtor. | Chapter 11 <br><br> Case No. 19-13223-smb |
| WANSDOWN PROPERTIES <br> CORPORATION, N.V., <br>          Plaintiff, <br>     - against - <br> AZADEH NASSER AZARI, <br>          Defendant. | Adv. Pro. No. 19-1450-smb |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT AZADEH NASSER
AZARI'S OPPOSITION TO PLAINTIFF DEBTOR'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON AZARI'S "UNCLEAN HANDS" DEFENSE**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………………………………………………….1

STATEMENT OF FACTS RELEVANT TO UNCLEAN HANDS DEFENSE…………………6

ARGUMENT……………………………………………………………………………….…34

    I.     THE UNCLEAN HANDS DEFENSE APPLIES WHERE DEBTOR AND ITS
          COUNSEL'S MISCONDUCT, INCLUDING MULTIPLE INSTANCES OF
          PERJURY AND DECEPTION, OCCURRED IN THE BANKRUPTCY
          ………………………………………………………..…………………………34

    II.    RES JUDICATA DOES NOT APPLY TO ANY OF AZARI'S ARGUMENTS IN
          HER UNCLEAN HANDS DEFENSE………………………………………………38

CONCLUSION…………………………………………………………………………………..40

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*,
792 F. Supp. 969, 970-72 (S.D.N.Y. June 5, 1992), *aff'd,* 93 F.2d 1048 (2d Cir. 1992)………...39

*C.C.S. Commc'n Control, Inc. v. Sklar*,
Case No. 86-CV-7191 (WCC), 1987 WL 12085 (S.D.N.Y. June 2, 1987)………………….....38

*In re C-TC 9th Ave. P'ship v. Norton Co.,* 113 F.3d 1310 (2d. Cir. 1997)………………………38

*In re Operations NY LLC*, 490 B.R. 84 (Bankr. S.D.N.Y. 2013)…………………………………..34

*In Re Stanwich Fin. Svcs. Corp.*, 488 B.R. 829 (D. Conn. 2013)…………………………………35

*Mas v. Coca-Cola Co.*, 163 F.2d 505 (4th Cir. 1947)……………………………………………39

*New Falls Corp. v. Soni Holdings, LLC*,
2:19-CV-00449 (ADS) (AKT), 2019 WL 3712127 (E.D.N.Y. August 7, 2019)………………..34

*Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*,
314 F.3d 1070 (9th Cir. 2002)……………………………………………………………...38

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*,
324 U.S. 806 (1945)………………………………………………………………………38-39

*Simon J. Burchett Photography, Inc. v. Maersk Line, Ltd.*,
Case No. 20-CV-3288 (GBD) (RWL), 2020 WL 8261580, at *9 (S.D.N.Y. December 20,
2020)………………………………………………………………………………………33-34

*Thai-Lao Lignite Co., Ltd., v. Gov't of the Lao People's Dem. Rep.*,
864 F.3d 172, 182 (2d Cir. 2015)……………………………………………………………..35

*U.S. Bancorp Mtge. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994)………………………..34

**Statutes**

*NYUVTA § 276*………………………………………………………………………………..34

*11 U.S.C. 1129(a)(3)*…………………………………………………………………………39

Defendant Azadeh Nasser Azari ("Azari") submits this memorandum of law in opposition to Plaintiff Debtor Wansdown Properties Corporation, N.V. ("Debtor")'s partial summary judgment on Debtor's "Unclean Hands" defense (the "Cross-Motion") in this adversary proceeding (the "Action").

## PRELIMINARY STATEMENT

1.      Debtor's Cross-Motion to dismiss Azari's "Unclean Hands" defense misses the mark on every level and ignores the multiples instances of misconduct by Debtor in this bankruptcy, including its unlawful filing of this Action for the benefit of Gholam Reza Golsorkhi ("Golsorkhi" or "GRG"), the President and sole executive of Debtor, rather than for the benefit of the creditors Debtor is purporting to represent.    However, what is most remarkable about Debtor's Cross-Motion is its willingness to showcase and highlight the Court's approval of (i) Blank Rome's retention as special counsel in this Action, (ii) the sale of Debtor's primary asset, a seven-story townhouse located at 29 Beekman Place, New York, New York 10022 (the "Townhouse") to 29 Beekman Corp., who was a previous potential purchaser, and (iii) Debtor's bankruptcy plan and disclosure statement without disclosing, let alone considering, the rampant – and undisputed – perjury by Debtor and its counsel, Blank Rome, in court proceedings, attorney declarations, and affidavits.    These perjured statements and omissions served as the factual bases for all three (3) court orders, but their falsity emerged ***only after*** the Court issued the orders and confirmed Debtor's plan.    By highlighting these orders, but omitting the perjury and deception underlying them, Debtor has left Azari no choice but to catalogue in detail Debtor's misconduct throughout this bankruptcy.

2.      First, Debtor relies on a technical argument that the defense of Unclean Hands, or its bankruptcy equivalent called the *Wagoner Rule*, does not apply to fraudulent conveyance, or "avoidance" actions, such as this one, which concern prepetition conduct.    The reasoning behind

1

this legal principle is that none of Debtor's prepetition misconduct can be imputed to its "new" status as a Debtor-In-Possession ("DIP"), who now is purportedly standing in the shoes of the "blameless creditors." However, this legal principle does not apply here for two primary reasons. First, Debtor's misconduct primarily occurred post-petition, and as such, the policy behind this rule is not implicated. Specifically, the concern over prepetition misconduct unfairly being imputed to a DIP in bankruptcy is not present since it is the DIP itself that engaged in the misconduct. Second, and more importantly, Debtor did not have the requisite standing to file this Action on behalf of the unsecured creditors since it represented no less than five (5) times, both at the time of the petition and for months afterwards, that these creditors were set to receive payment in full. Filing an action on behalf unsecured creditors when they had not suffered any injury violates the most basic principles of Article III standing.

       3.      Of course, Golsorkhi filed this Action for no other reason than to continue his personal (5+) five-plus-year litigation campaign whose only goal, both prepetition and post-petition, was to vacate a valid February 10, 2016 Confession of Judgment that Debtor itself signed in favor of Azari for her forty-nine years (49) of service to Debtor and the late Princess Achraf Pahlavi of Iran, who was the beneficial owner of Debtor (the "Judgment"). This dogged strategy is confirmed by the three (3) actions filed to vacate this same Judgment – including two (2) prepetition state court actions and one (1) post-petition Action. *See Wansdown v. Azari*, 151406/2017 (the "First Action"); *Kamran Abbas-Vahid v. Azari et al.,* 655724/2019 (the "Second Action"); and *Wansdown v. Azari, Adv. Proc. 19-1450* (this Action).

       4.      Second, Debtor spills a lot of ink discussing this Court's approval of (i) the retention of Blank Rome as special counsel to litigate the Action and (ii) the sale of Debtor's primary asset, a townhouse located at 29 Beekman Place, New York, NY 10022 (the "Townhouse") under the September 25, 2019 residential sale agreement ("RSA"), in the face of

Azari's objections to them. However, the narrow scope of these orders has no bearing on Azari's due process rights to defend herself against Debtor's fraudulent conveyance claims. Nevertheless, Azari's initial objections to Blank Rome's retention and the RSA proved to be prescient: the entire factual bases of the Court's approval of these motions were ultimately based on brazen perjury by both Debtor and its counsel, Blank Rome, all of which only emerged later.

5.      In its sworn declaration in support of its retention as special counsel to Debtor, Blank Rome falsely stated that it had ***"no connection"*** to Debtor's "<u>current or former officers and directors</u>, <u>unsecured creditors</u> or <u>equity holders</u> of Debtor." However, in the First Action against Azari, Blank Rome was counsel to Debtor. It was also counsel to Pelmadulla, Debtor's sole "<u>equity interest holder</u>." And it was counsel to Golsorkhi, Debtor's sole "<u>current officer and director</u>" and "<u>unsecured creditor</u>", who, in addition to serving as Debtor's sole executive, filed unsubstantiated claims of $7,000,000 and $480,000 in this bankruptcy.

6.      In fact, when Lawrence F. Flick II ("<u>Flick</u>"), the Blank Rome partner, signed this sworn retention declaration, he and his firm were still representing Pelmadulla in the First Action and corresponding with Pelmadulla about this very representation. Flick also was corresponding with Golsorkhi about this bankruptcy. Finally, Flick had socialized with Golsorkhi for decades, and Flick's wife also had been friends with Golsorkhi and his wife for decades. Consequently, Flick's statements in his sworn declaration that he had "***no connection to***" these parties – when he was legally representing them, communicating with them, and socializing with one of them – were brazen lies. To the contrary, Flick had nothing ***but connections*** to all relevant parties. Had the Court been aware of these facts, it might have disqualified Blank Rome from representing Debtor as special counsel due to insurmountable conflicts of interest. But it was not privy to this information.

3

7.     Golsorkhi, in turn, echoed Flick's lies in the retention application when he falsely stated that Blank Rome "had not represented any of Debtor's creditors or other parties in interest." Golsorkhi knew full well this was a lie: Not only did Golsorkhi know that he was a "creditor [and] part[y] in interest" with unsubstantiated claims of $7,000,000 and $480,000, but he also obviously knew that Blank Rome had represented him legally in the First Action and in settlement discussions with Azari for almost a year leading up to the bankruptcy.

8.     The only motive for these collaborative lies was Flick and Golsorkhi's desire to have Blank Rome continue representing the interests of Flick's friend, Golsorkhi, and his unsubstantiated and subordinated claims for $7,000,000 and $480,000, above the interests of the unsecured creditors that Debtor was supposed to be representing.[1]

9.     Third, Debtor's counsel withheld from the Court its communications with Pelamdulla – which would have exposed the "connections" it had to both Pelmadulla and Golsorkhi and potentially disqualified it from representing Debtor – long enough so that the Court would confirm its bankruptcy plan. It was only one week after the Court confirmed Debtor's plan when Debtor and its counsel produced these communications. As such, the confirmation of the plan also was based on deception.

10.     Fourth, months before the confirmation of the plan, Golsorkhi, Debtor's sole executive, also indisputably lied – no less than eleven (11) times – under oath at a January 16,

---

[1] Golsorkhi had subordinated his claims to the other unsecured creditors. Golsorkhi presumably agreed to this arrangement because Blank Rome – who was the largest unsecured creditor in this bankruptcy by more than double – would not have agreed to act as special counsel to Debtor if Blank Rome's unsecured claim in this bankruptcy for its prepetition unpaid legal fees would be diluted by Golsorkhi's unsubstantiated claims. Based on this arrangement, Golsorkhi stood <u>behind</u> the unsecured creditors in the priority of payment. The practical result of this priority was that, even if the creditors were paid in full, it would not necessarily mean that Golsorkhi's unsubstantiated claims would be paid in full, or even at all. This perfectly illustrates that the only beneficiaries to filing this Action were (i) Golsorkhi, who was seeking to get his claims paid, and (ii) Debtor's counsel, Blank Rome, who would continue incurring legal fees challenging the same Judgment under the direction of Golsorkhi.

2020 sale hearing to approve the RSA with 29 Beekman Corp. (the "Sale Hearing") and in a false affidavit submitted to the Court.  Blank Rome knew that one particular statement by Golsorkhi at the Sale Hearing – namely, that he informed Debtor's sole shareholder, Pelmadulla, about the RSA before its execution and received their approval – was a lie.   That is because, just weeks earlier, Blank Rome was copied on emails from Pelmadulla complaining that Pelmadulla actually, in fact, had ***not*** been informed by either Golsorkhi or Blank Rome about the RSA when Debtor signed it.  Nevertheless, Blank Rome permitted Golsorkhi to take the stand at the Sale Hearing and freely lie to the Court about the matter.   In short, it suborned perjury.   Another notable perjurious statement by Golsorkhi on the stand was his claim that, before the execution of the RSA, Debtor had only received one (1) offer for the Townhouse.    Two days earlier, at a status conference, Debtor's counsel had repeated this lie.   Discovery, however, established that Debtor received at least five (5) offers for the Townhouse.   Part of the basis for the Court's decision approving the RSA at a sale price of $10.3 million sale was the "fact" that Debtor had received only one (1) offer for the Townhouse.

11.     Remarkably, these are only two (2) of the eleven (11) false statements under oath by Golsorkhi during the short, few-hour evidentiary Sale Hearing.   The basis of this perjury is not third-party testimony, but rather Golsorkhi's own deposition testimony and documents, which contradict his sworn testimony at the earlier Sale Hearing.

12.     Whether these orders by this Court are still valid given the bed of lies on which they rest is irrelevant.  The issuance of an order by a court, or a confirmation of a bankruptcy plan, is not a "get out of jail free" card for Debtor to commit undisputed perjury, especially when all of the perjury emerged after the Court's orders.   Put another way, no court order or bankruptcy plan can provide Debtor or its counsel immunity from the penalties for lying under oath.  To date, none of this perjury has been before this Court in a formal motion or proceeding.

13. In sum, Debtor's efforts to exonerate itself from its litany of misconduct fails. If the Court has a statutory basis to discharge an entire bankruptcy based on perjury – which it does under section 727(a)(4)(A) of the Bankruptcy Code ("Code") – then it may, at the very least, permit it to serve as a basis for an "Unclean Hands" defense in an adversary proceeding, especially when all the misconduct occurred ***during*** this bankruptcy.

## STATEMENT OF FACTS RELEVANT FOR AZARI'S UNCLEAN HANDS DEFENSE

14. The following are the relevant facts for Azari's Unclean Hands defense, many of which emerged after Azari filed its Answer and Affirmative Defenses on June 11, 2020 (the "Affirmative Defenses"). [*Declaration of Nader Mobargha, Eq. In Opposition To Debtor's Cross-Motion, Ex. 40 ("Mobargha Declaration"), Answer To Second Amended Complaint And Affirmative Defenses [ECF No. 14]*.[2]

**I- THE PARTIES**

15. **Debtor** is a Netherland Antilles corporation with its former "principal place of business at 29 Beekman Place, New York, New York 10022" (the "Townhouse"). (*See Azari Memorandum Of Law In Support Of Her Motion For Summary Judgment On Debtor's Claims Under Federal Rule Of Bankruptcy Procedure 7056* (the "Motion"), ¶ 16).[3] Debtor's principal asset was the Townhouse, a seven-story luxury property located at 29 Beekman Place, New York, NY 10022 (the "Townhouse"). (*See Motion*, ¶ 19)

16. **Pelmadulla** is Debtor's sole shareholder. It is a "trust…formed under the laws of the country of Lichtenstein and is domiciled in Vaduz, Lichtenstein." (*Motion*, ¶ 17).

_____

[2] All Exhibits referenced here are attached to the Mobargha Declaration.

[3] To reduce the replication of exhibits, Azari will cite her April 26, 2022 Motion for any facts, including exhibits, referenced there.

17.  **Princess Achraf Pahlavi** was the twin sister of the former Shah of Iran.   She was the "beneficial owner" of Debtor.     (*Motion,* ¶ 20).

18.  **Golsorkhi** served as the Debtor's President and sole Managing Director for the past forty-two (42) years since the Debtor's formation in 1979.   (*Motion, at* ¶ 21).   He was Debtor's sole executive and decision-maker.   He also served as a board member of Pelmadulla from 1979 until 2012.   (*Motion,* ¶ 22).

19.  **Azari** was an employee of Debtor from 1979 to 2016.    (*Motion,* ¶ 24).   At the time that she left her employment, she was one of two office employees of Debtor.   Golsorkhi was the other employee.

## II-  *DEBTOR'S PREPETITION MISCONDUCT*:   FILING AN ACTION AGAINST AZARI ON KNOWINGLY FALSE BASES

20.  On February 10, 2016, Debtor signed a Confession of Judgment for $2.7 million in Azari's favor based on her life expectancy and her annual salary (i.e., the "Judgment").    The Judgment contains the facts and circumstances giving rise to Azari's pension.   (*Motion*, ¶¶ 27-27)  It was signed and notarized by Golsorkhi.

21.  Debtor "doe[s] not dispute that [it]…owes Azari" her "Pension." (*Motion, at* ¶ 30).  Debtor further admits that the "Confession of Judgment is based upon a debt justly due and owing by [the Debtor] and the Private Secretariat." (*Id.*).

22.  The Confession of Judgment granted Azari authority to file it in New York County, which she did on February 12, 2016.   (*Motion*, ¶ 29; *see also Azadeh N. Azari v. Wansdown*, Index No. 652137/2016, ECF No. 1).

23.  Ultimately, the clerk docketed the Judgment on April 21, 2016.  (*Motion,* ¶ 31).

24.  Despite Debtor's sworn admission that it owed Azari the amount of the Judgment, and its sworn statement authorizing her to file the Judgment, on February 13, 2017 – without

giving Azari any notice by phone or correspondence – Debtor filed an action against her in New York Supreme Court under CPLR 3218 and CPLR 5015 to renege on its own affidavit memorializing the pension it promised Ms. Azari.   (*See Wansdown v. Azari*, Index No. 151406/2017)(the "First Action").   CPLR 3218 requires affidavits of confession of judgment to comply with certain statutory requirements, including "stating concisely the facts out of which the debt arose and showing that the sum confessed is justly due or become due."   CPLR 5015 allows a court to vacate a judgment on the grounds of "fraud, misrepresentation, or other misconduct by the adverse party."

25.     One of Debtor's primary bases to vacate the Judgment in the First Action was Golsorkhi's allegation that he was not a "native English speaker," and that, as a result, he did not understand the plain terms of his own affidavit.   (*Ex. 40, Azari Affirmative Defenses*, ¶ 3; *see also First Action, Dock. No. 1*, at ¶ 6).   However, this was a lie since Golsorkhi received an undergraduate degree and MBA from American universities, and also attended secondary school in the United Kingdom and the United States.   (*Ex. 1*, *Golsorkhi Day 1 Deposition ("Dep.")* *Transcript ("Tr.")*, 12:25-14:6).   Not only does Golsorkhi have a "mastery of the English language," but English is his ***only*** fluent language.[4]   (*Ex. 1*, 12:10-13; 136:16-18). Consequently, Debtor's first basis to dismiss the First Action was fraudulent.

26.     Discovery further confirmed that Golsorkhi's claim that he did not understand the English terms of the Judgment was without merit since he (i) admitted that he "helped" and "collaborated" with Azari in drafting a December 15, 2015 letter sent by Azari to Pelmadulla, which memorializes the same English terms that were in the Judgment, and (ii) sent his own

---

[4] A cursory review of the numerous affidavits that Golsorkhi has filed in this bankruptcy only further confirms the absurdity of his claim that he does not understand the plain English terms of a simple affidavit.

email, in English, repeating that the Princess made "promises to Azari in [his] presence on which she relied." (*Ex. 34,* 163:14-164:9; *see also Ex. 2, Dec. 15, 2015 Azari Letter to A. Kerman* (memorializing the terms of her pension); *Ex. 3, April 18, 2016 Email From GRG to Pelmadulla,* at AA101 (repeating fact that promises were made to Azari).

27.     Debtor's other basis to vacate the Judgment in the First Action was Golsorkhi's claim that he did not have the authority to sign the Judgment.   (*Ex. 40*, ¶ 4).   Remarkably, in making this argument, Golsorkhi was accusing himself – as the sole executive of Debtor – of committing fraud when he signed the Judgment since, according to himself, he allegedly did not have authority to do so, but signed the Judgment anyway.    However, as the Appellate Division found, Debtor's Articles of Incorporation unambiguously confirm that Golsorkhi did, in fact, have authority to sign the Judgment. (*See Ex. 10, Oct. 23, 2018 First Dep't Decision in First Action,* at 21-22).   Furthermore, when Golsorkhi filed this bankruptcy, he filed a Resolution indicating that he "is authorized, empowered, and directed with full power of delegation, to negotiate, execute, deliver, file, and perform, in the name and on behalf of [Debtor]…."  (*Ex. 11, Oct. 7, 2019 Resolution of Debtor, Bankr. ECF No. 2, pg. 1*).  As such, Golsorkhi's second, and only other basis, for vacating the Judgment in the First Action was also fraudulent.

28.     Ultimately, the First Department found in favor of Azari in a 5-0 decision and dismissed the First Action. (*See Ex. 10*)

29.     On October 1, 2019 – a week before a duly-noticed Sheriff's sale of the Townhouse would have satisfied the Judgment after three-and-one-half (3 ½) years – Kamran Abbas-Vahid, a beneficiary of Pelmadulla, Debtor's shareholder, filed a second action in New York Supreme Court to vacate the Judgment again under CPLR 3218 and CPLR 5015, and alleged "fraud and collusion" against Azari. *See Kamran Abbas-Vahid v. Azari,* 655724/2019 (the "Second Action"). (*Ex. 40,* ¶ 34, fn. 2).  Abbas-Vahid also sought a temporary restraining

order ("TRO") to enjoin the Sheriff's sale. (*See Second Action,* ECF No. 8).   Mr. Abbas-Vahid

had been in contact with Golsorkhi before filing the Second Action.

30.     On October 4, 2019, Judge Bannon denied the TRO and dismissed the entire

Second Action.  (*See id.* at ECF No. 33).

## III-  *DEBTOR'S POSTPETITION MISCONDUCT*:     PERJURY  AND  FALSE STATEMENTS  BY  BOTH  DEBTOR  AND  BLANK  ROME  IN  THE <u>APPLICATION TO RETAIN BLANK ROME AS COUNSEL</u>

31.     Four (4) days later, on October 8, 2019 – the day before a Sheriff's sale was

scheduled –  the Debtor filed this bankruptcy petition to (i) prevent Ms. Azari from enforcing her

Judgment at the sale, and (ii) seek a third attempt to void Ms. Azari's pension, this time

claiming, as a DIP, that it was a "fraudulent transfer" on behalf of creditors.  (*Motion,* at ¶ 39;

*see also Ex. 37, S. Akabas Dep. Tr.*, 25:20-26:9 (There was "no other reason[ ]" given to

potential purchaser 29 Beekman Corp for filing bankruptcy except to "contest the Judgment…in

bankruptcy court rather than in state court."))

32.     To challenge the Judgment a third time, Debtor and Blank Rome filed an

application to retain its same prepetition counsel, Blank Rome, as special counsel, to continue its

years-long litigation campaign against Azari ("<u>Retention Application</u>").   (*See Ex. 4, Retention*

*Application, Bankr. ECF No. 11*)

33.     Egregiously, however, in the Retention Application, both Blank Rome and

Golsorkhi, on behalf of Debtor, committed perjury and made numerous false statements to the

Court about Blank Rome's concurrent legal representation of all three parties in interest –

including (i) Debtor, (ii) its sole executive and (iii) its sole shareholder – in the related First

Action and the status of the First Action.

### A.     In Its Retention Application, Debtor Makes False Representations To The <u>Court</u>

34.     In the Retention Application, Debtor, or more accurately Golsorkhi, made three (3) knowingly false statements to push the Court to retain Blank Rome's services.

35.     <u>First</u>, Golsorkhi claimed that he "seeks to retain Blank Rome to perform services" for the "continued counsel and representations" of Debtor in the First Action, which is "currently pending." (*Ex. 4, Debtor's Application,* ¶ 10, PDF pg. 5-6). This was <u>knowingly</u> <u>false</u> as Azari already had prevailed against Debtor in the First Action.[5] In one of its filed schedules, Debtor took the lie further and even represented that the ***Second Action*** also was still "pending." (*Bankr. ECF. No. 13, Official Form 207 Part 3*). This was also knowingly false; the Second Action had been entirely dismissed. (*See supra,* ¶ 31).

36.     <u>Second</u>, Golsorkhi falsely represented that Blank Rome "had not represented any of Debtor's creditors or other parties in interest." (*Ex. 4, Debtor's Application,* ¶ 14). Golsorkhi knew full well this also was a lie. Golsorkhi knew that he was an unsecured "creditor" and "party in interest" in this bankruptcy with unsubstantiated claims of $7 million and $480,000. He also knew that Blank Rome had represented him legally in the First Action and in settlement discussions with Azari for almost a full year leading up to the bankruptcy.

37.     <u>Third</u>, Golsorkhi falsely stated that "Blank Rome has not represented, nor does it now represent, any interest adverse to Debtor with respect to matters on which it is to be employed." (*Id.*). However, Golsorkhi knew that his interest was "adverse" to that of the other unsecured creditors since filing this Action on their behalf to vindicate his unsubstantiated and subordinated claims of $7,000,000 and $480,000 would be detrimental for them. That is because the other unsecured creditors, aside from Golsorkhi, had no reason to file this Action

---

[5] The only claim that was still pending in the First Action was Azari's counterclaim against Pelmadulla for payment of a "bequest" in the late Princess' will. (*See Infra,* ¶ 42; *see also Ex. 12, Sept. 5, 2016 GRG Email To Armao & Azari*)("All severance payments will be made once the property has been sold and will be offset by anything that was <u>willed</u> by [the Princess]")(emphasis added); *Ex. 3*, AA 00101 (discussing "BEQUEST" in Princess' will).

since they were set to be paid in full. (*See Motion*, ¶ 4, 43-49, 102). As such, they had nothing to gain and everything to lose if Debtor did not prevail in the Action. Even if Debtor prevailed, the unsecured creditors' claims could still become impaired since Blank Rome, as bankruptcy counsel, would have priority in payment over them.

**B.**     **<u>Blank Rome Perjures Itself In Its Retention Application</u>**

38.     Lawrence F. Flick III ("<u>Flick</u>"), a partner at Blank Rome, also made false statements under oath in the Retention Application to ensure that his firm could keep incurring legal fees in its continuous litigation campaign against Azari on behalf of his friend, Golsorkhi. Specifically, Flick swore the following:

    a.   "Blank Rome has examined its database of existing and former clients to determine whether it had or has any connections with the parties in interest. Specifically, based on the ***information made available to Blank Rome***, Rome's analysis included an ***"examination of the following parties: Debtor; professional engaged by Debtor in this chapter 11 case; current or former officers or directors of Debtor (to the extent identified to Blank Rome); certain known unsecured creditors and equity interest holders of Debtor…"***. It further stated that "Blank Rome's examination process is necessarily ongoing." (*Ex. 4, Flick Declaration*, ¶¶ 4 & 5, PDF pg. 18)(emphasis added).

    b.   "While Blank Rome has taken all reasonable steps to ascertain whether ***current or recent clients are creditors of Debtor, are affiliated with creditors of Debtor, or are otherwise parties in interest,*** it is possible there may be relationships or connections of which Blank Rome is not aware through ***reasonable diligence***… (*Ex. 4, Flick Declaration*, ¶ 7, PDF pg. 19)(emphasis added).

    c.   "Based on the database examination of potential interest parties…[Blank Rome] ha[s] concluded that, except as set forth in this Declaration, neither [Flick], Blank Rome, nor any partner, of counsel or associate thereof ***has any connection with the Debtor, its creditors or parties in interest.***" (*Ex. 4, Flick Declaration*, ¶ 8, PDF pg. 19)(emphasis added).

    d.   ***"Neither Blank Rome***, any member of Blank Rome, any attorney who is of counsel to Blank Rome, nor any associate of Blank Rome, ***insofar as I have been able to ascertain presently represents a creditor or equity interest holder of Debtor…..."*** (*Ex. 4, Flick Declaration*, ¶ 9(a))(emphasis added).

39.     All four (4) of these statements were indisputably false.

40.     <u>First</u>, Blank Rome did not conduct any "examination" of "the current or former officers or directors of Debtor" or "certain known unsecured creditors and equity interest holders of Debtor…" (*Supra*, ¶ 38(a)). As an obvious point, it was not necessary for Blank Rome to conduct a true "examination" or consult a "database" to determine Debtor's current officer and director or equity interest holder. That is because Debtor only had *one* "current officer [and] director" and only *one* "equity interest holder." The sole "officer and director" was Golsorkhi. The sole "equity holder" was Pelmadulla. Golsorkhi also was an "unsecured creditor" of Debtor with unsubstantiated, but large, claims of $7,000,000 and $480,000. Similarly, Pelmadulla also became an "unsecured creditor" of Debtor, though a meritless one, when it ultimately filed a claim in the bankruptcy. (*See Bankr. ECF, Claim 9*). This "information" was indisputably "available to Blank Rome." (*Ex. 5,* ¶ 4). Had Blank Rome simply asked itself the basic questions of who the one shareholder and one executive of Debtor were, which would have required no effort, it would have easily identified Pelmadulla and Golsorkhi. Consequently, Blank Rome's sworn statement that it conducted any "examination" at all was intentionally false.

41.     <u>Second</u>, Blank Rome's claim that "it has taken all reasonable steps to ascertain whether *current or recent clients* are creditors of Debtor, are *affiliated with creditors* of Debtor, *or are otherwise parties in interest*" was also intentionally false. …" (*Supra*, ¶ 38(b)). **Both** Pelmadulla and Golsorkhi were "recent clients" of Blank Rome in the First Action and were alleged "creditors of the Debtor." (*First Action, ECF No. 37* (Blank Rome had been Pelmadulla's counsel in the First Action since at least August 2018), *ECF No. 34* (Blank Rome had been Golsorkhi's counsel since March 2018)). Blank Rome knew about Golsorkhi's status as a creditor since it assisted in preparing Debtor's schedule of creditors, which listed

Golsorkhi's alleged creditor claims.  (*Ex. 30, Debtor's Amended Responses and Objections To Azari's First Set Of Interrogatories*, Response to No. 2)(Blank Rome partner Ira Herman and counsel Evan J. Zucker listed as assisting in preparation of Official Form 202).   During the months following Debtor's bankruptcy filing, Blank Rome also knew about Pelmadulla's potential creditor claim since Pelmadulla informed Blank Rome of its claim twice by email, and even requested assistance in filing the claim.  (*Ex. 15, Nov. 4, 2019 Pelmadulla Email To Blank Rome and GRG,* WANDIP 2410)(Pelmadulla indicating that it "has to be mentioned as creditor" based on an "outstanding shareholder loan"); (*Ex. 16, Dec. 6, 2019 Pelmadulla Email to Blank Rome and GRG,* WANDIP 2831)("[I]t would be correct for Pelmadulla to be listed as creditor" based on a "shareholder loan").  When Pelmadulla ultimately filed its claim, Blank Rome never informed the Court that its client, Pelmadulla, was also now claiming to be a creditor against Debtor, who also was Blank Rome's client at the time.   (*Supra*, at ¶ 38(a)).

42.   Third, Flick's statement that Blank Rome does not "***presently*** represent[ ] a creditor or equity interest holder of Debtor" also was intentionally false.  Pelmadulla was not just a recent client of Blank Rome's.   Pelmadulla was a ***current*** client of Blank Rome's when Debtor filed this bankruptcy.[6]  …"   (*Supra*, ¶ 38(d)).  Although Azari prevailed in the First Action against Debtor, Blank Rome was still actively defending Pelmadulla against Azari for Pelmadulla's failure to pay Azari a $150,000 bequest from the Princess' will.   Blank Rome knew this fact, and even was contemporaneously communicating with Pelmadulla about this very legal representation just at the time it filed its Retention Application.   (*See, e.g., Ex. 15, Oct. 9, 2015 Email,* WANDIP 2413 (referencing the "litigation" in the First Action and its representation of Pelmadulla); *Ex. 15, Oct. 16, 2019 Email,* WANDIP 2411 (Blank Rome

---

[6] Blank Rome's motion to withdraw as counsel to Pelmadulla in the First Action was only granted in February 2020, four (4) months after Debtor filed bankruptcy.   (First Action, ECF No. 62).

references First Action, indicating that "[a]ll litigation is stayed unless the bankruptcy court grants a party relief from the automatic stay."); *Ex. 15, Nov. 4, 2019 Email*, WANDIP 2410 (an entire heading of an email is called "Pending litigation"); *Ex. 16, Dec. 6, 2019 Email,* WANDIP 2832 (again devoting an entire heading devoted to "pending litigation")(collectively, the "Pelmadulla Emails").   Flick also was corresponding frequently with Golsorkhi as both Debtor's sole executive and largest creditor.   At the time, Golsorkhi was not represented by counsel, individually.   Blank Rome intentionally failed to disclose these communications and these facts to the Court.

43.     <u>Fourth</u>, and most significantly, Blank Rome's sworn statement that it has no "connection with Debtor, its creditors or parties in interest" was intentionally false.  (*Supra*, ¶ 38(c)).  As confirmed by its recent and ongoing legal representation of both Golsorkhi and Pelmadulla, Blank Rome had undisputed and extensive "connections" to both parties, who were both "creditors" <u>and</u> "parties in interest."

44.     Furthermore, for over a year leading up to this bankruptcy, Flick engaged in settlement negotiations with Azari's counsel in which he jointly and legally represented three parties to the First Action:    (i) Debtor; (ii) Golsorkhi; and (iii) Pelamadulla.    Although these were not genuine settlement discussions, but rather efforts to delay Azari from enforcing her Judgment after her victory in the First Action, Blank Rome's representation of all three parties was undisputed.  (*See Ex. 40*, ¶ 34).

45.     Finally – and most significantly – for at least "twenty (20) years," Flick and Golsorkhi had been social friends, and Golsorkhi and his wife also had been longtime friends with Flick's wife, Maryam Flick.   (*Ex. 31, Apr. 30, 2021, Affidavit Mwafak Peress*, ¶ 3; *see also Ex. 1*, at 129:10-13 (GRG "met Larry Flick socially some many years ago").   All four of them "dine and socialize regularly" together.  (*Ex. 31*, ¶ 3).   The "connections" between Flick and

Golsorkhi could not be any stronger.   Throughout the years, Flick also "provided legal advice to Golsorkhi as a courtesy for no compensation." (*Ex. 31,* ¶ 4).  Flick, of all people, did not need to consult a "database" or conduct an "examination" to "ascertain" what "connection," if any, he had to these key parties in the bankruptcy before he signed his sworn declaration.

46.   Never during the entire time when it was corresponding with Pelmadulla and Golsorkhi did Flick ever correct, or "supplement," his sworn declaration to the Court to disclose these "connections," as it swore it would do in his Retention Application.   (*Ex. 4, Flick Declaration,* ¶ 4, PDF pg. 18; *Ex. 4, Debtor Application,* ¶ 14, fn. 1, PDF pg. 7).   Rather, Flick and his firm continued to profit and incur legal fees with undisclosed conflicts of interest between Debtor, Pelmadulla, Golsorkhi, and the unsecured creditors, and uncorrected perjured statements in their Retention Application.

**C.    Blank Rome Files A Supplemental Declaration, But Fails To Provide Any Justification For Its Lies And Continues To Deceive The Court**

47.   It was a full seven (7) months later, after 29 Beekman Corp. raised the falsity of Flick's declaration, that Flick finally decided he had no choice but to supplement his false Declaration to finally disclose his and Blank Rome's connections to Pelmadulla and Golsorkhi. (*Ex. 6, June 19, 2020 Supplemental Declaration of Flick* (the "Supplemental Declaration")).

48.   Flick blamed his lack of disclosure of his connections to Pelmadulla on Pelmadulla "not [being] included in Blank Rome's conflict database" – even though Pelamdulla had played a central role in Blank Rome's litigation campaign against Azari dating back years and Flick was contemporaneously communicating with them in the Pelmadulla Emails when he executed his original Declaration.   (*Ex. 6,* ¶ 10).   Flick also disingenuously claimed that he thought the First Action "would be stayed against [Debtor], and informed Pelmadulla accordingly," as if a stay of an action terminates an attorney-client relationship or justifies a

failure to disclose Blank Rome's current representation of Pelmadulla to the Court. (*Ex. 6*, ¶ 15). Flick, however, never explains why, if he had the presence of mind to inform Pelmadulla about a possible "stay" of the State Action, that he did not have the same presence of mind to inform the Court about his firm's representation of Pelmadulla in that very same State Action. After all, the October 16, 2019 email in which he informed Pelmadulla about the possible "stay" was only two days apart from Blank Rome's October 14, 2019 disclosures in his Retention Application to the Court.

49. Remarkably, in his Supplemental Declaration, Flick still omitted to properly explain his failure to disclose Blank Rome's previous legal representation of Golsorkhi in the First Action, even while admitting that Blank Rome did, in fact, legally represent Golsorkhi. (*Ex. 6,* ¶ 11). Worse yet, Flick also still failed to disclose his decades-long social relationship between and among himself, his wife, Golsorkhi, and Golsorkhi's wife.

50. Consequently, none of Flick's attempts at damage control in his Supplemental Declaration excused his perjured statement that he had no "connection" to Pelmadulla or Golsorkhi. Finally, Flick intentionally ignored the possible conflict of interest between Golsorkhi and the other unsecured creditors on whose behalf Debtor filed this unnecessary Action.

51. In response to Flick's Supplemental Declaration, Azari's counsel filed his own declaration, informing the Court, among other things, about (i) Blank Rome's continued representation of Pelmadulla in the First Action and the current status of that litigation; and (ii) all of the conflicts of interest that Blank Rome disregarded throughout the years. (*Ex. 7, Declaration of Nader Mobargha, Esq. In Response To June 19, 2020 Declaration of Flick*). These unambiguous past and present conflicts of interest include, but are not limited to, the following:

a. **Conflict Of Interest In Execution Of RSA.** The impossibility of Blank Rome adequately representing (i) Pelmadulla, (ii) Golsorkhi, and (iii) Debtor in the negotiation and execution of a $10.3 million Residential Sale Contract with 29 Beekman Corp., dated September 25, 2019 ("RSA"), which was $6.6 million below the listed price and at a price which cuts off precisely when Pelmadulla, Debtor's equity holder, would receive its first dollar. (*Ex. 7*, ¶¶ 9 & 10; *see also Ex. 27*, 29:12-15 (One week before the RSA, the price was $16.9 million)). The RSA was executed only two (2) weeks before Debtor filed bankruptcy.

b. **Conflict Of Interest In First Action**. The impossibility of Blank Rome adequately representing (i) Pelmadulla, (ii) Golsorkhi, and (iii) Debtor in the First Action where Debtor claimed that Golsorkhi did not have the authority to sign the Judgment. This position contradicts Golsorkhi's statement in the Judgment that he "has the responsibility over the compensation of all employees" and his signature on the Judgment, which confirmed his authority. (*Ex. 7*, ¶ 13).[7]

c. **Conflict Of Interest In This Action**. The impossibility in this Action of Blank Rome adequately representing (i) Debtor, whose sole executive and decision-maker, Golsorkhi, was intent on continuing his pre-bankruptcy litigation campaign against Azari, and (ii) the unsecured creditors who had no reason to file this Action when they were set to be paid in full without litigation. (*Ex. 7*, ¶ 14(b)).

52.     What is perhaps most remarkable is the conflict of interest detailed in paragraph 51(a) concerning Blank Rome's joint representation of Debtor and Pelmadulla in the negotiation and execution of the RSA. It is undisputed that, at the low $10.3 million sale price, Pelmadulla – who had a direct interest in the Townhouse as the sole shareholder of Debtor – would not benefit from the RSA's sale price since the proceeds were enough to only satisfy the claims of creditors and Blank Rome's fees in bankruptcy. Blank Rome resolved this conflict by ***intentionally hiding the $10.3 million sale of the Townhouse from its own current client, Pelmadulla***. Pelmadulla only learned about the RSA after reading about it in Golsorkhi's publicly-filed affidavit in this bankruptcy, filed over two weeks after the RSA was a done deal. (*See, e.g., Ex.*

---

[7] Of course, this distinction between Debtor and Golsorkhi ignores the reality that Debtor *is* Golsokrhi since Golsorkhi was the sole executive and decision-maker.

*15,* WANDIP 2410 ("<u>According to the [bankruptcy] affidavit</u> of GRG," Debtor "negotiated" the

RSA. "We <u>assume</u> [Flick] advised Debtor."); *Ex. 16,* WANDIP 2831 ("<u>According to GRG's</u>

<u>[bankruptcy] affidavit,</u> [Debtor] received one binding offer regarding the sale of [the

Townhouse].")(emphasis added)).

      53.     In an indignant December 13, 2019 email (the "<u>December 13th Email</u>"),

Pelmadulla raised this blatant breach of fiduciary duty by Blank Rome with both Flick and

Golsorkhi:

> We are quite astonished about your email(s).
>
> According to our information, the [RSA] was made **September 25, 2019.** Your law firm, Blank Rome, was informed about the sale since the receipt of the down payment was acknowledged by your firm by signature of the contract.
>
> Before and after September 25, 2019, your firm still represented the legal interests of Pelmadulla. Consequently, ***you were obliged to inform your client***, Pelmadulla, [about the RSA] accordingly.
>
> In the email correspondence at that time, you did not mention at all that an [RSA] was made on September 25, 2019.

(*Ex. 17, Pelmadulla Dec. 13, 2019 Email to Flick and GRG,* WANDIP 3659)(part of the

"<u>Pelmadulla Emails</u>")(emphasis added in second bold only).

      54.     In that same email, Pelmadulla also chided Golsorkhi not only for hiding the sale

of the Townhouse and the RSA from Pelmadulla, Debtor's sole shareholder, but misleading them

into believing that it had ***not sold yet*** when Debtor ***already*** had signed the RSA and inviting

potential buyers to see the Townhouse:

> By email dated October 1, 2019, Dr. Taskapan [i.e., Pelmadulla's adviser] asked Golsorkhi about the broker and he responded on the same day that the exclusivity with the last broker was still valid. He omitted to inform us that at that time that a sale contract had already been concluded!

*Id.; see also Ex. 13, GRG Oct. 1, 2019 Email to Pelmadulla* (in response to Pelmadulla having "two potential buyers" for the Townhouse, Golsorkhi falsely stated that the broker agreement was "still valid" and failed to disclose that the RSA had been executed six (6) days earlier). Golsorkhi invited Pelmadulla to bring its "potential buyers" to the Townhouse, even though he did not believe that he was "allowed to show the Townhouse because [Debtor] already [had] a contract [i.e, the RSA]." He further testified, "how can I bring someone else when I have a contract there so I have another lawsuit with them?" (*Ex. 28, 341 Creditor Meeting Tr.,* at 15:16-19). Based on Golsorkhi's own testimony, Golsorkhi flat out deceived Pelmadulla, Debtor's sole shareholder, by leading them to believe that the Townhouse was still available for purchase.

55.     Neither Blank Rome nor Golsorkhi bothered to deny, let alone even address, these points or the very serious breaches of the attorney-client or the Debtor-sole shareholder relationships.

**IV-     *DEBTOR'S POST-PETITION MISCONDUCT:*  DEBTOR WITHOLDS MATERIAL FACTS THAT WOULD EXPOSE ITS PERJURY AND AFFECT CONFIRMATION OF ITS PLAN**

56.     Debtor and Blank Rome intentionally hid the Pelmadulla Emails – including the December 13th Email above – from the Court. In these emails, which span from October through December 2019, Pelmadulla, Flick, and Golsorkhi discuss (i) Blank Rome's legal representation of Pelmadulla, (ii) the status of the bankruptcy; (iii) Pelmadulla's dismay at Blank Rome's unwillingness to assist Pelmadulla in filing its alleged claim; and (iv) Flick's failure to inform Pelmadulla, his own client, about the negotiation and execution of the RSA (the "Pelmadulla Emails"). (*See, e.g.,  Exs. 13, 14, 15, 16, 17, 19*).

57.     The reason for Blank Rome and Debtor withholding this information is simple.

They did not want the Court to know about the Pelmadulla Emails until after the Court

confirmed Debtor's bankruptcy plan.   The following timeline confirms this:

a.  In both a **May 12, 2020** email to Debtor and a subsequent **May 26, 2020** letter
    to the Court, 29 Beekman Corp. raised the possibility that Flick lied under
    oath in its Declaration.   (*Ex. 8, May 12, 2020 Email From 29 Beekman Corp.
    to Blank Rome,* No. 5 (requesting information regarding Debtor and Blank
    Rome's communications with Pelmadulla between "September 20, 2019 and
    December 31, 2019," the precise time frame of the Pelmadulla Emails); (*Ex.
    9, May 26, 2020 29 Beekman Corp. Letter To Court,* at 3) ("Blank Rome has
    also misrepresented its relationship with Pelmadulla and Debtor in its
    [Retention Application].").

b.  On **June 5, 2020**, 29 Beekman Corp. sent a formal document request seeking
    the Pelmadulla Emails, which prove that Flick lied under oath in the Retention
    Application. (the "29 Beekman Document Request").   (*Ex. 36, June 5, 2020
    29 Beekman First Set of Document Requests*).

c.  On **June 9, 2020**, Debtor filed a motion to shorten the time for the Court to
    preliminarily approve its disclosure statement and to schedule a hearing date
    for final approval of the disclosure statement and bankruptcy plan.  The Court
    granted the motion and scheduled a hearing for one week later on June 16,
    2020.   (*Ex. 21, June 12, 2020 Court Order*)

d.  On **June 19, 2020**, Flick filed his Supplemental Declaration.  (*Ex. 6*).  At the
    time, Blank Rome and Flick possessed the Pelmadulla Emails, which
    indisputably show that he was contemporaneously communicating with
    Pelmadulla about Blank Rome's legal representation of it, while he falsely
    was declaring to the Court under oath that he had ***"no connection"*** to
    Pelmadulla.

e.  On **July 16, 2020**, the Court confirmed Debtor's bankruptcy plan and
    approved the disclosure statement.  (*Ex. 35, Restated Order Granting Final
    Approval of Disclosure Statement & Confirming Debtor's Second Amended
    Chapter 11 Plan*).

f.  On **July 24, 2020** – eight (8) days <u>after</u> the Court confirmed Debtor's plan –
    Debtor produced the Pelmadulla Emails in response to the 29 Beekman
    Document Request.  (*Ex. 41, Blank Rome July 24, 2020 Cover Email For
    Document Production*)

58.     Had Blank Rome produced these Pelmadulla Emails before the Court's confirmation of Debtor's plan, the Court may have delayed confirmation to disqualify Blank Rome from continuing its representation of Debtor based on its perjury and connections to the key parties in this bankruptcy.     But it never had the opportunity to do so.

**V-     *DEBTOR'S POST-PETITION MISCONDUCT:* BLANK ROME REPRESENTS THE INTERESTS OF GOLSORKHI, INCLUDING HIS CONTINUOUS LITIGATION CAMPAIGN AGAINST AZARI, ABOVE THE INTERESTS OF THE CREDITORS**

59.     The result of Flick and Golsorkhi's collaborative false statements in the Retention Application, and the Court's approval of Blank Rome's retention without knowing about their perjury and deception, was that Blank Rome partner Flick could now freely represent the interests of his friend, Golsorkhi, over the interests of the unsecured creditors.   Nothing illustrates this more than Debtor's – or more accurately, Golsorkhi's – decision to file this Action purportedly on behalf of creditors, while representing that all the creditors would be paid without any need to file an Action.    (*See Motion,* at ¶¶ 4, 48, 94-98)(proving that filing this Action was not necessary since the proceeds from the sale of the Townhouse were sufficient to satisfy all the claims of creditors).

60.     The only beneficiaries of this Action were (i) Golsorkhi and his two unsubstantiated claims of $7 million and $480,000, which were subordinate to the claims of other creditors, and (ii) Blank Rome, who would incur legal fees that would take priority over the claims of the unsecured creditors.

**VI-    *DEBTOR'S POST-PETITION MISCONDUCT:* DEBTOR FAILS TO DISCLOSE TO  THE COURT ORDER PERMITTING  AZARI TO LITIGATE THE CREDITOR CLAIMS IN THIS ACTION**

61.     In its Cross-Motion, Debtor and Blank Rome attempt to protect Golsorkhi's unsubstantiated claims, filed with no supporting documentation or proof of claims, by falsely claiming that Azari waived her objections to these claims by failing to object to Debtor's plan.

62.     As an initial matter, this point is moot since Azari does not have to litigate the merits of Golsorkhi's unsubstantiated claims of $7,000,000 and $480,000 to prevail in this Action.  Specifically, on June 14, 2021, Debtor and Azari signed a stipulation in which Debtor agreed that it "will not use, or reference in any way, the [Golsorkhi claims] to support any of its allegations of insolvency for its remaining causes of action."  *(Ex. 22, June 14, 2021 Stipulation Re: The Unsecured Claims of GRG)*.  In exchange, Azari agreed not to "seek any discovery concerning these claims."  (*Id.*).[8]  Rather than providing simple discovery on Golsorkhi's unsubstantiated claims which Debtor listed on its schedules, Debtor was willing to remove them entirely from any insolvency analysis.

63.     Regardless, contrary to Debtor's arguments, Azari did, in fact, object to three classes of creditors, including Golsorkhi:   (i) Pelmadulla's claim; (ii) the claims of the Pelmadulla beneficiaries under the August 10, 2007 By-Laws of Pelmadulla, or the Princess' "will" as Debtor calls it; and (iii) Golsorkhi's unsubstantiated claims of $7,000,000 and $480,000.  (*See Ex. 26, Oct. 2, 2020 Notice For Hearing On Objection To Nonpriority Claims and Claim No. 7 of Golsorkhi*; *Ex. 23, Azari's Joinder in Debtor's April 22, 2020 Objection To Claim No. 9 by Pelmadulla*).   For the Pelmadulla claim, Azari actually joined Debtor's objection before the confirmation of Debtor's plan.  (*Ex. 23*).

64.     Debtor and Pelmadulla settled Debtor's objection before discovery barely began. The Court held that the settlement was without prejudice to Azari's right to discovery of

---

[8] In correspondence with Debtor's counsel, Azari preserved the right to use Golsorkhi's claims to support her Unclean Hands Defense.

Pelmadulla's claim or her right to question the claim's validity in this Action. (*See Ex. 24, Sept. 29, 2020 Order Approving Settlement Agreement*, ¶ 5 ("Nothing contained in this Order or the Settlement Agreement shall preclude Azari from arguing [in the Action] that Pelmadulla is not a 'triggering creditor' for purposes of Section 544(b) of the Code"); *see also Ex. 20, Excerpt from Aug. 4, 2020 Court Hearing*, at 19:11-13)("Azari is reserving her right to seek discovery in the [Action] that Pelmadulla didn't have a claim…").

65. Ultimately, just as she did with the Pelmadulla claim, Azari withdrew her objection to the claims of Golsorkhi and the Pelmadulla Beneficiaries "without prejudice to her rights and defenses in [this Action]." (*Ex. 25, Oct. 13, 2020 Notice of Withdrawal of Objections To Nonpriority Claims and Claim No. 7*). This was consistent with this Court's orders regarding Azari's right to question the Pelmadulla claim in this Action. Debtor never objected to Azari's reservation of her rights.

## VII- DEBTOR LIES TO THE COURT AND MAKES FALSE STATEMENTS IN ITS COMPLAINT AGAINST 29 BEEKMAN CORP.

66. In addition to failing to disclose this key Court order regarding Azari's rights, on three different occasions, Debtor lied to this Court that Debtor did not have any knowledge or notice that Pelmadulla was going to file its $3,243,941.19 claim.

67. <u>First</u>, at a January 14, 2020 conference, Debtor lied to the Court that the Pelmadulla claim was "unexpected." (*See Motion*, ¶ 57).

68. <u>Second</u>, a little over a month later, on February 26, 2020, in its complaint against 29 Beekman Corp., Debtor doubled-down on that lie when it alleged that it had no "prior notice or warning" that Pelmadulla was going to file its claim "[o]n December 31, 2019." (*Ex. 18, Complaint, Bankr. ECF No. 77*, ¶ 31).

69. <u>Third</u>, almost two years later, at a deposition under oath, Debtor further confirmed the lie that that it "had no idea that [Pelmadulla] would file a claim." (*See Motion,* at ¶ 57)(citing GRG deposition).

70. The Pelmadulla Emails, including those on November 4, 2019 and December 6, 2019, confirm that Debtor ***did*** have notice of Pelmadulla's claim. (*See Exs. 15 & 16*). Rather than inform the Court about these communications – at either the November 16, 2019 initial conference or the December 6, 2019 hearing, or even by letter – Debtor simply proceeded with the approval of its bankruptcy plan and disclosure statement. Then Debtor and its counsel actively lied to the Court in multiple filings that it did not even have any "prior notice or warning" of the Pelmadulla claim.

## VIII- GOLSORKHI PERJURES HIMSELF NO LESS THAN EIGHT (8) TIMES AT A JANUARY 16, 2020 SALE HEARING

71. As if all of this deception was not enough, Golsorkhi and Debtor continued to deceive the Court and commit perjury in another venue, this time at a January 16, 2020 sale hearing concerning the approval of the RSA and the sale of the Townhouse (the "<u>Sale Hearing</u>"). At this Sale Hearing, Golsorkhi perjured himself no less than eleven (11) times, including submitting a perjured affidavit along with his testimony. This perjury claim is not based on the testimony of a third party, or the subject of a "he said, she said" debate. Rather, it is based on Golsorkhi's <u>own</u> sworn testimony and documents produced in discovery, which contradict his sworn testimony at the Sale Hearing.

### A. Golsorkhi Lied About The Amount Of Offers Debtor Received For The Townhouse Throughout The Years

72. <u>First</u>, Golsorkhi lied to the court – and its counsel lied to the Court in a separate hearing – that during the previous six (6) years, the only offer Debtor received was the one from Secured Capital Partners ("<u>Secured</u>"). The Court even required confirmation of Golsorkhi's

testimony that "there were no offers."   Golsorkhi responded, "Yeah, I said that."   (*Ex. 27, Excerpt from Sale Hearing,* at 14:6-8).   To eliminate any doubt about his testimony, Golsorkhi further testified, "Your Honor…we have [had]  no offers <u>whatsoever</u> since 2014" except "one [that] ended up in court…".   (*Ex. 27*, 13:9; 18:13-16)(emphasis added); *see also Ex. 43,* at 16:24-17:3) (two days earlier, at a January 14, 2020 hearing, Debtor's counsel falsely tells the Court that Debtor received only one offer for the Townhouse before the RSA).   Later in the hearing, Golsorkhi again confirmed that "we have had not one offer."   (*Ex. 27,* 33:11).

73.     Months earlier, at the Creditor Meeting, Golsorkhi had lied about the same issue. Specifically, he testified that "[p]rior to [the contract with 29 Beekman Corp.], we never had an offer except one, which the gentleman did not come through….We've had people come and see it, but there's been <u>no</u> <u>offers</u> made."   (*Ex. 28, Nov. 12, 2019 Creditor Meeting*, at 15:6-12)(emphasis added).

74.     In its decision to approve the RSA at $10.3 million, the Court relied on Golsorkhi's testimony that Debtor only "got that one offer that fell through" and "[t]he fact [that] they just weren't getting offers."  (*See Ex. 27*, at 50:3-6).

75.     However, as discovery has confirmed, before filing bankruptcy, Debtor received no less than <u>four</u> offers, and one "interest" at a specific price, for the Townhouse.  (*See* Motion, at ¶¶ 69-74).

**B.     Golsorkhi Lied That A Previous Purchaser, Who Had Signed A Contract, <u>Wanted To Purchase The Townhouse With No Down Payment</u>**

76.     <u>Second</u>, Golsorkhi lied to the Court that Secured, who had entered into a $17 million real estate contract with Debtor in December 2017 to purchase the Townhouse, had "insisted that they wanted to buy [the Townhouse] with no down payment, nothing."   (*Ex. 27*, at 15:1-3).   This testimony is belied by the two contract deposit payments that Secured tried to

make to Debtor, including the wire received – and rejected – by Debtor's counsel at Kelly Dry Warren. (*See Motion,* at ¶ 76). Although these wires were late under the contract, they confirm that Secured did not expect to buy the Townhouse without any down payment or "nothing." In its decision approving the sale, the Court again relied on Golsorkhi's perjured testimony that Secured wanted to purchase the Townhouse "with no down payment." (*Ex. 27*, 50:22-51:2).

C. **Golsorkhi Lied That He Informed Pelmadulla, Debtor's Sole Shareholder, About The RSA**

77. <u>Third</u>, Golsorkhi lied to the Court when he testified that he informed Pelmadulla about the RSA with 29 Beekman Corp. Golsorkhi testified that, "[a]fter the negotiation with the buyer's counsel, the price that was offered was relayed to [Pelmadulla] for approval. [Pelmadulla] found under the circumstances, they agreed to the price." (*Ex. 27*, at 21:1-4). Both Golsorkhi's own deposition testimony and the December 13th Email from Pelmadulla confirm that this was false.

78. In the December 13th Email, Pelmadulla wrote to Golsorkhi and Blank Rome, complaining that, remarkably, neither Blank Rome – despite being Pelmadulla's counsel – nor Debtor, informed Pelmadulla about the execution of the RSA. (*Ex. 17*). Blank Rome and Golsorkhi did not deny their concealment of the RSA.

79. In his deposition, Golsorkhi also testified that he did ***not*** contact Pelmadulla, even orally, about the RSA, its purchase price, or the bankruptcy filing. (*Ex. 1*, at 187:22-25; 189:3-12). He just assumed that Blank Rome "must have" told Pelmadulla about the RSA. *(Ex. 1, 190:12-16)* However, even this claim is contradicted by Pelmadulla's indignant emails to Blank

Rome, which Golsorkhi also received, about Blank Rome's failure to inform them of the RSA.[9] (*Ex. 17*).

80.     Even more egregiously, Blank Rome was the recipient of these indignant emails and knew that neither the firm nor Debtor informed Pelmadulla about the RSA.   Nevertheless, Blank Rome, who was present at the Sale Hearing, permitted Golsorkhi to freely lie to the Court on the stand and to testify that he did in fact inform Pelmadulla about the RSA.

### D.     Golsorkhi Lied That, When Debtor Was Negotiating The RSA, Debtor Never Told 29 Beekman Corp. The Total Amount Of Debt

81.     <u>Fourth</u>, Golsorkhi lied that Debtor "never told [29 Beekman Corp.] the total amount of claims that the creditors could have against [Debtor]." (*Ex. 27*, at 34:20-22). According to Golsorkhi, 29 Beekman Corp. did not offer $10.3 million "because [he] told them we owe so much money."   (*Ex. 27*, 34:23-35:3).

82.     However, since 29 Beekman Corp. and its counsel testified that they were only willing to pay the minimum amount necessary to satisfy all claims of Debtor, Golsorkhi must have informed them the total amount of debt that Debtor was carrying.   (*See, e.g., Ex. 32*, *May 7, 2020 Declaration of Seth Akabas*, ¶ 9).   Indeed, that is the only way 29 Beekman Corp. could have arrived at the specific $10.3 million figure – which almost magically matches the $10.03 million of alleged debt that Debtor was carrying, plus an additional $270,000 for routine administrative costs and attorney's fees in bankruptcy.   [*ECF No. 13, Official Form 206 E/F/: Creditors Who Have Unsecured Claims*][the total secured and unsecured claims of Debtor are $10.03 million at the time of the petition].   "Independent of the information that [29 Beekman

---

[9] On the second day of his deposition, realizing that he admitted to lying under oath at the Sale Hearing, Golsorkhi tried to change his testimony – again – by claiming that he **did** tell Pelmadulla about 29 Beekman Corp. and discussed the offer with them.   (*See Ex. 34*, 83:20-25; 84:25-85:14).   However, this is belied by the December 13th Email.   (*Ex. 17*).   Regardless of which version of his testimony Golsorkhi chooses, it is undisputed that one of them is perjurious.

Corp.] received from Debtor, 29 Beekman Corp. had no independent knowledge of the amount of debt that Debtor was carrying." (*Ex. 37*, 51:22-25). More accurately, 29 Beekman Corp., was told the total liabilities "were slightly under $10.3 million so that, when the costs of the transaction taken from the proceeds, the proceeds would satisfy all claims." (*Ex. 37*, 37:13-38:1).

**E. Golsorkhi Lied About The Estimated Value That Lenders Placed On The Townhouse**

83. Fifth, Golsorkhi lied about the "estimated" value that "bridge finance lenders" placed on the Townhouse, claiming that they did not value it "more than $8 to 10 million." (*Ex. 27*, at 35:13-14). The term sheets produced in discovery, however, show that, in 2019, the same year that Debtor signed the $10.3 million RSA, bridge finance lenders were estimating the value well above that range. In 2019, Bloomfield Capital was willing to lend $10,000,000 at a loan-to-value of no greater than 65%, while Titan was providing a $8 million loan with a loan-to-value of no greater than 60%. (*Motion*, at ¶¶ 89, 120). These "bridge finance lenders" were estimating the value of the Townhouse to be at least $14 million and $13.3 million, respectively.

**F. Golsorkhi Lied About Who Negotiated The RSA**

84. Sixth, Goslorkhi lied that the "price [of the RSA] was negotiated by the attorneys from Blank Rome [Debtor's counsel] and Seth Akabas ("Akabas"), the real estate lawyer for 29 Beekman Corp." (*Ex. 27*, at 20:7-8)(emphasis added). The Court sought clarification on the issue, asking "[Mike] Perez [29 Beekman Corp's principal] made the offer?" Golsorkhi responded "[t]he offer was made by the lawyer representing 29 Beekman….Perez did not give the offer to me. I made it very clear. The offer was given by the counsel representing [29 Beekman Corp.], and it was negotiated with counsel for the [Debtor], Blank Rome." (*Ex. 27*, at 32:3-18).

85.     However, in his deposition, Golsorkhi contradicted this testimony by stating that he "made a suggestion of what they would offer." (*Ex. 1*, 199:6-7).   Peress "came up with the price" and "made the offer on behalf of [29 Beekman Corp.]." (*Ex. 1*, 224:25 – 225:2; *Ex. 34*, 80:20-81:6, *see also Ex. 34*, 83:11-14 (confirming that Peress made the offer); 93:15-21(same). That price was "$10.3 million." (*See Ex. 34*, 80:20-81:6).   Golsorkhi told him it was "low." Peress responded that "this is all they are willing to offer."   Golsorkhi said it was "fine." (*Ex. 1*, 204:3-20).   Golsorkhi further confirmed that it was "only after the price was determined that the lawyers got involved…to draw up the contract." (*Ex. 1*, 205:12-20).   The lawyers "did ***not*** negotiate the price themselves." (*Ex. 1*, 205:18-20)(emphasis added).   Golsorkhi's admissions about the negotiation of the RSA, alone, confirm Golsorkhi's perjury at the Sale Hearing.

86.     Emails from Debtor's own counsel, Blank Rome, also confirm that the principals, Mike Peress ("Peress") and Golsorkhi – not the lawyers, Akabas and Blank Rome – negotiated the Townhouse's sale price.   (*Ex. 33, Sept. 13, 2009 Email Chain b/w L. Flick and S. Akabas*, BK 0038-39)(Debtor's and 29 Beekman Corp.'s counsel acknowledging that the principles negotiated the price).

87.     Finally, in their depositions, both 29 Beekman Corp.'s lawyer, Akabas, and 29 Beekman Corp's principal, Peress, Akabas confirmed that "[p]rior to [his] communication with Flick…the basic economic terms were already negotiated." (*Ex. 37, Akabas Depos. Tr.*, 12:20-13:5; *see also* 36:6-9 (The "[p]rice was already negotiated between the principals" of Debtor and 29 Beekman Corp.); 46:25-47:3 (The lawyers "had no involvement whatsoever in negotiating the price.").   They further confirmed that the "[a]ttorneys did not negotiate the price." (*Ex. 38, Perez Depos. Tr.*, at 58:25-59:1).

88.     In sum, all the key parties involved in the RSA – Blank Rome, Peress, Akabas, and most importantly, Golsorkhi himself – confirmed that Golsorkhi perjured himself on this issue.

### G.     Golsorkhi Lied About The Identity Of The Broker Handling The Sale Of The Townhouse During The Relevant February 2016 Period

89.     <u>Seventh</u>, Golsorkhi intentionally omitted disclosing the identity of Dan Danielli, the Halstead broker who was responsible for selling the Townhouse during the relevant early 2016 period when Debtor signed the Judgment.  Danielli also prepared a detailed $34 million valuation of the Townhouse, a fact that certainly played a role in Golsorkhi omitting to disclose Danielli's identity to the Court.  (*See Motion*, at ¶ 64).   Furthermore, in response to a targeted question by the Court, Golsorkhi compounded his lie to the Court by further lying that it was <u>Sotheby's</u> who was retained during the relevant period in 2016.  (*Ex. 27*, 11:22-12:5).  It is undisputed that Debtor retained Halstead as its broker in 2016.  (*Ex. 30*, Response To Interrogatory No. 5).

90.     At the Sale Hearing, Golsorkhi disclosed the identities of almost all of Debtor's **other** brokers, including Sotheby's, Corcoran, Brown Harris, and Compass.  (*See Ex. 27*, 11:22-12:5).  However, he intentionally left out Danielli's and Halstead's names.

### H.     Golsorkhi Lied About Informing The Broker About 29 Beekman Corp. or the RSA Debtor Was Executing

91.     <u>Eighth</u>, Golsorkhi lied at the Sale Hearing when he testified that he told Charlie Attias ("<u>Attias</u>"), Debtor's broker at Compass in September 2019, about 29 Beekman Corp., "a potential buyer," for the Townhouse.   (*Ex. 27*, 38:6 – 23).  There is not a single email produced in discovery informing Attias about the RSA with 29 Beekman Corp. and it is undisputed that Attias was not part of any of the negotiations for the purchase of the Townhouse.  Under a September 7, 2019 Exclusive Townhouse Sales Agreement that it signed with Compass (the

"Broker Agreement") just weeks before signing the RSA, Debtor was obligated to "refer all inquiries and offers regarding the sale of [the Townhouse] to Compass and negotiate exclusively through Compass." (*Ex. 5,* ¶ 4). Debtor never even informed Compass about 29 Beekman Corp.'s "offer" before executing the RSA, let alone "negotiate" through Compass. Attias only discovered Debtor's execution of the RSA and breach of the Broker Agreement after Debtor filed bankruptcy.

92.     Ninth, Debtor intentionally omitted to disclose to the Court that it had conducted an appraisal of the Townhouse. That appraisal was for $18 million, and followed a $34 million broker-prepared valuation, which Debtor also did not disclose. (*See* Motion, ¶¶ ). Given that this was a Sale Hearing on the value of the Townhouse, these were material omissions. Not only did Debtor and its counsel mislead the Court into believing that Debtor had not appraised the Townhouse, they also did not not bother to correct the Court when it stated on the record, as part of its decision, that "it's true there are no appraisals…" (*See* Ex. 27, 50:23).

### I.     Golsorkhi Submitted A Perjured Affidavit To Accompany His Live Perjured Testimony

93.     Tenth, to accompany his perjured testimony at the Sale Hearing, Golsorkhi submitted a perjured affidavit into evidence as well. (*Ex. 29, Jan. 10, 2020 GRG Affidavit In Support Of Motion For Order Approving Sale Of Debtor's Real Property*). In the affidavit, Golsorkhi double-downed on two indisputably false statements that he gave on the stand.

94.     He again lied that Debtor's broker in 2015 was Sotheby's. (*Ex. 29,* ¶ 4, *but see Ex. 30*, Response to Interrogatory No. 5)(listing Douglas Elliman as broker in 2015).[10]

---

[10] Mr. Danielli's damaging deposition testimony against Debtor, and especially against Golsorkhi, showed why Golsorkhi had every incentive to lie twice – both on the stand and in his affidavit – about the identity of the broker for Debtor in early 2016.

95.     Golsorkhi also lied again about the number of offers that Debtor received for the Townhouse by claiming that it only received one (1) from a third-party called Secured Capital Partners.   (*Ex. 29*, ¶ 14(b)).   This was untrue, as discovery confirmed.   (*See Motion,* at ¶¶ 69-74).

96.     In sum, during a short, few-hour hearing on the sale of the Townhouse, Golsorkhi managed to indisputably make no less than (11) eleven perjurious statements and omissions. These are just the ***known*** lies.   The only motive for all of these lies was that Debtor was attempting to justify its rushed sale of the Townhouse at an almost 70 percent discount from its listed price.   The hasty and suspect way in which Debtor executed the RSA was never more evident than its inclusion of the unconscionable "liquidated damages" provision, which requires that, should the Court conduct an auction rather than approve the RSA with 29 Beekman Corp., 29 Beekman Corp. would still receive "$500,000, <u>plus</u> 80% of all gross proceeds of [an alternative sale] in excess of $10,800,000."   (*Ex. 42,* ¶ 51(b), PDF pg. 20 (emphasis added). This meant that, even if Debtor received a higher offer, practically all of that financial benefit still would go to 29 Beekman Corp.  To date, the identity of the owner of 29 Beekman Corp. has not been revealed.

97.     Blank Rome did not just hide this RSA, and its onerous "liquidated damages" provision, from Pelmadulla, its own client.   When Pelmadulla finally discovered the RSA, Flick further lied to them, stating in writing that "if [29 Beekman Corp.] had not agreed to buy the [Townhouse] when they did, the [Townhouse] would already have sold at a sheriff's sale…" (*Ex. 19, Dec. 12, 2019 Flick Email*).  This was patently false.  Blank Rome knew that all Debtor had to do was declare bankruptcy on October 8, 2019, when they did, and the Sheriff's sale would have been stayed regardless of whether Debtor had a signed contract with a third party.

## I. THE UNCLEAN HANDS DEFENSE APPLIES WHERE DEBTOR AND ITS COUNSEL'S MICONDUCT, INCLUDING MULTIPLE INSTANCES OF PERJURY, OCCURRED IN THE BANKRUPTCY

98.     The unclean hands doctrine bars recovery "when an individual's misconduct has immediate and necessary relation to the equity that he seeks." *Simon J. Burchett Photography, Inc. v. Maersk Line, Ltd.*, Case No. 20-CV-3288 (GBD) (RWL), 2020 WL 8261580, at *9 (S.D.N.Y. December 20, 2020) (citation omitted).    This is precisely the case here.    All of Debtor and its counsel's prepetition, and especially its post-petition conduct, is related "to the equity that he seeks," namely, unlawfully filing an action on behalf of creditors who are set to be paid in full, just to satisfy Golsorkhi's unsubstantiated claims.    Even the eleven (11) instances of perjury committed by Golsorkhi at the Sale Hearing were primarily "related" to his attempt to prove Debtor's insolvency by showing that the Townhouse, Debtor's primary asset, was worth less than it actually was.    And a subsequent sale at $11.5 million only a few months later proved that, even in 2020 in the midst of a falling luxury real estate market, the Townhouse was worth more than the $10.3 million price in the hastily and suspiciously executed RSA.

99.     Furthermore, it is undisputed that this Debtor's fraudulent conveyance action is equitable in nature since Debtor is not seeking any money from Azari, but rather vacatur of the Judgment and a lien.  *See, e.g., U.S. Bancorp Mtge. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994) (discussing the equitable nature of vacatur); *see also New Falls Corp. v. Soni Holdings, LLC*, 2:19-CV-00449 (ADS) (AKT), 2019 WL 3712127, at *1 (E.D.N.Y. August 7, 2019) (noting the magistrate judge correctly found that the relief sought by plaintiff – vacating and setting aside the deeds in connection with the fraudulent conveyances of properties – was equitable in nature).    The legislature has recently confirmed that fraudulent conveyance actions are equitable in nature.  *See* NYUVTA § 276.    The doctrine of fraudulent conveyance is

"obviously based on principles of unjust enrichment and associated equitable remedies" and, as such, both claims overlap. *In re Operations NY LLC*, 490 B.R. 84, 99 (Bankr. S.D.N.Y. 2013). (quoting Restatement (Third) of Restitution & Unjust Enrichment § 48). Since request for relief from a judgment is an equitable remedy, a court may deny such relief if the moving party has acted inequitably, or with unclean hands. *See Thai-Lao Lignite Co., Ltd., v. Gov't of the Lao People's Dem. Rep.*, 864 F.3d 172, 182 (2d Cir. 2015).

100. Debtor attempts to circumvent these realities by arguing that that Azari still cannot assert Unclean Hands as a defense to a fraudulent conveyance action since, as a DIP, Debtor is now standing in the shoes of the creditors, and no longer acting on behalf of the prepetition wrongdoer. Debtor claims it would be unfair to impute Debtor's prepetition wrongdoing to its post-petition, "blameless creditors." This argument, while having some facial appeal, falls like a house of cards upon the slightest scrutiny of Debtor's conduct in this bankruptcy.

101. First, to benefit from this rule – namely, that unclean hands cannot be a defense to a fraudulent conveyance action under Section 544(b) of the Code – Debtor must first establish that it had standing in the first place to file this fraudulent conveyance action. *In Re Stanwich Fin. Svcs. Corp.*, 488 B.R. 829, 833 (D. Conn. 2013) (Debtor can only file a 544(b) action "if an actual unsecured creditor could bring an avoidance claim under applicable state law."). The undisputed facts, however, confirm that Debtor had no right – and no standing – to file this action on behalf of creditors when, at the time of the bankruptcy petition and for months afterwards, Debtor represented and continued to represent that the creditors were set to be paid

in full.  This fails the most basic requirement of standing under Article III, namely that, to file an action, the plaintiff has to suffer injury-in-fact.[11]

102.    Of course, this case was never about the creditors, whom Debtor steamrolls with this unnecessary Action that will cost them millions of dollars in legal fees.   (*Ex. 40*, ¶ 44). Rather it was about Golsorkhi using these "blameless creditors" as "sham plaintiffs" to continue his personal litigation campaign against Azari and pay himself personally.   (*Ex. 40*, ¶ 45). When asked whether he consulted the creditor, who were set to be paid in full, he responded "on what basis would I consult the creditors?   They have no bearing on [this Action]."   (*Motion*, ¶ 52).    Debtor should not be permitted to shield itself from its misconduct by claiming that it is now standing in the shoes of "creditors" when Debtor has done everything in this bankruptcy ***but*** represent the interest of the creditors.

103.    Second, the policy behind the legal principle cited by Debtor does not apply here since Debtor's misconduct primarily occurred post-petition.   The purpose behind this principle is to distinguish between a prepetition Debtor on the one hand, and a post-petition trustee or DIP acting on behalf of creditors on the other hand, and to ensure that the "blameless creditors" are not held accountable unfairly for the sins of the prepetition Debtor.    However, Debtor and its counsel, in tandem, committed the following acts ***while it was purportedly acting on behalf of the creditors***:

---

[11] Debtor still misses this point by arguing that ***any*** creditor can be a triggering creditor, and as such, it did not need to "fabricate" any creditor claims.   It then names Verizon and Con-Ed as its triggering creditors to justify its almost three-year litigation odyssey in bankruptcy court, following its almost three-year prepetition litigation odyssey. (*Cross-Motion*, ¶ 65).   First, it is not true that any creditor can be listed as a triggering creditor.   Illegitimate or "disputed" creditors, such as Kelly-Drye, cannot serve as a triggering creditor and their claims cannot be part of any insolvency analysis.   (*Motion*, ¶ 100).   Second, while theoretically any legitimate creditor can serve as a "triggering creditor," none of Debtor's creditors can serve this role here where Debtor admitted at the time of the petition and for months afterwards that it was ***solvent.***   Creditors who are set to be paid in full – which includes all of Debtor's creditors – cannot serve as "triggering creditors" since it violates Article III's standing requirement.

a. Lying under oath to push the Court to approve the retention of Blank Rome, and failing to disclose the potential conflicts of interest of Blank Rome's joint representation of Debtor, Pelmadulla, and Golsorkhi.

b. Lying under oath at the Sale Hearing to push the Court to approve the RSA with 29 Beekman Corp. at a price that was at an almost seventy (70) percent discounted from the listed price.

c. Suborning perjury by allowing Golsorkhi to testify that he had informed Pelmadulla about the RSA when Blank Rome knew that he was lying about this fact based on Pelmadulla's December 13th Email to both Golsorkhi and Flick.

d. Hiding Pelmadulla's claim, even if disputed, from the Court, while pushing the Court to approve a Disclosure Statement and confirm a Plan that did not include the Pelmadulla claim.

e. Further lying to the Court that it had "no notice or warning" of the Pelmadulla claim when, in fact, it did have plenty of "notice" in numerous emails from Pelmadulla.

f. Hiding the $10.3 million RSA from Pelmadulla, even while Blank Rome legally represented Pelmadulla and had a duty to disclose it to its client.

g. Filing this Action on behalf of unsecured creditors, even while representing that a litigation was not necessary since all unsecured creditors would be paid. This Action was solely for the benefit of Blank Rome Flick's friend, Golsorkhi.

h. Hiding the Pelmadulla Emails from the Court so that the Court would confirm Debtor's Plan without the benefit of knowing the contents of those emails and the perjury that Flick unambiguously committed.

104. Since Debtor was acting "on behalf" of the creditors when it committed these acts, it is only fair that its conduct should be imputed to the creditors. To hold otherwise would allow Debtor to commit crimes, while simultaneously permitting Debtor to shield itself from those same crimes by disingenuously claiming they were acting on behalf of the creditors.

105. Third, Debtor and Golsorkhi are abusing the bankruptcy court by perverting the distinctions between its prepetition and post-petition existence. Golsorkhi's fraudulent bases for the First Action show that he is willing to do or say anything to renege on his own affidavit and

the Judgment. The purpose behind creating distinctions between a prepetition Debtor, post-petition Trustee, and the unsecured creditors in bankruptcy is not served here where Golsorkhi is wearing all three hats. Golsorkhi should not be able to hide behind these legal distinctions just so that it can abuse the unsecured creditors and deplete the estate, all to serve his own personal, vendetta-fueled litigation campaign against Azari and pay himself to the detriment of the creditors. *See, e.g., In re C-TC 9th Ave. P'ship v. Norton Co.,* 113 F.3d 1310 (2d. Cir. 1997)(dismissal of bankruptcy justified where DIP's filing is just a two-party dispute with the goal of frustrating the legitimate enforcement efforts by a secured creditor in a state foreclosure action)*; Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002)(Primary purpose of Chapter 11 is to maximize the value of the estate).

## II- RES JUDICATA DOES NOT APPLY TO ANY OF AZARI'S ARGUMENTS IN HER UNCLEAN HANDS DEFENSE

106. Debtor's next argument, namely, that the issues Azari raises in her Unclean Hands Defense are barred by the doctrine of Res Judicata or Collateral Estoppel, also fails spectacularly.

107. First, Debtor's argument ignores the elephant in the room: All three orders cited by Debtor, including the orders concerning the approval of (i) the sale to 29 Beekman Corp., (ii) the retention of Blank Rome, and (iii) Debtor's bankruptcy plan and disclosure statement were based on undisputed perjured statements and deception that only emerged later. Courts have justified application of the unclean hands doctrine to misconduct which includes false testimony. *See, e.g., Mas v. Coca-Cola Co.*, 163 F.2d 505, 510-11 (4th Cir. 1947) (finding the plaintiff had unclean hands and upholding dismissal of plaintiff's suit where plaintiff submitted false testimony and forged documents to the Patent Office); *C.C.S. Commc'n Control, Inc. v. Sklar*, Case No. 86-CV-7191 (WCC), 1987 WL 12085, at *2-3 (S.D.N.Y. June 2, 1987) (applying the

doctrine of unclean hands and denying request for equitable remedy because plaintiff committed perjury); *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945) (stating that unclean hands doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief" and denying relief because of perjury); *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969, 970-72 (S.D.N.Y. June 5, 1992) (holding that the unclean hands doctrine defeated the affirmative defense of laches where a defendant had, in a prior proceeding, given false testimony directly related to the circumstances giving rise to the laches defense); *aff'd,* 93 F.2d 1048 (2d Cir. 1992).   Furthermore, if the Court has a statutory basis to discharge an entire bankruptcy based on perjury – which it does under section 727(a)(4)(A) of the Bankruptcy Code ("Code") – then it also has the authority to nullify any orders, or confirmation of a plan, that are based on perjury and deception.   *See, e.g.* 11 U.S.C. 1129(a)(3) (good faith requirement for Court's confirmation of a plan).

108.     Even if the effect of these orders based on perjury is not set aside, res judicata still does not apply here since it was impossible for Azari to have "raised and litigated" these issues when she did not even know about the perjury and deception at the time.   (*Cross-Motion*, ¶ 60). As such, all of Debtor's case law on the issue is irrelevant.

109.     Second, the Court's order approving the sale to 29 Beekman Corp. does not preempt any issues that Azari raises in her Affirmative Defense.   Azari has every right to question the low $10.3 million purchase prices of the Townhouse in the RSA, especially given that the Townhouse ultimately sold for $11.5 million months after the Court's Sale Order in the midst of a global pandemic.   The Court also never had the opportunity to consider Debtor's $18 million appraisal or $34 million broker valuation because Debtor hid this information from the Court.   (*See Motion*, ¶¶ 8, 64, 67, 69-74).

110.  <u>Third</u>, the Court's retention order also has no effect on the issues that Azari can raise in her Affirmative Defenses.   Azari has every right to question Debtor and Blank Rome's conflicts of interest and motive for filing an unnecessary action on behalf of creditors, all of whom were set to be paid in full at the time of the petition.   At the November 14, 2019 hearing on Blank Rome's retention, Azari did raise this very issue, which the Court articulated as whether "a solvent debtor can't bring [this Action] because it does not need to avoid [the Judgment] to pay all the claims."   The Court's response was that Azari "was arguing the merits," and "[a]t the end of the day, [Azari] may be right," but the Court was "not going to rule on that in the context of a retention action." (*Ex. 39, Nov. 14, 2019 Preliminary Conference*, at 9:14-15; 10:1-7).   In sum, the Court permitted Azari to raise this issue in the future.   And she did so in her Affirmative Defenses.

111.  <u>Fourth</u>, as this Court held, the confirmation of the bankruptcy plan does not affect Azari's right to object to the legitimacy of the creditor's claims in this Action.   When Azari objected to the claims of the creditors in the main bankruptcy and sought discovery, Debtor claimed that Azari should not be permitted to continue litigating the issue when Debtor had the opportunity to settle with one of the creditors.   Debtor's position was that Azari could always question the claims and seek discovery in this Action.   Now that Azari is questioning the claims in this Action, Debtor backtracks and insists that Azari should have continued to litigate the creditor claims in the main bankruptcy.   What is clear is that Debtor, or more accurately Golsorkhi, does not want any party to litigate the merits of the claims that Goslorkhi listed on Debtor's schedule, especially his personal, unsubstantiated claims of $7,000,000 and $480,000.

## **CONCLUSION**

112.  For all the foregoing reasons, the Court should deny Debtor's summary judgment motion on Azari's Unclean Hands Defense.

Dated: June 10, 2022
      New York, New York

**BEYS LISTON & MOBARGHA LLP**

By: *Nader Mobargha*
    ———————————————————
    Nader Mobargha, Esq.
    Alison Moss, Esq.
    641 Lexington Avenue, 14th Floor
    New York, New York 10022
    Telephone: (646) 755-3603
    Facsimile: (646) 755-5229
    Email: nmobargha@blmllp.com
    *Attorneys for Defendant Azadeh Azari*