**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | |
| WANSDOWN PROPERTIES CORPORATION N.V., | ) | Chapter 11 |
| | ) | Case No. 19-13223 (DSJ) |
| | ) | |
| *Debtor.* | ) | |
| | ) | |

-----------------------------------------------------------------

| | | |
|---|---|---|
| WANSDOWN PROPERTIES CORPORATION N.V. | ) | |
| | ) | |
| *Plaintiff,* | ) | Adv. Proc. No. 19-1450 (DSJ) |
| | ) | |
| - against - | ) | |
| | ) | |
| AZADEH NASSER AZARI, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

-----------------------------------------------------------------

## MEMORANDUM OF DECISION AND ORDER (i) DENYING MOTION FOR SUMMARY JUDGMENT BY DEFENDANT [ECF No. 53], AND (ii) GRANTING PARTIAL SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF WITH RESPECT TO FIRST AND SECOND AFFIRMATIVE DEFENSES [ECF No. 56]

**APPEARANCES:**

**BLANK ROME LLP**
*Counsel for Plaintiffs*
1271 Avenue of the Americas
New York, NY 10020
By:    Ira L. Herman, Esq.
        Jeffrey Rhodes, Esq.

**BEYS LISTON & MOBARGHA LLP**
*Counsel for Defendants*
641 Lexington Avenue
New York, NY 10022
By:    Nader Mobargha, Esq.
        Michael P. Beys, Esq.
        Alison Moss, Esq.

**DAVID S. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a motion [ECF No. 53 (the "**Motion**")] filed by Azadeh Nasser Azari ("**Ms. Azari**" or the "**Defendant**") seeking summary judgment for Defendant in an avoidance action brought by Wansdown Properties Corporation N.V. (the "**Debtor**," "**Plaintiff**," or "**Wansdown**").  Also before the Court is a motion filed by Wansdown as debtor in possession for partial summary judgment [ECF No. 56 (the "**Unclean Hands Motion**")] as to an unclean hands defense pled by Ms. Azari in her Answer [ECF No 14] to the operative amended complaint [ECF No. 13].

Wansdown, a Curaçao corporation, managed assets on behalf of Princess Achraf Pahlavi (the "**Princess**"), the twin sister of the late Shah of Iran.  The Princess was expelled from Iran after the Iranian Revolution in 1979 and spent time in various properties around the world.  Wansdown owned one such property: 29 Beekman Place in Manhattan, a seven-story townhouse (the "**Townhouse**").  This was Wansdown's principal asset.  The Townhouse also served as Wansdown's principal place of business.  Wansdown employed Ms. Azari to work on various matters for the Princess.  Ms. Azari, during the course of her work for Wansdown, was supervised by Gholam Reza Golsorkhi ("**Golsorkhi**").  The Princess died on January 6, 2016.

Soon thereafter, in early 2016, Ms. Azari received a Confession of Judgment (the "**Confession**") signed by Golsorkhi, purporting to grant Ms. Azari at her option either a lump sum of $2,700,000 or an open-ended recurring monthly $9,000 payment for her "competence," "diligence" and "loyalty" in working for the Debtor and the Princess.  On February 12, 2016, Ms. Azari filed the Confession in New York County state court as authorized by the Confession.  The subsequent docketing of this Confession by the clerk of the New York County court on April 21, 2016, created a lien on the Townhouse for the amount of the Confession.  Wansdown thereafter

embarked upon a long and ultimately unsuccessful effort in state court to void the Confession.  In 2019, Ms. Azari obtained authorization for a sheriff's sale of the Townhouse to satisfy the Confession, with the sale scheduled for October 9, 2019.  On October 8, 2019, the day before the scheduled sale, Wansdown filed for chapter 11 protection in this Court.

On December 18, 2019, Plaintiff Wansdown commenced an adversary proceeding against Ms. Azari, alleging that the obligation to pay Ms. Azari was a voidable transfer under 11 U.S.C. § 544(b) of the Bankruptcy Code (the "**Code**").  Following discovery, both parties submitted motions for summary judgment.  Defendant Azari's Motion argues that the Debtor cannot establish the elements of avoidance actions under section 544(b), contending both that (1) there is no creditor that held an unsecured claim that is "allowable" as is required to support Debtor's entitlement to relief under section 544(b), and (2) even if such a claim were allowable, the Confession is not a fraudulent transfer "voidable under applicable law," namely, sections 274 and 275 of New York Debtor & Creditor Law ("**DCL**") as they existed at the time of the Confession.

Meanwhile, Plaintiff Wansdown's Unclean Hands Motion argues that Azari's First and Second affirmative defenses, of unclean hands and fraud, are inapplicable in this section 544(b) avoidance action, since the debtor in possession is pursuing the claim on behalf of triggering creditors, not for itself.  Plaintiff further argues that unclean hands, as an equitable remedy, is not applicable to a statutory or legal claim like the claims here under section 544(b).  Plaintiff also argues that both claim and issue preclusion principles establish facts that stand in the way of Ms. Ansari's affirmative defense of unclean hands.

For the reasons set forth below, the Court denies Defendant's Motion and grants Plaintiff's Unclean Hands Motion.  In brief, both the creditor matrix and admissions by both parties establish that there exists at least one creditor who holds an unsecured claim that suffices to permit Debtor

to seek relief under section 544(b), and there is a genuine dispute of material fact regarding the validity of Plaintiff's DCL claims.  Meanwhile, the Unclean Hands Motion is granted because, in essence, unclean hands based on Debtor's conduct is not a viable defense against a section 544(b) action, where the debtor in possession brings the avoidance action not on behalf of itself or a successor-in-interest, but on behalf of creditors.

## BACKGROUND

### A. **Wansdown's Corporate Structure, History, and Bankruptcy**

The Debtor is a Curaçao corporation with its former principal place of business at 29 Beekman Place, a townhouse in Manhattan.  [ECF Nos. 1 at ¶ 3, 62 at ¶ 1].  Debtor's sole shareholder is Pelmadulla Stiftung ("**Pelmadulla**"), a trust formed under the laws of Liechtenstein and domiciled in Vaduz, Liechtenstein.  [ECF No. 62 at ¶ 2].  Debtor's purpose was to manage and invest the Princess' assets, including the Townhouse.  [*Id.* at ¶ 3].  After the Princess' expulsion from Iran following the Iranian Revolution in 1979, the Princess lived in several homes around the world, including the Townhouse in New York, until her death in 2016.  [*Id.* at ¶¶ 5–6].  Ms. Azari was employed by the Princess in various roles, including as part of her private secretariat and as part of the Consulate General of Iran prior to the Princess' expulsion.  [*Id.* at ¶ 9].  Ms. Azari was also employed by the Debtor from 1979 until December 2016, eleven months after the Princess' death.  [*Id.*].  Ms. Azari reported to Golsorkhi, who was a director of Wansdown beginning in 1979.  [*Id.* at ¶ 6].

Towards the end of the Princess's life, Golsorkhi signed a Confession of Judgment in Wansdown's name, purporting to grant Azari either a lump sum of $2,700,000 or a promised lifetime payment of $9,000 per month as a reward for staying loyal to the Princess throughout her lifetime.  [*Id.* at ¶¶ 11, 12; ECF 54-1 ¶ 4].  Ms. Azari filed the Confession in New York County

state court on February 12, 2016, two days after Golsorkhi signed the Confession. [ECF No. 62 at ¶ 14]. The subsequent docketing of the Confession by the clerk of the New York County court [*Id.* at ¶ 16] created a lien on the Townhouse in the amount of the Confession. Wansdown contended that Ms. Azari and Golsorkhi had an understanding that the Confession was solely to give Ms. Azari leverage in negotiating her employment terms with Pelmadulla, and it was not to be enforced by any court. [*Id.* at ¶¶ 12, 14]. Ms. Azari argued that there was no such understanding and that the Confession by its own terms granted Ms. Azari authority to file it in court, which she rightfully did. [*Id.* at ¶ 14]. Plaintiff and a possibly related third party made two separate unsuccessful attempts in New York state court to void the Confession under various theories. [*See Id.* at ¶¶ 20, 21, 22; Bankr. Docket No. 16, Exs. 3, 4].

To enforce the Confession, Ms. Azari ultimately scheduled a sheriff's sale of the Townhouse for October 9, 2019. However, Wansdown filed for chapter 11 protection in this Court on October 8, 2019, with the resulting automatic stay putting a stop to the sheriff's sale of the Townhouse. [ECF No. 62 at ¶ 24]. Just prior to its bankruptcy filing, Wansdown had signed a residential contract of sale ("**RSA**"), by which it agreed to sell the Townhouse for $10.3 million to an entity named 29 Beekman Corp. Ultimately, that sale did not close, and the failed transaction is the subject of separate litigation between 29 Beekman Corp. and the Debtors. *See generally Wansdown Props. Corp. N.V. v. 29 Beekman Corp. (In re Wansdown Props. Corp. N.V.)*, 620 B.R. 487 (Bankr. S.D.N.Y. 2020). The Townhouse was finally sold for $11.5 million in June 2020. [ECF No. 62 at ¶ 4].

Plaintiff commenced this adversary proceeding on December 18, 2019. [ECF No. 1]. Defendant filed a motion to dismiss on February 11, 2020, which the Court, by Judge Stuart M. Bernstein, denied in part and granted in part with leave to replead. [*See* ECF No. 10]. Thereafter,

Plaintiff filed a First [ECF No. 3] and Second Amended Complaint [ECF No. 13 (the operative "**Complaint**")]. Defendant answered on June 11, 2020 [ECF No. 14] and discovery commenced on August 21, 2020 [ECF No. 15]. The case was reassigned to the undersigned on March 1, 2021. [ECF No. 18]. Defendant filed her motion for summary judgment on April 26, 2022. [ECF Nos. 53–55]. Plaintiff responded on June 10, 2022. [ECF Nos. 61–63]. The Court heard argument on August 18, 2022, and reserved decision. [*See* ECF No. 79].

### B. The Fraudulent Transfer Action and Related Objections

The Complaint claims that the Confession obligation incurred by the Debtor was voidable under section 544(b) of the Bankruptcy Code. Specifically relevant to Defendant's Motion, the Debtor-Plaintiff alleges that there existed at all relevant times a creditor holding an unsecured claim that is allowable under section 502 of the Code, and alleges that the pre-petition Confession obligation incurred by Wansdown is voidable under applicable law. Plaintiff asserts, among other statutes, New York's DCL §§ 274 and 275 as applicable. DCL section 274 renders voidable any exchange for property made without fair consideration if the property remaining in the debtor's hands after the conveyance constitutes an "unreasonably small" amount of capital. [Complaint ¶ 97][1]. DCL section 275 renders voidable any exchange of property without fair consideration when the person making the exchange intends or believes that he will incur debts beyond his ability to pay. Plaintiff contends that at the time the Confession was entered, the Townhouse was subject to a mortgage and was not generating income. [*Id.* at ¶ 56]. Further, Plaintiff points to Wansdown's payroll and other creditor obligations, as well as non-consensual liens filed against the Townhouse,

---

[1] DCL § 274 has been subsequently amended to remove mention of "unreasonably small capital," but because the alleged transfer took place before the amendments became effective, the Court and relevant parties are constrained by the earlier version of the statute. *See* 2019 N.Y. Sess. Laws Ch. 580 § 7 (providing that the statute as amended "shall not apply to a transfer made or obligation occurred before such effective date"); *see also In re Tops Holding II Corp.*, No. 18-22279, 2022 WL 6827457, at *3 n. 37 (Bankr. S.D.N.Y. Oct. 12, 2022) (citing *Ray v. Ray*, 799 Fed. App'x 29, 31 n.1 (2d Cir. 2020)).

all of which Plaintiff contends left Wansdown with insufficient cash to pay its debts, and instead

left Wansdown dependent on Golsorkhi voluntarily advancing his own funds to cover all or some

of Wansdown's expenses.  [*Id.* at ¶¶ 48, 56–58].  Lastly, Plaintiff asserts that, after the conveyance,

Wansdown was left with unreasonably small capital and that it had incurred, intended to incur, or

believed that it would incur, debts that would be beyond its ability to pay.  [*Id.* at ¶¶ 59–60].

For her part, Ms. Azari contests both the existence of an unsecured creditor that meets the

requirements of section 544(b), and the existence of admissible facts sufficient to support triable

claims under DCL sections 274 and 275.  Specifically, Azari contends that a creditor did not exist

with an allowable claim at the time of the chapter 11 petition since Debtor repeatedly represented

that all of its creditors would be paid in full from the sale of the Townhouse.  [Motion at ¶ 94].

Further, to counter Plaintiff's DCL section 274 claim, Azari contends that the following facts prove

that Debtor remained solvent after the Confession was signed in 2016: (1) solvency ratios

computed using various valuations of the Townhouse prepared on behalf of the Debtor reveal a

strong equity cushion for Debtor's operations [*id.* at ¶ 8]; (2) Pelmadulla had historically paid all

of Debtor's expenses, providing Debtor with plenty of liquidity [*id.* at ¶ 9]; (3) Debtor mortgaged

the Townhouse for $2 million the day before it signed the Confession, providing it with cash to

pay all present and future expenses associated with the Townhouse [*id.* at ¶ 10]; (4) Debtor could

have rented out the Townhouse if it needed more operating revenue but it chose not to do so [*id.*

at ¶ 11]; (5) Debtor never tried to pay Ms. Azari on account of the Confession, or to treat the

Confession as a current expense, because the Confession was to be paid from the sale of the

Townhouse [*id.* at ¶ 12]; and (6) after three and a half years in bankruptcy, Debtor still admitted it

was solvent [*id.* at ¶ 13].

Further, Ms. Azari counters Plaintiff's DCL section 275 claim by arguing that Golsorkhi

did not intend or believe when he signed the Confession that the Debtor would be unable to pay debts as they matured, because (1) he believed that Pelmadulla or the subsequent mortgaging of the Townhouse would cover current and future expenses [*id.* at ¶¶ 132–135]; (2) Golsorkhi continued to send payment requests to Pelmadulla with the expectation that they would be fulfilled [*id.* at ¶ 138]; and (3) Golsorkhi anticipated a lucrative sale of the Townhouse, with sale proceeds that would settle any outstanding debts of the Debtor [*id.* at ¶ 139].

Plaintiff disagrees. Plaintiff argues that competing Townhouse valuations and its eventual sale price show that the Debtor did not have a strong debt to equity ratio; that Pelmadulla was not legally required to advance funds when necessary, and did not reliably do so; that Debtor did not have any capital cushion; and that Debtor's access to further mortgage financing was severely restricted due to the judgment lien created under the Confession. [ECF No. 61 (the "**Reply**") at ¶¶ 61, 65, 67, 69–72]. Further, as to the DCL section 275 claim, Plaintiff argues that Golsorkhi's state of mind is contested and not susceptible to summary judgment [*id.* at ¶ 76], pointing to evidence that Plaintiff contends demonstrates that Golsorkhi understood and believed that Wansdown incurred, and would continue to incur, debts beyond its ability to pay as they matured [*id.* at ¶ 78].

### C.  The Various Valuations of and Offers for the Townhouse

The parties point to evidence that the Townhouse was "valued," "priced," or "appraised" many times prior to and at various stages of this bankruptcy [ECF No. 54, Exs. 18–21, 35–37, 39, 42] before it was finally sold in June of 2020 for $11.5 million [ECF No. 102-B].

First, in 2015, Plaintiff hired McRory and McRory PLLC to prepare a document showing the tax consequences of a sale of the Townhouse at an "assumed" $30–35 million sales price. [ECF No. 54–35]. Ms. Azari characterizes this number as a "projection" by Plaintiff as to the

value of the Townhouse.  [Motion at ¶ 66].  Plaintiff disputes this characterization, describing the document as merely a tax analysis "assuming" a hypothetical sale at a price that was merely aspirational, not a true market value.  [*Id.* at ¶ 51].

Second, in early 2016, Plaintiff's broker Halstead Property, LLC ("**Halstead**") prepared a document which stated that the "per-square-foot value of 29 Beekman Place falls in the range of 50% to 60% that of [*sic*] 21 Beekman Place (which traded impressively @ $4753.67 PSF)."  [ECF No. 54-18].  Applying this formula to the square footage of the Townhouse (12,120) yields a range of approximately $28 million to $34 million.  Ms. Azari and Wansdown, however, dispute what these figures represent.  Ms. Azari characterizes this document as a "valuation" that Plaintiff "did not object to" [ECF No. 62 ¶ 50] while Wansdown calls it a "list price" that merely reflects the "Debtor's aspirations" [*id.*].

Third, in 2017, Plaintiff hired Vanderbilt Appraisal Company, LLC ("**Vanderbilt**") to appraise the Townhouse.  Vanderbilt returned with a figure of $18 million.  Plaintiff and Defendant do not dispute the characterization of this number as an "appraisal," but they do dispute how accurate that appraisal is.  [*Id.* at ¶ 52].

Fourth, in 2015, Plaintiff received an offer of $37 million for the Townhouse.  Defendant asserts that Plaintiff then adopted this number going forward as the market value for the Townhouse.  [*Id.* at ¶ 55].  Plaintiff counters, once more, that this figure was merely aspirational and not a true market value.  [*Id.*].

Fifth, in January 2017, Plaintiff received an email with marketing materials from Brown Harris Stevens Residential Sales, LLC recommending a "realistic asking price" of $28 million for the Townhouse and describing a client from China who has "expressed interest at $25 million all cash."  [ECF No. 54-36].  Plaintiff asserts that this letter expressing "interest" was not a serious

one, since the client from China viewed the building once and then "never came back" and "never sent [] a written . . . letter to say that 'I'm buying this.'"  [ECF No. 62 at ¶ 56].

Sixth, in March 2017, Plaintiff received an offer for $17 million from a "Russian gentleman."  [*Id.* at ¶ 57].  What happened next is disputed.  Plaintiff contends that there was some negotiation before Plaintiff concluded that the offer was not a "serious realistic offer," while Defendant asserts that the Debtor rejected the offer "outright."  [*Id.*].

Seventh, in June 2017, Plaintiff received another offer from yet another "Russian gentleman," but the evidence does not reveal the amount of the offer (although Plaintiff contends it was "probably a lowball offer that was rejected").  [*Id.* at ¶ 58].

Eighth, in December 2017, Plaintiff received a $17 million offer from Secured Capital Partners LLC ("**Secured**"), with $1.7 million due to Plaintiff at signing and the remainder due at closing.  [*Id.* at ¶ 59].  Plaintiff executed a sales agreement.  [ECF No. 54-20].  However, the deal never closed, and was the subject of a separate litigation between Plaintiff and Secured.  *See Secured Cap. Partners, LLC v. Wansdown Props. Corp. N.V.*, No. 150780/2018, 2019 WL 1470210, at *1 (N.Y. Sup. Ct. Apr. 03, 2019).

Ninth, on September 25, 2019, Plaintiff signed an RSA with 29 Beekman Corp. for $10.3 million.  [ECF No. 62 at ¶ 63].  Like the Secured sale, this transaction failed to close and is the subject of a related adversary proceeding between Plaintiff and 29 Beekman Corp.  *See In re Wansdown*, 620 B.R. 487.

### D.  **Pelmadulla's Reliabilty in Providing Payments to the Debtor**

There is substantial disagreement on whether Pelmadulla could be relied upon for advancing funds to meet Wansdown's expenses.  Defendant contends that Pelmadulla had paid all of Wansdown's expenses since its inception and therefore Wansdown declined to rent the

Townhouse when it faced a cash shortage, instead relying on Pelmadulla to continue covering Wansdown's expenses. [*Id.* at ¶ 65]. Plaintiff disputes this and claims that Pelmadulla did not pay all of Wansdown's expenses; that Mr. Golsorkhi needed to pay some expenses out of his own pocket to care for the Townhouse; that Wansdown was "unable to pay its debts" and "consistently paid creditors late"; and that renting the Townhouse was simply not feasible. [*Id.*].

## DISCUSSION

### A. **Jurisdiction**

The Court has jurisdiction over adversary proceedings filed in this District pursuant to statute and the standing order of reference to this Court of all cases commenced under title 11 and all proceedings arising under title 11 or arising in or related to a case under title 11. *See* 28 U.S.C. §§ 157, 1334; *Amended Standing Order of Reference M-431*, dated January 31, 2020 (Preska, C.J.). Consideration of this motion is a core proceeding. *See* 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### B. **Legal Standard for Summary Judgment**

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure, made applicable here by Federal Rule of Bankruptcy Procedure 7056. Summary judgment is appropriate when the record demonstrates that there are no genuine disputes as to any material facts and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file that

demonstrate the absence of a genuine dispute regarding any material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, all evidence must be viewed in the light most favorable to the non-moving party, *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and the Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322 (quoting Fed. R. Civ. P. 56(c)); *In re Firestar Diamond, Inc.*, 643 B.R. 528, 539 (Bankr. S.D.N.Y. 2022).

At bottom, the Court's function at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter" but rather to determine whether "the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 249, 251–52.

## C. **Claims Under Bankruptcy Code §§ 544(b) and 550(a)**

For reasons detailed below, triable issues of fact exist that preclude a grant of summary judgment on the merits of Plaintiff's avoidance claims.

### 1. Section 544 Avoidance Actions and Triggering Creditor Standard

The Code bestows broad powers upon a trustee to avoid certain transfers of property made by a debtor before the filing of a bankruptcy petition. When the Trustee succeeds, "the transferred property is returned to the estate for the benefit of all persons who have presented valid claims." *See Christy v. Alexander & Alexander of NY, Inc*., 130 F.3d 52, 55 (2d Cir. 1997). Specifically,

section 544(b) of the Code provides that a trustee may avoid any transfer of an interest of the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the Code.   11 U.S.C. § 544(b)(1).   Where no trustee is appointed, a debtor in possession is statutorily vested with all the rights and powers (other than rights to compensation and with immaterial exceptions) of a bankruptcy trustee.  *See* 11 U.S.C. § 1107(a).

The power of a trustee (or debtor in possession) to avoid transfers under section 544(b) is entirely derivative "because the trustee is stepping into the shoes of a creditor."  *In re Omansky*, No. 18-13809, 2022 WL 4281472, at *9 (Bankr. S.D.N.Y. Sept. 15, 2022).   This means that, in order for a trustee to maintain an avoidance action, the trustee must show that at least one of the unsecured creditors of the estate holds an allowable claim against whom the transfer or obligation was invalid under applicable state or federal law.  *See id.* at *6 ("[t]his is generally referred to as the "golden creditor" issue); *see also In re Wingspread Corp.*, 178 B.R. 938, 945 (Bankr. S.D.N.Y. 1995); *MC Asset Recovery, LLC v. Southern Co.*, No. 1:06-CV-0417, 2006 WL 5112612, at *3 (N.D. Ga. Dec. 11, 2006) ("[I]n order to maintain an avoidance action under § 544(b), a trustee must demonstrate the existence of a so-called 'golden' or 'triggering' creditor: (1) an unsecured creditor, (2) who holds an allowable unsecured claim under section 502, and (3) who could avoid the transfers at issue under applicable (i.e., state) law."); *In re Archdiocese of Milwaukee*, 483 B.R. 855, 862–63 (Bankr. E.D. Wis. 2012) ("The trustee's rights under § 544(b) are limited to the 'rights of an existing unsecured creditor because § 544(b) rights are completely derivative of those of an actual unsecured creditor.'") (quoting *Lippe v. Bairnco Corp.*, 225 B.R. 846, 852 (S.D.N.Y. 1998)).

Thus, as long as its complaint identifies a category or group of creditors holding an allowable claim (or possibly even merely alleges that one exists, *see In re Musicland Holding Corp.*, 398 B.R. 761 (Bankr. S.D.N.Y. 2008)), Plaintiff, as a debtor in possession, can utilize section 544(b) to claw back certain transfers pursuant to applicable law.

This power, however, is limited by section 550(a) of the Code:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544 . . . of this title, the trustee may recover, *for the benefit of the estate*, the property transferred, or, if the court so orders, the value of such property, from . . . the initial transferee of such transfer or the entity for whose benefit such transfer was made . . . .

11 U.S.C. § 550(a) (emphasis added). "For the benefit of the estate" is not a defined term in the Code. But it has been "consistently" held to limit a trustee's power under section 544. *In re Murphy*, 331 B.R. 107, 122 (Bankr. S.D.N.Y. 2005) ("Courts have consistently held that an avoidance action can only be pursued if there is some benefit to creditors and may not be pursued if it would only benefit the debtor.").

Section 550 thus limits an avoidance action under section 544(b) to circumstances in which the action benefits the estate. *In re Vintero Corp.,* 735 F.2d 740, 742 (2d. Cir. 1984), *cert. denied*, 469 U.S. 1087 (1984). In other words, if all creditors stand to be paid in full even without avoidance of the transfer at issue, it would not benefit the estate for the debtor in possession or the trustee to avoid a transfer under section 544(b), as any extra returns would inure to the debtor and not benefit any existing creditor. *In re Calpine Corp.*, 377 B.R. 808, 812 (Bankr. S.D.N.Y. 2007). This limitation, however, is not overly stringent. A trustee need not point to any direct benefit to the estate; even an indirect benefit that is likely to strengthen a reorganized debtor's financial position to pay creditors is enough to grant the trustee standing to pursue those claims. *Id.* at 813–14 (collecting cases).

Lastly, the existence of a section 544(b) cause of action should be evaluated as of the time the bankruptcy petition is filed. *In re Mirant Corp.*, 675 F.3d 530, 534 (5th Cir. 2012); *In re Extended Stay, Inc.*, 2020 LEXIS 2128 (Bankr. S.D.N.Y. Aug. 8, 2020) (same). And "[o]nce a trustee's avoidance rights are triggered at the time of filing, they persist until avoidance will no longer benefit the estate under § 550." *Mirant*, 675 F.3d at 534.

2. <u>Analysis of Triggering Creditor Standard</u>

Contrary to Azari's contentions, there is no serious doubt here that a triggering creditor exists. The following facts are undisputed: (1) there existed at least one creditor at the time of petition who had an allowable claim [*see* Claims Register, Claims 1–2]; (2) that claim has not been paid yet and is impaired under the plan [*see* Bankr. Docket No. 206]; and (3) avoidance of the Confession would benefit the estate by decreasing its payment obligations, thus increasing the percentage return to holders of impaired, allowed claims. Furthermore, Plaintiff identified relevant general creditors in its amended complaint [Complaint at ¶ 70]. Thus, Plaintiff meets the triggering creditor requirement under 554(b) and the benefit to the estate test under 550(a).

Defendant Azari nevertheless argues that no triggering creditor exists in this case, since the Debtor "represented no less than (5) five times—including under oath—that it had sufficient funds from the proceeds of the RSA to pay all the creditors in full." [Motion at ¶ 98]. Next, Defendant argues that roughly one-third of the total amount of claims against the estate are disputed and that certain creditors are not actually creditors, but rather shareholders, and therefore cannot be used as a triggering creditor for section 544(b). [*Id.* at ¶ 100–02].

Each of these objections misses the mark. Even assuming that they are true, there is at least one creditor who could benefit from the avoidance action the Debtor now brings. During oral argument, based on the claims registry, the Court identified the Internal Revenue Service and the

"New York State Department of Tax and Finance" as triggering creditors, and Defendant did not contest this identification. [ECF No. 79 (Hearing Tr.) 40:1–10].

Further, Defendant Azari's observation that certain claims are not contested does not extinguish the trustee's or debtor in possession's avoidance rights, because "[o]nce a trustee's avoidance rights are triggered at the time of filing, they persist until avoidance will no longer benefit the estate under section 550." *Mirant*, 675 F.3d at 534. Since it is undisputed that eligible creditors have not been paid yet under the confirmed plan and at least some of those claims are impaired, the Debtor has the right to pursue its cause of action under sections 544(b) and 550(a).

D. **DCL § 274 Claim**

Because Defendant Azari is not entitled to summary judgment based on her assertion that no "triggering creditor" exists, the Court next considers Plaintiff Wansdown's claimed entitlement to relief under two provisions of New York state law, Debtor and Creditor Law §§ 274 and 275.

1. Legal Standard Under DCL § 274

In order to prevail on a claim under Bankruptcy Code section 544(b), a trustee or debtor in possession must show that the transfer in question is voidable under applicable law. In this case, the Debtor points to DCL sections 274 and 275, as they existed at the time of the 2016 confession, as applicable law entitling it to avoid Azari's Confession of Judgment. DCL section 274 has since been amended, but at that time required (1) a conveyance; (2) made without fair consideration; (3) while the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small amount of capital. N.Y. Debt. & Cred. Law § 274. The parties are locked in a fact-intensive dispute (further described below) regarding whether, after the Confession was signed and filed, the amount remaining in the estate constitutes an "unreasonably small amount of capital." The existence of

such a dispute precludes granting summary judgment.

To determine whether the Debtor was left with unreasonably small capital, relevant factors include the transferor's debt-to-equity ratio, historical capital cushion, and the need for working capital in the transferor's industry. *In re Manshul Constr. Corp.*, No. 97 Civ. 8851, 2000 WL 1228866, at *54 (S.D.N.Y. Aug. 30, 2000); *In re Direct Access Partners, LLC*, 602 B.R. 495, 536 (Bankr. S.D.N.Y 2019); *In re Vivaro Corp.*, 524 B.R. 536, 551 (Bankr. S.D.N.Y. 2015). Although a court may consider the length of time a Debtor survived after the challenged transfer and whether the deterioration of the enterprise was affected by unforeseeable intervening events, these are just some among many factors to consider. *See In re Tronox, Inc.*, 503 B.R. 495, 536 (Bankr. S.D.N.Y. 2019); *ASARCO LLC v Ams. Mining Corp.*, 396 B.R. 278, 397 (S.D. Tex. 2008) (finding that even though debtor survived for more than two years after the challenged transfer, it had "unreasonably small assets and was unable to generate sufficient cash flow to sustain operations . . . .").

    2.  Analysis of DCL § 274 Claim

Here, viewing all underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party and drawing all reasonable inferences in favor of the non-moving party, the Court concludes that there exists a genuine dispute of material fact as to whether the Debtor was left with unreasonably small capital after the Confession.

    *a.  Factual Disputes Concerning the Value of the Townhouse*

First, Defendant argues that the Debtor had a strong debt-to-equity ratio based on two valuations of the Townhouse (the primary asset of the Debtor), one at $34 million, the other at $18 million. Defendant argues that the Debtor adopted the $34 million valuation by signing an agreement authorizing that valuation and refusing to lower it as a sale list price in subsequent

months.  [Motion at ¶ 110].  Alternatively, Defendant argues that the value of the Townhouse was $18 million based on a valuation by Vanderbilt.  Defendant argues that even at a value of $18 million, the debt-to-equity ratio of the Debtor was robust, and precludes any reasonable inference that the Debtor was left with unreasonably small capital post-transfer.

To avoid summary judgment, Plaintiff Wansdown need only adduce facts sufficient to create a triable issue of fact as to whether Debtor's debt to equity ratio supports a reasonable inference that Debtor was left with unreasonably small capital.  Here, Plaintiff disputes the asserted $34 million valuation of the Townhouse, arguing that that figure was merely an "aspirational" listing price, while contending that the alternative $18 million valuation did leave the Debtor with unreasonably small capital.  [Reply at ¶ 68].  Plaintiff further argues that the best way to determine the true value of the Townhouse is by looking to what it actually sold for: $11.5 million.  [Reply at ¶ 111].  Defendant, on the other hand, denies that $11.5 million is the true value of the Townhouse, and contends that that figure was depressed because the sale occurred during the global COVID pandemic and an asserted associated real estate price slump, whereas the relevant valuation date is the time of the 2016 transfer, when real estate prices were higher.  Overall, as discussed above, at different times many different prices or proposed valuations were advanced for the Townhouse, ranging from $10.3 million to $37 million.

The parties' contentions urge competing inferences drawn from admissible evidence and create an unmistakable triable question of fact regarding the value of the Townhouse at the time of the transfer at issue.  It follows that there is a genuine dispute of material fact whether the Confession of Judgment left the Debtor with unreasonably small capital.  This issue directly informs the section 274 analysis, and, accordingly, precludes granting summary judgment.

       *b.*   *Factual Dispute Whether Pelmadulla Could Be Relied Upon to Pay the Debtor's Expenses*

Defendant Azari next argues that the Debtor's historical capital cushion precludes a finding of unreasonably small capital following the Confession of Judgment, since Pelmadulla paid all of Debtor's expenses since 1979.  [Motion at ¶ 115].  As Defendant puts it, the Debtor was "so confident in its capital cushion that it left its Townhouse empty and decided not to earn income from it."  [*Id.*].

Plaintiff, however, identifies enough contrary evidence to preclude summary judgment. Emails from 2015–2018 indicate that the Debtor was not as confident in its capital cushion as Defendant suggests, but instead was consistently sending pleas to Pelmadulla for money.  [ECF No. 63, Exs. 25–38].  Further, Plaintiff contends that it could not simply lease the Townhouse, an argument the Court summarized during oral argument:

> Court: Basically [your argument is that], you have, what I'll call, a fabulous residence that you want to sell for top dollar and you can't have it encumbered by tenants, and you can't risk having tenants come in and mess things up either commercially or physically, so the business judgment was made to leave it empty and try to market it, which is reasonable, not an unreasonable decision . . . .  Am I doing okay?
>
> Plaintiff: You're doing okay.

[ECF No. 79 (Hearing Tr.) at 36:2–17]

Still further, Plaintiff claims that Mr. Golsorkhi needed to pay some Townhouse expenses out of his own pocket and that Wansdown was "unable to pay its debts" and "consistently paid creditors late."  [Reply at ¶ 65].

Viewing all facts in the light most favorable to Plaintiff, at the very least there is a genuine dispute of material fact as to whether, even taking Pelmadulla's funding into account, the Debtor had unreasonably small capital following the Confession.  Accordingly, summary judgment is denied to the extent the motion is predicated on the sufficiency of Wansdown's funding or financial

resources.

### c.   *Debtor's Working Capital Requirements*

In addition to the dispute about the amount and reliability of Debtor's funding, Debtor's working capital requirements are also the subject of a factual dispute.  Defendant contends that Debtor's need for working capital was small, given that Wansdown was "winding down" its affairs after the Princess' death and that Wansdown received a $2 million mortgage in 2016 to cover anticipated current and future expenses.  [Motion at ¶ 116–17].  Thus, Defendant asserts, Debtor cannot prevail on its DCL section 274 claim because it had minimal need for working capital at the time of the relevant transfer.

It is unclear from the available evidence whether the need for working capital was large or small after the Debtor took out the $2 million mortgage.  A reasonable fact finder could conclude that even a loan in this amount left a continuing substantial need for working capital such that the Confession left the Debtor with an unreasonably small amount of capital.  Plaintiff cites emails between Pelmadulla and the Debtor from 2016–17 showing that the maintenance of the Townhouse was "very expensive," and that the Debtor was consistently in need of funds for taxes and "assorted payments."  [ECF No. 62 at ¶ 68].  Thus, a genuine issue of material fact exists concerning the adequacy of Wansdown's available funds.

In short, every recognized factor defining "unreasonably small capital" for the purposes of DCL section 274 is the subject of a genuine factual dispute.  Defendant's motion for summary judgment on the DCL section 274 claim therefore is denied.

### E.  **DCL § 275 Claim**

1.   Legal Standard Under DCL § 275

DCL section 275 provides:

> Every conveyance made and every obligation incurred without fair
> consideration when the person making the conveyance or entering
> into the obligation intends or believes that he will incur debts
> beyond his ability to pay as they mature, is fraudulent as to both
> present and future creditors.

Under this provision, where the intent requirement is met, a transfer may be avoided where "the property remaining after the conveyance is insufficient to pay [the transferor's] probable liabilities on existing debts as they become mature." *Fromer v. Yogel*, 50 F. Supp. 2d 227, 246 (S.D.N.Y. 1999); *see also In re Flutie N.Y. Corp.*, 310 B.R. 31, 35 (Bankr. S.D.N.Y. 2004).  Section 275 requires proof of the debtor's subjective intent or belief that it will incur debts beyond its ability to pay as they mature.  *See MFS/Sun Life*, 910 F. Supp. at 943 (noting support for the view that § 275 requires proof of subjective intent); *58th Street Plaza Theatre, Inc.*, 287 F. Supp. at 498 (finding that corporate taxpayer fraudulently transferred property under NYDCL § 275 when insider knew that corporation would be unable to pay federal tax claims if they were upheld); *In re Best Prods. Co.*, 168 B.R. 35, 52 n. 28 (Bankr. S.D.N.Y. 1994) (NYDCL § 275 requires proof of the transferor's subjective belief that it will incur debts beyond its ability to pay), *aff'd* 68 F.3d 26 (2d Cir. 1995).

## 2.  Analysis of DCL § 275 Claim

As discussed above, there is a genuine factual dispute as to whether there existed sufficient property remaining after the Confession to pay Wansdown's debts.  Plaintiff presents evidence that the Debtor was unable to secure a mortgage necessary to pay debts as they became due post-transfer [ECF No. 63-30] and that Golsorkhi was unable to rely on Pelmadulla to pay debts as they matured [*id.* Ex. 35].  Defendant points to the fact that Wansdown took out a mortgage to cover past and future expenses, and asserts that Golsorkhi must have believed that the Debtor had sufficient funds even post-transfer to pay debts as they matured.  [Motion at ¶ 135].  Whether or

not Golsorkhi believed at the time of transfer that the Debtor would be able to pay debts as they

matured is a triable question of material fact that is currently in dispute.

"Summary judgment is notoriously inappropriate for determination of claim in which

issues of intent, good faith and other subjective feelings play dominant roles." *Krishna v. Colgate

Palmolive Co*. 7 F.3d 11, 16 (2d Cir. 1993) (citation and internal quotation marks omitted); *Meiri

v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) (recognizing that "summary judgment is ordinarily

inappropriate where an individual's intent and state of mind are implicated"). Summary judgment

may nonetheless be granted on a "state of mind" issue when the non-movant fails to come forward

with contrary evidence. *Meiri*, 759 F.2d at 998 ("The summary judgment rule would be rendered

sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to

defeat an otherwise valid motion."). Here, however, Plaintiff has adduced evidence supporting an

inference that Golsorkhi was aware that granting the Confession would render the Debtor unable

to pay its debts as they matured, and Defendant has shown evidence to the contrary. For example,

Defendant points to Golsorkhi's stated belief that Pelmadulla had received the proceeds of the $2

million mortgage of the Townhouse and thus would be "able to meet their obligations" [ECF No.

54-23 at 19:23–24], while Plaintiff points to emails between Golsorkhi and a trust representative

that fund transfers to Wansdown were not much more than "a drop in the ocean" [ECF No. 63-

54], arguably suggesting that Golsorkhi believed Wansdown was insolvent. Thus, viewing all

facts in the light most favorable to the non-movant Debtor, summary judgment is not appropriate

on the section 275 claim.

F. **UNCLEAN HANDS**

1. Additional Background and Parties' Contentions on Unclean Hands Motion

Plaintiff moves for partial summary judgment rejecting Defendant Azari's First and Second

affirmative defenses, which are, respectively, that Wansdown is barred from prevailing on its fraudulent transfer claims due to its alleged unclean hands and fraud. [ECF Nos. 56, 65, 78]. For the following reasons, the Court grants summary judgment in favor of Plaintiff on Defendant Azari's First and Second affirmative defenses.

To briefly and incompletely recap Ms. Azari's asserted factual bases (many disputed by Wansdown) for these asserted defenses, all of which purport to present reasons to preclude Wansdown from now disavowing the validity and enforceability of the Confession in favor of Ms. Azari in light of asserted earlier misconduct of Wansdown leadership and counsel:

- Mr. Golsorkhi assertedly lied in denying that he was fluent in English in a previous attempt to set aside the Confession in state court. [ECF No. 65 at 11].
- The application for the estate's retention of Blank Rome LLP contained numerous falsehoods and failed to disclose social and legal relationships with, among others, Mr. Golsorkhi. [ECF No. 65 at 12–14].
- The $10.3 million sale of the Townhouse (which Azari argues was for a below-market price) was kept secret from Pelmadulla and Pelmadulla was "astonished" upon learning that the Townhouse had been sold, in violation of professional and fiduciary duties owed by Blank Rome and Mr. Golsorkhi. [*Id.* at 21–23].
- Discovery of emails disclosing Blank Rome's asserted conflicts came to light only after the bankruptcy plan was confirmed, potentially allowing confirmation to proceed when it might otherwise have been delayed and when Debtor's counsel may have been disqualified. [*Id.* at 24–25].
- Golsorkhi perjured himself ten times throughout proceedings leading to the sale of the Townhouse on issues that are materials to the instant fraudulent conveyance action, generally relating to the Townhouse's value and efforts to sell it. [*Id.* at 25–33].
- Debtor engaged in post-petition misconduct through its counsel at Blank Rome in concert with Golsorkhi to thwart Azari's interests even at the expense of Debtor's estate and its creditors. [*Id.* at 22 *et seq.*].

Mounting a fact-based dispute as to these contentions would inevitably present a factual dispute that could not be resolved on summary judgment. Plaintiff instead advances legal reasons for its request for dismissal of the unclean hands and fraud defenses. Specifically, Plaintiff argues that: (1) the doctrine of unclean hands is an equitable remedy, and is not available as a defense to Code section 544(b) claims because those claims sound in law and are not susceptible to equitable

defenses; (2) even if the relief under section 544(b) were equitable in nature, a debtor in possession or trustee bringing a section 544(b) claim stands in the shoes of creditors, such that equitable defenses based on a debtor's or trustee's misconduct on its own behalf do not preclude the claims; and (3) principles of res judicata and/or collateral estoppel bind Azari and preclude defenses based on post-petition conduct that could have been raised in opposition to the Townhouse sale and/or Plan confirmation. [*See generally* ECF No. 56].

> 2. <u>Inapplicability of Unclean Hands Defense to Claims Brought on Behalf of Creditors Pursuant to Section 544(b)</u>

The Debtor brings this action in its capacity as debtor in possession, which in the absence of appointment of a trustee is statutorily vested with all the rights and powers (other than as to compensation and with certain immaterial exceptions) of a bankruptcy trustee. *See* 11 U.S.C. § 1107(a). In that capacity, the Debtor here seeks to set aside a transfer or conveyance pursuant to Code section 544(b) for the benefit of the estate's creditors, whose recoveries under the confirmed Plan will increase if the estate's $2.7 million obligation to Azari is reduced or eliminated. Plaintiff Wansdown points to extensive case law holding that defenses of unclean hands do not lie against claims brought by trustees on behalf of creditors pursuant to section 544(b), on the theory that innocent creditors should not be victimized by the bad acts of the debtor.

Azari points to no persuasive authority distinguishing or contravening that authority. Accordingly, the Court grants summary judgment in favor of Plaintiff Wansdown on Defendant's First and Second affirmative defenses.

In other contexts, when a "bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damages to the creditors." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991); *accord Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2010) (under the *Wagoner* Rule, a "claim against a

third party for defrauding a [debtor] with the cooperation of [the debtor] accrues to the creditors, not to the guilty [debtor]") (citation omitted). "The *Wagoner* rule derives from the common law doctrine of *in pari delicto*," *Fox v. Picard* (*In re Madoff*), 848 F. Supp. 2d 469, 483 (S.D.N.Y. 2012), aff'd sub nom. *In re Bernard L. Madoff Inv. Secs. LLC*, 740 F.3d 81 (2d Cir. 2014), and "bars a trustee from suing to recover for a wrong that he himself essentially took part in," *Wight*, 219 F.3d at 87.

This limitation does not apply in all circumstances, however; "[t]he *Wagoner* rule does not . . . apply to causes of action that the Bankruptcy Code specifically confers on a trustee or a debtor in possession." *In re Madoff*, 848 F. Supp. 2d at 483 (quoting *In re Park South Sec.*, LLC, 326 B.R. 505, 513 (Bankr. S.D.N.Y. 2005)). More specifically, "neither the Wagoner rule nor the *in pari delicto* doctrine apply to a trustee's statutory standing under Section 544 of the Bankruptcy Code." *Wells Fargo Bank v. First Republic Bank* (*In re Salander*), 503 B.R. 559, 568 n. 12 (S.D.N.Y. 2013). That is, "avoidance actions do not fall within the *Wagoner* rule." *Nisselson v. Empyrean Inv. Fund, L.P.* (*In re MarketXT Holdings Corp.*), 376 B.R. 390, 423 (Bankr. S.D.N.Y. 2007) (citing cases); *see also Geltzer v. Mooney* (*In re MacMenamin's Grill Ltd.*), 450 B.R. 414, 431 (Bankr. S.D.N.Y. 2011) (trustee has "independent standing" under § 544); *Pereira v. Garritano* (*In re Connie's Trading Corp.*), No. 14 Civ. 376, 2014 WL 1813751 at *5–6 (S.D.N.Y. May 8, 2014).

There are differences between the *Wagoner* Rule and the doctrines of *in pari delicto* and unclean hands,[2] but none are relevant here. The dispositive point is that in a section 544(b)

---

[2] *See*, e.g., *In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 424 n.5 (Bankr. S.D.N.Y. 2005) (explaining that the *in pari delicto* doctrine and the Wagoner Rule are not the same). Some courts have analyzed the Wagoner Rule and *in pari delcito* together because both are "grounded in substantive agency law" and "identical tests appear to apply to both doctrines." *Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II SCA)*, 524 B.R. 488, 532 (Bankr. S.D.N.Y. 2015). But "[t]he Wagoner Rule is one of standing. *In pari delicto* is an equitable defense analogous to unclean hands rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct." *Grumman Olson Indus.*, 329 B.R at 424 n.5.

avoidance action, the debtor is not suing on behalf of itself, but rather acts as a trustee or debtor in possession who is suing on behalf of other creditors. As Judge Lane concluded in a recent decision, an unclean hands defense is a "poor fit" where the trustee "seeks to recover the funds for the benefit of creditors of the estate, not for the benefit of [a director] who is not only the equity holder of the Debtor but also owner of the entities that ultimately received the benefit of the transfers." *LaMonica v. NEDM Payables Corp. (In re Pretty Girl, Inc.)*, No. 14-11979, 2022 WL 5333830, at *9 (Bankr. S.D.N.Y. Oct. 7, 2022). Plaintiff points to numerous other decisions concluding that section 544 avoidance actions are not subject to unclean hands and/or *in pari delicto* defenses. *See In re Wedtech Corp.*, 88 B.R. 619, 622 (Bankr. S.D.N.Y. 1988) ("trustee's ability to obtain a recovery for an estate and its blameless creditors may not be denied by the pre-petition wrongful conduct of the debtor"); *In re Cornerstone Homes, Inc*, 567 B.R. 37, 53 (Bankr. W.D.N.Y. 2017) (avoidance actions pursuant to section 544 "are not subject to the *Wagoner* rule or the *in pari delicto* doctrine"); *In re NJ Affordable Homes Corp.*, No. 05-60442, 2013 WL 6048836, at *29 (Bankr. D.N.J. Nov. 8, 2013) (trustee's status "preclude[s] application of the *in pari delicto* defense and the parallel doctrine of unclean hands to all of his avoidance actions"); *see also In re Davis*, 785 F.2d 926, 927 (11th Cir. 1986) ("since the trustee's claims are for the benefit of the creditors, the fraud of the bankrupt does not require them to be forfeited."); *In re Vaughan Co. Realtors*, No. 11-10-10759, 2013 WL 960143, at *6 (Bankr. D.N.M. Mar. 11, 2013 (under section 544(b), "the trustee stands in place of an unsecured creditor rather than the debtor. Since the claim is viewed from the creditor's perspective, the claim has not been tainted by the debtor's wrongdoing.") (internal citations omitted).

Ms. Azari does not contest the legal basis of Plaintiff's argument, at least insofar as it concerns pre-petition conduct of a debtor. [*See* ECF No. 79 (Hearing Tr.) at 71:19–21] ("Pre-

petition debtor committed misconduct. . . . I understand that can't be imputed to a post-petition debtor"). She argues, however, that the Debtor lacks standing to bring its claims seemingly due to the asserted lack of a "triggering creditor," a position that the Court rejects as a basis for summary judgment for reasons discussed above. Defendant further argues that different considerations apply to post-petition conduct of a debtor, at which point the debtor has become the debtor in possession and, in Ms. Azari's view, therefore should no longer be shielded from the litigation consequences of its own misconduct. [*See id.* at 72] ("What we have is just the debtor in possession committing misconduct, and then pretending that it shouldn't be held liable for its own misconduct after the petition date.").

Ms. Azari's argument, however, understates the broad sweep of the case law relied upon by Plaintiff Wansdown. [*See* ECF 65 ¶¶ 100–05]. At argument, Ms. Azari referenced one case as going to the different implications of post-petition as opposed to pre-petition debtor conduct, but that case does not support binding innocent creditor beneficiaries of a section 544 avoidance action to a debtor's misconduct. [ECF No. 79 (Hearing Tr.) at 76; *see* ECF No. 65 at ¶ 98 (citing *Simon J. Burchett Photography, Inc. v. Maersk Line, Ltd.*, No. 20-CV-3288, 2020 WL 8261580, at *9 (S.D.N.Y. Dec. 20, 2020), *report and recommendation adopted*, 2021 WL 1040472 (S.D.N.Y. Mar. 18, 2021))]. *Burchett* did not involve bankruptcy, much less section 544 claims; rather, it was a Magistrate Judge's report and recommendation concerning a motion to dismiss a commercial dispute involving licensing of rights to use a photographic image in light of an arbitration agreement among the parties, in which the Court recommended staying the action pending arbitration. And, for good measure, the Court termed the unclean hands issue before it "mere makeweight," 2020 WL 8261580, at *9, and flatly concluded, "[t]here is no basis for an unclean hands argument," *id.* at *10. In addition, Plaintiff Wansdown plausibly contends that any linkage

between the complained-of conduct and the issues raised in this avoidance action are tenuous at best; whether the Confession of Judgment is avoidable under DCL sections 274 and 275 turns in large part on whether the exchange was for fair consideration, whether the Confession left the debtor with unreasonably small capitalization, and whether Wansdown (through Golsorkhi) intended or believed that, following the Confession, Wansdown would incur debts beyond its ability to pay as they mature.  It is unclear to the Court what if any impact the asserted "lies" identified by Azari have on those questions.

Lastly, Ms. Azari contends that the Debtor should not be able to use section 544(b) as both a sword (promoting recovery for the benefit of creditors) and a shield (preventing use of section 544 proceedings to shield the debtor from equitable defenses).  But that dynamic is exactly what section 544 and the case law calls for – protection of innocent creditors from losing the benefit of remedies they enjoy under the Bankruptcy Code simply because a debtor engaged in misconduct, where a trustee or debtor in possession pursues a remedy from which creditors will benefit.

This motion-dispositive conclusion means that the Court need not decide Wansdown's additional arguments based on claim and issue preclusion theories (which have some force), as well as Wansdown's argument that its section 544 claims sound in law and are not susceptible to equitable defenses (about which case law appears inconsistent).

Accordingly, Plaintiff's partial summary judgment motion as to Defendant's First and Second affirmative defenses is granted.

## CONCLUSION

For the foregoing reasons, the Court **denies** Ms. Azari's motion for summary judgment, and **grants** Plaintiff's partial motion for summary judgment as to the Complaint's First and Second affirmative defenses.  The parties are to settle an order to that effect, and to contact chambers to

schedule a case management conference.

It is **SO ORDERED.**

Dated: New York, New York
       November 7, 2022

_s/ David S. Jones_
HON. DAVID S. JONES
UNITED STATES BANKRUPTCY JUDGE